674 F.Supp. 687 (1987)
Craton LIDDELL, et al., Plaintiffs,
v.
The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, MO., et al., Defendants.
No. 72-100C(5).
United States District Court, E.D. Missouri, E.D.
September 3, 1987.
Joseph McDuffie, William P. Russel, St. Louis, Mo., for Liddell plaintiffs.
Michael Middleton, Columbia, Mo., Wayne C. Harvey, St. Louis, Mo., Craig M. Crenshaw, Jr., Jeremiah Glassman, U.S. Dept. of Justice, Washington, D.C., for Caldwell and NAACP.
James J. Wilson, St. Louis City Counselor, St. Louis, Mo., for City of St. Louis.
Michael Fields, Asst. Missouri Atty. Gen., Jefferson City, Mo., for State defendants.
Kenneth C. Brostron, Stephen Cooper, Lashly Baer & Hamel, St. Louis, Mo., for City Bd. defendants.
Joseph R. Neimann, Eric Schmitz and Timothy R. Kellett, St. Louis, Mo., for Special School Dist.
Shulamith Simon, St. Louis, Mo., amicus curiae.
Anthony J. Sestric, St. Louis, Mo., for Ronald Leggett (Collector of Revenue).
Warren M. Brown, Jay Moody, Lake St. Louis, Mo., for Budget Review Committee (BRC).
Tracy Libros, Director, Magnet Review Committee, St. Louis, Mo., for Magnet Review Committee (MRC).
Susan Uchitelle, Director, VICCWright School, St. Louis, Mo., for Voluntary Interdistrict Coordinating Council (VICC).
James Dixon, Exec. Director, Committee on Quality Educ., St. Louis, Mo., for Committee on Quality Educ. (CQ).
Mary Bremner, Exec. Director, St. Louis, Mo., for Desegregation Monitoring & Advisory Committee (DMAC).
Ralph Beacham, Exec. Director, Florissant, Mo., for Metropolitan Coordinating Committee (MCC).
William Knaak, Exec. VP, Convergent Systems, St. Paul, Minn., for Vocational Educ. Advisory Council (VEAC), Bi-Racial Monitoring Team (BRMC).
James Leroy Jones, St. Louis, Mo., Jay Willows, Director, GAMM Project, LaBelle, Mo., for Vocational Educ. Advisory Council (VEAC).
E.J. Williams, Superintendent, New Orleans LA School Dist., New Orleans, La., for Bi-Racial Monitoring Team (BRMT).
Charles Werner, St. Louis, Mo., Robert Bartman, Asst. Com'r, Dept. of Elementary & Secondary Educ. Jefferson City, Mo., for Nat. Educ. Ass'n (NEA).
*688 Andrew J. Minardi, Joseph Ferry, St. Louis, Mo., for St. Louis County defendants.
Robert G. McClintock, St. Louis, Mo., for Ladue School Dist.
George J. Bude, St. Louis, Mo., for Clayton, Hancock Place, Brentwood and Bayless School Districts.
Kenneth V. Byrne, St. Louis, Mo., for Valley Park School Dist.
Donald J. Stohr, James Erwin and R.J. Robertson, St. Louis, Mo., for Parkway School Dist.
Douglas A. Copeland, Robert W. Copeland, St. Louis, Mo., for Webster Groves and Rockwood School Districts.
John Gianoulakis, Mark Bremer, St. Louis, Mo., for Ritenour, Pattonville and Mehlville School Districts.
Richard Ulrich, James Sanders, St. Louis, Mo., for Maplewood and Richmond Heights School Districts.
Frank Susman, Norman C. Parker, St. Louis, Mo., for Ferguson-Florissant School Dist.
Edward E. Murphy, Jr., Garry E. Selzer, St. Louis, Mo., for Riverview Gardens School Dist.
Robert P. Baine, Jr., St. Louis, Mo., for Hazelwood School Dist.
Henry D. Menghini, Robert J. Krehbiel, Evans & Dixon, St. Louis, Mo., for Lindbergh and Affton School Districts.
Bertram Tremayne Jr., St. Louis, Mo., for Kirkwood and University City School Districts.
Darold E. Crotzer, Jr., St. Louis, Mo., for Normandy, Wellston and Jennings School Districts.

MEMORANDUM OPINION
LIMBAUGH, District Judge.
It was the best of times for the St. Louis city school system. The coveted Triple AAA rating bestowed by the Missouri Department of Education has again been received. A quality education is generally provided for all the city children attending public schools. A sound faculty of teachers and principals are dedicated to use their utmost talent in developing the skills of their students. Parents and friends are caring more about the children and are beginning to work with the educators in the business of youth education. The breadth of educational opportunity is unlimited.
An impressive black principal of an all black primary school and his remarkable first assistant stated "our goal is to make certain these children learn to communicate and when they leave our school for middle school, they can."
A white principal of a mixed middle school remarked that "these students are now being exposed to sophisticated educational experiences and they will be equipped to take their place in this competitive society."
A high school principal observed that "our teachers are back to the basics with their students, but a huge variety of other educational opportunities exists."
Throughout the system, remedial programs are administered to those students with learning disabilities and devoted teacher after teacher provide tender care for these youngsters giving them "something to hang on to."
Enrichment programs are evident and are receiving increased attention. It is amazing to enter a room in which a dozen or more fifth graders are each performing an assignment on their Apple-type computers.
An air of friendly but strict discipline pervades the system. Respect is being instilled. When the principal enters the room in some delightful primary schools, the children rise and acknowledge in animated voices, "Good morning Ms. ______."
There is great pride among the middle and high school students. Their excellent art work is everywhere. They are striving to keep their schools clean and presentable. Custodial staffs are attentive to their duties. School spirit abounds. In many difficult situations, racial problems are alleviated and the number and intensity of racial incidents remains low.
*689 Parents and relatives are coming to school meetings and are working with the teachers in seeking the best educational interests of the children. On Saturdays and after hours, some parents can be seen with the children painting the walls of school buildings with paint and equipment they provide themselves.
Vocational education is virtually unlimited. Students can receive special training in every field imaginable. A young black female has just finished a difficult welding assignment done with a highly sophisticated computer system. Others are in aviation mechanics or are using all trades to build a house (within the school confines), or are developing beautician skills or a host of other things. A middle school has its own radio broadcasting network.
Teachers, principals and administrators, generally, have worked diligently to promote a sound integrated school system and much progress has been made. It is a good school system.
But, it was also the worst of times for the St. Louis city school system.[*] The schools have not received major repairs in the memory of most of the staffs. Roofs leak in over half the schools. The leaks receive only temporary attention. In classroom after classroom, in gymnasiums, in libraries and study halls and in cafeterias, water is everywhere. It drips from the ceiling, down the walls and even from light fixtures.
Cans, buckets and other receptacles are all over. A sixth grader in a reading class leans over in her chair to avoid the steady drip of water going into a bucket at her feet.
Some of the plumbing is intolerable. On one occasion in a school when the water was flushed from a urinal, portions came down a wall in the room below, while a devoted teacher was attempting to teach her students in that room.
Ceiling tile in many rooms no longer exists or is so permeated with water that it hangs perilously. Plaster falls to the floor sometimes placing the student or teacher in some danger.
Paint peels from many walls and exposes the plaster or wall board and sometimes the studs.
Many buildings are old and dilapidated and were designed for education seventy-five years ago. Some have no gymnasiums. Others have gymnasiums, but the ceilings are only seven or eight feet high. In many schools, a student must bend or duck going from some rooms to others to avoid hitting exposed pipes or mechanical supports.
In the face of this deplorable and impossible situation, those in charge use bandaids to cover gaping wounds and, with some hypocrisy lament the lack of funds to conduct a necessary structural overhaul of the city school buildings as being the sole basis of their inaction.
And, too, without addressing them, the school system has its other problems and deficiencies as do all metropolitan schools.
This opinion, therefore, addresses the capital improvement problems of the city integrated and non-integrated schools as well as those of the existing magnet schools and those which may reasonably be needed in the foreseeable future.
Although this case was filed in 1972, the physical condition of the schools was not considered until the so-called Settlement Plan was approved and later accepted by the Court. No attempt will be made here to recount the history of the events leadings to the enactment of the Settlement Plan as it has been adequately reviewed in Liddell v. Board of Education of City of St. Louis, 567 F.Supp. 1037 (E.D.Mo.1983), *690 and Liddell v. State of Missouri, 731 F.2d 1294 (8th Cir.1984).
The Settlement Agreement basically was an attempt to address previous determinations of this Court and of the United States Court of Appeals for the Eighth Circuit, that the defendant Board of Education of the City of St. Louis (City Board), and State of Missouri defendants were liable because of their establishment and maintenance of a racially segregated public school system within the City of St. Louis. The remedy for the liability was ordered in 1980 by this Court, (Meredith, J.), Liddell v. Board of Education, 491 F.Supp. 351 (E.D.Mo.1980). The order directed the implementation of a mandatory, intradistrict desegregation plan within the City of St. Louis public school system, and the development and submission of plans involving voluntary interdistrict transfers between suburban school districts and the St. Louis city school district.
Following the 1980 order, the Court approved two interdistrict transfer plans (the 12(a) voluntary plan and the 12(b) vocational education plan). The 12(c) Settlement Plan was approved in 1983 in Liddell v. Board of Education of City of St. Louis, 567 F.Supp. 1037 (E.D.Mo.1983). This was done after a fairness hearing in which all parties had complete opportunity to present evidence and the point of view of each.
The physical condition of existing schools following the Settlement Agreement (Settlement Agreement and Settlement Plan are used interchangeably), was first addressed by the appellate court in Liddell VII, 731 F.2d at 1318 (decided February 8, 1984). As noted in Liddell VII, p. 1318, the Settlement Agreement suggested the age and condition of the city schools.[1] The Court in Liddell VII, at p. 1318, also observed that over the years, the school board has attempted unsuccessfully to raise funds to provide for school improvements.[2]
In approving the 12(c) Settlement Plan, Liddell, supra, 567 F.Supp. 1037, the District Court (Hungate, J.)[3] ordered that:
(b) The City Board shall submit to its voters, on or before February 1, 1984, a proposed bond issue of an amount determined by the City Board as sufficient to meet those of its capital improvement needs as are deemed necessary to meet its constitutional obligation to desegregate the city's public schools; (and) (c) Should that bond issue fail to obtain the two-thirds majority vote required by state law, the court will consider an appropriate order to obtain the funds deemed sufficient to meet the capital improvement needs of City Board in complying with its constitutional obligation to desegregate the city's public schools.
Liddell supra, 567 F.Supp. at 1056 and Liddell VII, supra at 1318.
Following the District Court's order, the City Board formulated a building program with a total cost of $127,000,000.00 with one-half of the total to be financed by the issuance of $63,500,000.00 in City Board bonds. Ostensibly, the other one-half was to be paid by the State of Missouri.
The bond issue was presented to the voters on November 8, 1983 and 55% of the voters approved the issue. Eighty-four percent of the voters in the predominantly black wards voted for the issue, but 65% of the voters in the predominantly white wards voted against it. The bond issue was defeated because it failed to receive a *691 two-thirds majority. Liddell VII, supra at p. 1319.
Following the February 8, 1984 Liddell VII decision a bond issue identical to the one defeated on November 8, 1983 was again submitted to the voters on June 5, 1984. It, too, was defeated with a voting pattern similar to that in the 1983 election.
The Court of Appeals for the Eighth Circuit specifically held in Liddell VII, supra, at p. 1319 "that the State had an obligation to pay one-half of the costs of the capital improvements program necessary to restore the city facilities to a constitutionally acceptable level ..." The Court of Appeals in Liddell VII, supra, at p. 1319 also directed,
On remand, therefore, the City Board should promptly identify the projects to be undertaken, estimate the cost of each project, and set a reasonably detailed schedule for the completion of each project. The projects having the highest priority must be scheduled for completion at the earliest possible date. To that end, the City Board should consider the desirability of a referendum on a bond issue which can be initiated at a very early date, and subsequent bond issue for those projects to be built in later years. The State will pay one-half of the cost of preparing the detailed plans and schedules.
As soon as the City Board has prepared the new plans, estimates and schedules, it shall submit them to the Budget Review Committee, discussed infra Section VI, and then to the district court. When the District Court has approved them, a new bond issue shall be submitted to the voters. If it is defeated again, the District Court shall determine how the improvements shall be funded. See infra Section V.
Following the decision in Liddell VII of February 8, 1984, the District Court directed the United States Magistrate to conduct an evidentiary hearing and recommend the legal standard to be applied in ascertaining the desegregation-related costs of a capital improvements program for the schools operated by the Board of Education in the City of St. Louis. After extensive hearings, United States Magistrate Noce filed his report and recommendation on October 17, 1984, H(3422)84. Although a standard was not set out with specificity, Magistrate Noce noted that there ought to be no distinction in the basic quality and educational usefulness of the capital facilities of the non-integrated schools, the integrated schools, the magnet schools, or any capital asset necessary to spport any remedial program. Districtwide, the capital facilities must be brought to a uniform minimum level of educational utility. No specific order of the District Court was ever entered approving or disaffirming the findings of the Magistrate.
During the same period of time, the City Board determined that professional assistance would be needed in the capital improvement area to follow the mandate of Liddell VII, so as to enable it to "identify the projects to be undertaken, estimate the cost of each project and set a reasonably detailed schedule for the completion of each project." Liddell VII, at 1319.
The professional assistance needed would include engineers and architects who could survey the approximate 150 schools in the system and make recommendations to the City Board and to the Court. While discussions were being carried out between the State and the City Board concerning the procedure to be followed to employ professional assistance, Judge Hungate was relieved of the responsibility of handling this case and on February 1, 1985, Judge Limbaugh was appointed as the successor to Judge Hungate.
On March 20, 1985, the State and the City Board reached an accord and agreed to prepare jointly an invitation to submit bids to employ architects and engineers to make the necessary evaluation of the capital improvement problem. The parties agreed to share the cost equally for the preparation of detailed plans and schedules. L(122)85. On April 15, 1985, the Court approved the agreement of the State and the City Board and ordered the parties to file a joint report on the status and *692 findings of the facilities study no later than August 15, 1985. L(160)85.
During this period, the United States Court of Appeals for the Eighth Circuit rendered Liddell VIII on March 26, 1985. Liddell v. Board of Education of City of St. Louis, 758 F.2d 290 (8th Cir.1985). That Court in addressing the capital improvement problem determined that "the district court shall on remand direct the City Board to prepare promptly a building program, not to exceed $40,000,000.00 to meet the most urgent capital needs of the district, with emphasis on the all-black schools and the magnet schools." The appellate court then directed the district court to conduct a hearing in order to determine that all projects in the program are necessary to cure constitutional deficiencies in the City Board's facilities. If the district court determined that question in the affirmative, it was directed to order the City Board to submit a bond issue of up to $20,000,000.00 to the voters which was to be matched by the State. If the bond issue failed, then the appellate court stated that "the district court shall enter a judgment against the City Board in the amount determined and in an equal amount against the State." The appellate court determined further that "we recognize the need for long-term planning, and that should proceed, but the needs of the all-black schools appear to be so obvious that they should be met at the earliest possible time." The Court then went on to address further suggestions as to a capital improvement plan as to new magnet schools authorized under the Settlement Agreement.
The appellate court did not explain the basis on which it had arrived at a total of $40,000,000.00 but apparently, it was calculated on the basis of a recommendation of the financial advisor that a bond issue of $20,000,000.00 would have continued the debt service levy for the City Board at a rate which was required to retire a 1964 bond issue in 1984. Liddell VIII, at 302.
The decision in Liddell VIII caused some concern as well as confusion to the new Judge who had just been assigned the 13-year old complex litigation for a period less than two months and to the parties as well. At that point, the parties had agreed on the mechanics for obtaining professional help to determine the proper method for meeting the criterion in the capital improvements area of all of the city schools within the guidelines of Liddell VII. It finally became apparent that the mechanics and the cost for preparing a building program for $40,000,000.00 to meet urgent capital needs of the district with emphasis on all-black schools and the submission of the program to the Budget Review Committee, the holding of a hearing for the purpose of determining that the projects in the plan are necessary to cure constitutional deficiencies and the ultimate submission of a bond issue for one-half of that cost, would require not much less effort than if the planning was directed to the entire school system. After consultation with counsel for the parties, it appeared more feasible to attack the problem as a whole for it would be a duplication of effort and cost to plan for urgent needs utilizing an uncertain sum of $40,000,000.00, all the while duplicating this effort with a long-range plan.
Accordingly, this Court read all of the opinions of the Court of Appeals in pari materia and determined that the proper function of the district court would be to urge the planning to continue to apply to the school system as a whole as this plan would produce costs obviously in excess of $40,000,000.00 and as the framework for the payment of these costs had been established by the spirit and intent of Liddell VII and the other decisions of the appellate court.
The engineering firm of Zurheide-Herrmann in St. Louis, Missouri was employed and it began the facility study of all of the City Board schools. This study was necessary for long-range planning with respect to all schools and would have been equally necessary in addressing the specific $40,000,000.00 program set out in Liddell VIII. Obviously, a study of all the schools must be made before it could be determined what "the most urgent capital needs of the district, with emphasis on the all-black schools" were.
*693 As the Zurheide-Herrmann study progressed, the lack of cooperation of the City Board and the State became evident, as was noted in an order of the District Court on August 30, 1985. L(446)85. In that order, the District Court directed that after the Zurheide-Herrmann facilities study is filed, the Court would hear oral arguments and accept briefs regarding the issue of the applicable standard to be utilized in an ultimate determination as to which capital improvements are desegregation-related. After the Court determined the applicable standard, the parties were then directed to propose a detailed capital improvement program pursuant to the standard and those needs addressed by the Zurheide-Herrmann study. The Budget Review Committee was to consider the proposal and the arguments of the parties, and then report its findings to the Court and all parties were entitled to provide input for the benefit of the Court in making an ultimate decision. This Court announced its ambitious plan to have a proposal to submit to the voters with respect to a bond issue in early 1986.
On September 13, 1985, in response to requests by both the City Board and the State, the Court stayed the time requirements relating to capital improvements because of the requests by the City Board to propose a bond issue of $155,300,000.00 on the November 5, 1985 ballot. At that point, it was represented that the city administration and other influential entities were prepared to support this issue which the City Board felt would be adequate in and of itself to address the overall capital improvement needs of the city school system. As the Zurheide-Herrmann study had still not been completed, and as nothing could proceed further without the benefit of that study, the District Court stayed the original schedule.
The November 5, 1985 bond issue of $155,300,000.00 was defeated with 56.2% approving the issue when 66 2/3 was required. Only 33% of the registered voters voted and in the predominantly white wards 31% voted in favor of the issue and in the predominantly black wards 88% voted in favor of the issue and 74% voted in favor of the issue in the mixed wards. Only 26% of the registered voters voted in the predominantly white and black wards, and 36% of the registered voters voted in the mixed wards.
On November 14, 1985, shortly after the election, the Zurheide-Herrmann study was filed. It contained over 50 pages of recommendations with well over 6,000 pages of supporting data.
After the study was filed, the Court addressed the schedule which had been on hold, pending the election. On January 10, 1986, a standard was established for determining what capital improvements are desegregation related. L(680)86. In setting out that standard, the Court considered the findings of Magistrate Noce on October 17, 1984, H(3422)84, the briefs and arguments of all of the participating parties, all other relevant information in the case file and the opinions of the Court of Appeals involving this case. This Court noted that "capital improvements are part of the remedial effort to eliminate the effects of a dual-system. The purpose of the total desegregation plan is to remedy the vestiges of segregation and to attract and maintain white students. The goal is to provide `quality, integrated educational opportunities to black and white students alike.'" Liddell VIII, at 304.
This Court continued by finding that "everyone agrees that the physical condition of many city schools is in a deplorable state. Thirty years of neglect by the City Board cannot be condoned; however piecemeal repairs will not promote the desegregation effort. Equal educational opportunity mandates that district-wide, capital facilities must be improved. There are limitations in achieving a uniform minimum level of educational utility. The city schools must meet the basic requirements of safety and health standards in order to enhance the appeal of the city schools, especially to suburban white students. Additional renovation work must be necessary for the implementation of the approved 12(c) programs."
The Court then set the standard, perhaps in an simplistic way, by holding that "summarily, *694 desegregation-related capital improvements are those expenditures necessary for the city schools to fulfill the bare minimum requirements of the St. Louis city safety and health codes, and to provide the facilities necessary to implement the 12(c) programs." This Court then directed the City Board to propose a desegregation-related capital improvements plan without regard to a fixed monetary amount. The City Board was further directed to give top priority to the non-integrated schools and the intra-district magnet schools, to have a school-by-school breakdown similar to the Zurheide-Herrmann report format, to consider demographic trends and all other areas which would conform to the standard announced. L(680)86.
Again, the enormity of this directive was obvious. It was equally obvious that a same or similar type of directive would have been necessary to carry out the specific $40,000,000.00 mandate set out in Liddell VIII. In addition, it became apparent that substantial time would be needed to meet the District Court's directive, but the end result anticipated was thought to overcome the necessary delay. Accordingly, the City Board was to comply with the District Court's order, L(680)86, on or before May 1, 1986, and all interested parties were to respond to the proposal on or before May 16, 1986. L(734)86.
In this Court's order, L(680)86, certain guidelines for the capital improvements plan were stated. The guidelines were to be met with the data collected in the Zurheide-Herrmann facilities study. These guidelines suggested that top priority be given to nonintegrated and intra-district magnet schools, that consolidation of enrollments be considered with closing of small schools, that there be rehabilitation of buildings presently in operation only, that low priority be given to schools which probably should close within the next five years, and that plan standards be in compliance with minimum local, state and federal health and safety requirements and codes.
In response to the order, L(680)86, the City Board filed its so-called "680 Plan" on May 1, 1986. In general, the plan provided for the rehabilitation of 127 buildings for approximately $145,000,000.00. The City Board plan used as its source material the Zurheide-Herrmann report, as well as the so-called "Billingsly Report" and the "Winsor Model". The Billingsly Report forecasts four population scenarios for the City of St. Louis. The Winsor Model is an educational prototype used to formulate plant-classroom capacity and sets standards of educational requirements for physical improvements.
The 680 Plan is based upon a projected enrollment in the City of St. Louis in 1990 of 53,399 students. This number is somewhat misleading, as it fails to account for the 10,000 approximate transfer students which could serve to reduce the resident student population to 43,399 persons. The 680 Plan of the City Board also utilizes a lower pupil-teacher ratio than that required by Liddell IX, which will be addressed later, or those set out in AAA requirements. Finally, the Winsor Model prototype allows for extremely generous space allocations. Otherwise, the 680 Plan basically adheres to the guidelines set forth in L(680)86.
There were various responses to the City Board's 680 Plan by the parties, some of which were favorable and others of which were not.
The Court finds that the projected population figure of the 680 Plan is, in fact, flawed because the student population estimate did not account for the 10,000 students transferred from the City to the County, and the pupil/teacher ratios conflict with the directives of Liddell IX. The Winsor Model is impractical when applied to an old urban school district.
Unfortunately, the Court finds that certain data in the Zurheide-Herrmann Report is flawed. There are some serious inconsistencies in the unit costs which will be addressed later. In addition, the recommendations of the 680 Plan, based upon Zurheide-Herrmann data can be considered extravagant. For illustration, suggestion was made that all boilers in a building which were old should be replaced whether or not they were in good working condition.
*695 In addition to the 680 Plan calling for an approximate $145,000,000.00 expenditure, the City Board also projected a long-range facilities plan whereby all schools in the system should be rehabilitated in accordance with the data set out in the Zurheide-Herrmann Report for $420,000,000.00. This figure included 10% for architect costs, as well as a 5% built-in inflation cost. At least 150 buildings were involved in this proposal.
The State of Missouri chose not to analyze the Zurheide-Herrmann data or the City Board's 680 Plan, and instead, it proposed an alternative in response to the directives of L(680)86. The State's plan, L(1047)86, assumed that the 1985-1986 enrollment of city students would remain stable, and then projected a 1990 enrollment of 42,298 persons. This reflected the magnet school enrollment and the city to county transfer students. The State plan rejected the Winsor Model, and used AAA standards in calculating the classroom capacity required. The State proposed that only 67 schools be rehabilitated for a cost of approximately $44,000,000.00. The State's plan did utilize Zurheide-Herrmann unit costs, however, it eliminated certain projects which it considered to be non-desegregation related. These involved energy efficient items, accoustical ceilings, fluorescent lighting, landscaping, removal of graffiti, handicap-accessibility items in the form of elevators, etc. The plan also did not provide for fees for architects, engineers or contingencies.
During the late summer and early fall of 1986, the Court conferred with representatives of the State and the City Board for the purpose of attempting to reach some accord as to various aspects of the problem. Thereafter, the Court was prepared to address the issues and make a final determination.
During this time, the Court of Appeals for the Eighth Circuit rendered an opinion referred to as Liddell IX, 801 F.2d 278, which was issued September 5, 1986. In that opinion, the Court noted that several bond issues had been submitted to the voters and rejected. The Court then directed "that upon receipt of this opinion, the Board of Education of the City of St. Louis shall prepare a capital improvement program for the non-integrated elementary and middle schools which is estimated to cost not more than $40,000,000.00. It shall provide for the replacement or complete rehabilitation of the buildings and grounds of those non-integrated elementary and middle schools which (1) are in the worst physical condition and (2) are so located that the best available demographic studies indicate that they will continue to serve students for the foreseeable future. This program should be presented to the district court within thirty (30) days of the receipt of this decision. (The parties have advised this Court that a comprehensive study and report of repairs to the entire school system has already been accomplished.) Thereafter, the District Court shall promptly either approve the program as submitted, or make such modifications in the program as it feels necessary to carry out the mandate of this Court. At the earliest possible date after such approval, a bond issue for the sum of $20,000,000.00 shall be submitted to the voters of the City of St. Louis. If the voters fail to approve the issue by the required majority, the District Court shall follow the course set forth in this Court's en banc opinion in Liddell VII, 731 F.2d at 1323, as reiterated in Liddell VIII, 758 F.2d at 302." This directive in Liddell IX obviously created a substantial dilemma to the District Court as well as to the parties involved. The parties had spent $800,000.00 for the Zurheide-Herrmann study, the District Court had established a standard for the parties to follow and various plans had been submitted in response to the standard and the data in the Zurheide-Herrmann Report. At the time of the issuance of Liddell IX, the District Court was in the process of preparing an order which would address the capital improvement program for the entire city district and the proper methods of financing the project. Liddell IX, on the other hand, gave specific directions for handling the matter on a piecemeal basis.
On October 6, 1986, in response to Liddell IX, the City Board filed a $40,000,000.00 *696 capital improvement site selection plan. The plan envisioned renovation costs of seven middle schools, and eight elementary schools, which were non-integrated and the data used as to the cost was that included in the Zurheide-Herrmann study. Other parties responded to the City Board's plan, L(1093)86, and the dilemma was then placed squarely in the District Court.
This Court reasoned that even the specific mandate of Liddell IX could not be carried out with any more rapidity that the overall school plan, the solution for which was also before the District Court.
Accordingly, the District Court, on October 17, 1986, directed that an evidentiary hearing be held on December 8, 1986, for the purpose of having available for testimony and questioning representatives of Zurheide-Herrmann and others who have been instrumental in collecting and preparing the data and the material in the various plans before the Court. This Court stated in the order, L(1113)86, that the information needed to make a final determination as mandated by Liddell IX, as well as the other decisions of the appellate court, is contained in the Zurheide-Herrmann facilities study, L(598)85, City Board's desegregation related capital improvements plan, L(852)86, the City Board's long-range facilities plan, L(857)86, the State's response to these documents, L(1047)86, and the City Board's $40,000,000.00 capital improvement site selection plan, given in response to Liddell IX, L(1093)86.
The evidentiary hearing was held when scheduled and at the beginning of 1987 the District Court began the task of making a final resolution of the capital improvements problem, keeping in mind the directives of all of the decisions of the Court of Appeals.
Beginning on April 22, 1986, and on sporadic occasions since that time, the Court personally visited representative schools in the system. At the time this opinion is written the Court will have been in and examined 43 of the schools involved. These include representative schools in the primary, middle and high school level and integrated, non-integrated and magnet schools. During these visitations, the Court has examined the physical facilities, observed classroom teachers and students and had personal conversations with principals and members of their staff, teachers, students and maintenance staff personnel. In addition, the Court has observed at least 20 other schools from the outside without an intimate examination of the interior.
The Court has also directed its financial advisor, Warren M. Brown, Chairperson of the Budget Review Committee (BRC), and his associate Jay Moody, to gather certain material and data for the benefit of the Court from the Zurheide-Herrmann report and other documents on file in this case. In particular, Brown and Moody were directed to inspect all of the schools in the system, analyze the Zurheide-Herrmann Report, project enrollment and consider budgetary requirements for capital improvements. The Court has carefully reviewed all of the appellate decisions in this case, as well as the District Court findings concerning capital improvements, the City Board proposals as well as those of the State of Missouri and the responses of all of the parties to those proposals, the evidence adduced at the capital improvements hearing, and all other pertinent matters in the file of this case relating to capital improvements. With that review and after the Court's personal examination of representative schools and after conferences with Warren Brown and Jay Moody concerning their assignment, the Court is now ready to enter findings of fact upon which an order can be entered.
In its order, L(680)86, this Court stated its intention to approve a district-wide plan for facilities rehabilitation, based on the following standard for desegregation-related capital improvements: The order:
1. Gives top priority to nonintegrated and intradistrict magnet schools.
2. Encourages consolidation of enrollments and closing of small schools.[4]

*697 3. Includes only buildings which are now in operation.
4. Abandons or gives low priority to schools which probably should close in the next five years.
5. Requires a plan of work which describes each particular facility improvement in detail (i.e., renovation or rehabilitation work on an existing building).
6. Includes projects which meet St. Louis health and safety codes.
7. Provides facilities necessary to implement approved 12(c) programs.
In response to the order L(680)86, the Board filed its Desegregation Related Capital Improvements Plan, L(852)86 (Plan 680), which met in part and exceeded in part the provisions of the order L(680)86. The Board's response to the order contains two proposals. The Plan 680, L(852)86, restates the Board's Zurheide-Herrmann (ZH) costs for rehabilitating 127 buildings, taken from L(598)85. The Plan 680, costing $145,000,000 is presented as a subset of a comprehensive long-range facilities plan, the second part of which would cost another $145,000,000 plus escalation costs. [L(857)86]. The Board has left out capital costs for 17 current and future 12(c) magnets, pursuant to L(680)86, which are subject later to 100 percent state financing. It contends that the entire plan is essential to meet desegregation objectives. The Plan 680 conforms to the Board's interpretation of the order L(680)86 which the Board believes is too restrictive.
The State's response to the order L(680)86 and to the Board's plan recites each of the elements of the Court's standard, shows how the Board allegedly exceeds it, and proposes an alternative plan to meet the State's interpretation of the order. [L(1047)86]. The State concedes an obligation to help pay for capital improvements which are needed to meet desegregation objectives, not those which generally upgrade the educational system. The State analyzed the validity of ZH improvement recommendations by visiting a sample of 40 schools. The State's architectural consultants reported that ZH unit costs for construction projects in the schools visited were reasonable. The State agrees with many projects proposed by the Board but rejects others as unnecessary to meet Court standards. The State agrees that 67 of the 127 buildings proposed by the Board should be rehabilitated (using State-approved projects). The State also accepts the Board's Billingsley enrollment projections for the year 1990 as a basis for planning.
Architects, engineers and educators who have inspected the Board's facilities find them to be fundamentally sound although in a condition of deterioration. The Court agrees with this concensus opinion. As a practical matter, these soundly constructed buildings should be the base point from which facilities improvements proceed. The most productive approach is to start from today's realities and to move forward constructively to rehabilitate existing facilities. Further, the cost of the plan to rehabilitate buildings currently in use is within the Board's financial means, as detailed later in this opinion.
Recognizing the urgent need for prompt action to rehabilitate existing school facilities in St. Louis, as noted in the Settlement Agreement, Section IV, 9-12, H(2217)83, and in numerous orders and related filings, this Court's approved capital improvements plan embraces the following objectives:
1. Provide completely rehabilitated buildings and grounds for a sufficient number of nonintegrated, magnet, integrated, and special school facilities to house enrollments projected for the foreseeable future.
2. Provide sufficient classroom space to accommodate projected enrollment in accordance with (1) court-mandated pupil/teacher ratios in nonintegrated schools and magnets and (2) current pupil/teacher ratios in integrated schools, which now exceed AAA accreditation requirements.

*698 3. Make space available to accommodate court-approved 12(c) programs such as (1) preschool rooms, kindergartens, libraries, art, music and physical education facilities, and special education rooms in all schools; (2) enrichment labs and schools of emphasis in nonintegrated schools; (3) computer labs in nonintegrated middle and high schools.
4. Consolidate enrollment, housing students in larger buildings which are in sound operating condition.
5. Provide a planning and reporting system for completion of all needed capital projects and for continuing maintenance of physical school plant.
6. Set aside a stream of revenue to meet the Board's obligation to fund capital expenditures needed to restore, repair, maintain, or enhance existing facilities. Provide matching State funding for all desegregation-related capital improvements.
7. Make funds available at the earliest possible date so that the most urgent work can begin promptly.
8. Provide for a continuing flow of revenue to be applied to desegregation-related capital projects and to the ongoing maintenance of facilities after improvements are completed.
The Court's plan is detailed under the following nine identified issues:
(1) the target year for planning;
(2) the projected enrollment to be used for planning purposes;
(3) the 12(c) programs to be accommodated;
(4) the capacity of presently operating schools;
(5) consolidation of facilities;
(6) the number of buildings needed to house projected enrollments;
(7) the construction projects approvable as desegregation-related;
(8) the budgeted cost of rehabilitation and reconfiguration projects; and
(9) the method of financing the proposed plan.

Target Year for Projections
What is an appropriate target year for estimating Board enrollments for the purpose of determining plant capacity needed to meet constitutional requirements? This section of the plan summarizes the parties' positions as compared with Court guidelines.
Directions from the Courts
The Court directed the City Board to conduct a long-range study of the City Board's plant facilities, `especially in light of possible changes that may occur throughout the course of this remedial effort in student and staff populations, as well as in specialized educational programs.'
L(680)86, page 2.
... [B]uildings closed as of this date are not to be considered for renovation. The vitality of open schools must be closely scrutinized in light of declining enrollment as pointed out in Liddell VII ... Schools with low enrollments, which in all reasonable probability should close in the next five years, are good candidates for consolidation and the capital improvement needs for some should be abandoned or prioritized accordingly.
Id., page 7.
Nonintegrated elementary and middle schools planned for rehabilitation should be "so located that the best available demographic studies indicate that they will continue to serve students for the foreseeable future."
Liddell IX, 801 F.2d at 284.
With regard to determining the facilities needed to reach a 20:1 pupil/teacher ratio, "planning should assume that by 1990, fewer than 15,000 black students will be attending non-integrated schools in the city."
Liddell XII, 823 F.2d at 1254.
The Board uses the year 2000 as its target year for enrollment projection. The Board believes that redevelopment in the city, improvements to school facilities and K-12 curriculum revisions toward the year 2000 will revitalize the educational program in the public schools. Significant enrollment increases will result. To plan for the *699 short-term will not embrace long-run upward trends in enrollment. Therefore, the year 2000 has been selected for program, enrollment, and plant improvement planning. If enrollment gains do not materialize, proposed plans can be scaled down over the proposed four-year construction period without disadvantage to the plant improvement program.
The State chooses the year 1990-91 because it believes that enrollment projections beyond five years are speculative and because the desegregation-related capital improvements program should not be concerned with growth which may occur independent of any past constitutional violation. The last victim of the dual system will graduate in 1991. The State accepts Billingsley's 1990 enrollment number using the "most optimistic scenario."
This Court and the Eighth Circuit have repeatedly used the phrase "foreseeable future" in connection with capital improvements. A five-year limit (from 1986) was set in Order L(680)86. The Eighth Circuit utilized the school years 1989-1990 and 1990-1991 as target years with regard to enrollments in the interdistrict magnets and the nonintegrated schools. All these factors suggest a target year of 1990. The Court finds that for planning purposes, with regard to capital improvements, the year 1990 provides the most reasonable target year for projected enrollment analysis. Beyond 1990 is simply too speculative.

Enrollment Projection
What is a reasonable estimate of the enrollment to be served in the target year 1990-91, taking into account demographic changes and the relocation of students under the Settlement Plan?
Directions from the Courts.
"Planning and scheduling are important in view of the expected decline in enrollment."
Liddell VII, 731 F.2d at 1319.
The Board shall plan to improve those nonintegrated elementary and middle schools so located that the best available demographic studies indicate that they will continue to serve students for the foreseeable future.
Liddell IX, 801 F.2d at 284.
The goal must be to have 2,000 more students in interdistrict magnets by 1987-88 and a total of 6,000 by 1989-90.
Liddell IX, at 282.
... planning should assume that by 1990 fewer than 15,000 black students will be attending nonintegrated schools in the City.
Liddell XII, 823 F.2d at 1254.
The Board projects its target year 2000 local enrollment at 61,995 (including 3,930 county transfers). The enrollment projections used in the Plan 680 are from the 1984 Phase I report, "Population Analysis: St. Louis Public Schools," by Billingsley Consultants. Four population scenarios, with attendance enrollment scenarios, were developed. The projections ranged from continued decline to stabilization followed by moderate growth. The 680 Plan uses the most optimistic scenario of stabilization followed by moderate growth. Billingsley employed a projection technique which extracted public school enrollment from projected total school-age population, based on an assumed "capture ratio." For 1990, Billingsley Consultants project 51,584 in its "most optimistic" scenario, assuming stabilization plus moderate growth. [L(848)86, population analysis, pages 19-20]. Billingsley clearly states that its enrollment projections do not account for interdistrict transfers. But, the Board's Plan 680 states that interdistrict transfers have been removed. The Board then adds 1,815 county-to-city students, deriving a total of 53,399 for 1990. The Board's projection does not appear to deduct city-to-county transfers. [L(852)86, page 18]. This fact was later confirmed at the evidentiary hearing held in December, 1986.
The State accepts the Board's 1990-91 enrollment projection data produced by Billingsley, L(848)86, and shown on page 19 of the Plan 680 and page 27 of the State's filing. Billingsley projected a local enrollment of 51,584 for the 1990-91 school year. When adjusted for interdistrict transfers, the net city enrollment would be 40,574, *700 according to the State. The State also uses current enrollment data to project enrollment, based on the 1985-86 total of 51,236. The State assumes that the 1985-86 enrollment will remain stable through 1990-91. The State then reduces total current enrollment to reflect additional city-to-county transfers and increased magnet school enrollment. After adjustment for these factors, the State predicts that 42,298 children will need to be housed in all St. Louis public schools in 1990-91. [L(1047)86, page 13].
Dr. Brown's enrollment projection for 1990 is based upon a technique he refers to as the "cohort survival method." He believes that this technique is much more realistic than the methods employed by the City Board and the State. Neither of those techniques takes into account the City Board's long-term enrollment history. Neither technique considers student survival rates which may be statistically derived from the City Board's actual experience. He believes that student survival rates will be influenced by improved learning opportunities through quality education programs, magnet schools and interdistrict transfers. He further believes that the Billingsley enrollment projections are skewed because they are based on total population estimates in the city for five-year periods 1970 to 2000. [L(848)86, pg. 14]. The trend has been steadily downward since 1950. (Id., at 10).
Dr. Brown's projection procedure, the cohort survival method, recognizes the actual retention rate of first grade enrollment as it has moved through the grades since the school year 1971-72.[5] This historical rate is applied to first grade enrollments which will produce enrollments in all grades through the year 1990-91. He extracted his data from the following sources:
1. The Board's annual October enrollment reports required by paragraph 14 of the district court order of May 21, 1980.
2. Kindergarten enrollment for the years 1971-80 as reported by the Board to the State Department of Elementary and Secondary Education (DESE). Enrollment for the years 1980-86 was obtained from the Board's annual October enrollment reports.
3. First grade enrollment for the years 1971-1986 as reported by the Board to the DESE.
4. Interdistrict transfers as reported by VICC.
5. Vocational interdistrict transfers as reported by MCC.
The enrollment projection derived from the cohort survival method indicates that 44,737 will need to be accommodated in St. Louis schools in 1990-91. Dr. Brown recommends that facilities be provided to house 31,261 regular students (5,301 in grades 9-12 plus 24,960 in grades K-8); 12,876 magnet students (4,530 local students in grades 9-12, 7,103 local students in grades K-8, plus 1,243 students from county districts); and 600 vocational students.[6]
Since 1980, there has been an increasing interchange of students between St. Louis and suburban schools as a result of desegregation court orders. Interdistrict transfers will have a significant impact upon student assignments and housing. Liddell IX established the goal of at least 2,000 additional students in interdistrict magnets by the opening of the 1987-88 school year and a total of 6,000 students in these magnets by the 1989-90 school year. The goal is 40 percent white students from the county. Interdistrict magnet enrollment also *701 reduces the classroom space needed in both regular integrated and nonintegrated schools. Housing provided for students attending interdistrict magnets reduces the housing needed for regular enrollment.
The Court has carefully reviewed the enrollment projections of the City Board, the state and Dr. Brown and the various methods employed to calculate these projections. It appears to this Court that the most reliable estimate is derived via the cohort survival method. This procedure for analysis accurately makes allowance for students who have transferred in and out of city schools since 1980. It is also the only procedure which tracks actual enrollment prior to 1980 and adjusts the historical enrollment trend for the effects of the desegregation programs. The Court finds that this method provides the most realistic basis for a 1990 enrollment projection. Accordingly, the Court accepts a 1990 enrollment forecast of 44,737 City students.

Accommodating 12(c) Programs
What Settlement Plan 12(c) programs must be provided for in rehabilitated schools? The allocation of space for the 12(c) programs is an important factor in determining available physical plant capacity.
Directions from the Courts.
"Additional renovation work must be necessary for the implementation of the approved 12(c) Programs." L(680)86, page 6. "(The) model standard that the (ZH) engineering firm created ... is a higher standard than this Court has pronounced or will accept."
Id., at page 8.
The Board uses the Winsor Model in making its capacity projections. The model provides space for the Board's year 2000 curriculum, which includes all 12(c) program requirements. L(852)86, pages 10, 16, 20-29. It contends that its 680 Plan does not include all programs, in the absence of building additions. But it does not specificaly show the program requirements by budget function as required in L(680)86.
The State claims that the Board's proposal contains elements which exceed 12(c) needs, such as elementary foreign language rooms, computer literacy labs in integrated schools, handicapped access, counseling offices for high schools and middle schools, expanded facilities for counselors, nurses, security guards, middle school science rooms, and excess storage space. However, the State used the Winsor capacity estimates in assigning its 1990-91 enrollment to buildings.
The courts have clearly enumerated 12(c) programs which require space allocations in nonintegrated and/or integrated schools. In analyzing plant capacity space has been allowed both nonintegrated and integrated schools for art, music and physical education rooms; all-day kindergarten rooms; preschool rooms; special education rooms; and libraries. Also, space has been set aside for 12(c) programs implemented in the nonintegrated schools only, as follows:
1. Rooms for school of emphasis labs and enrichment labs in elementary, middle and high schools.[7]
2. Computer labs in high schools and middle schools.

Analysis of Plant Capacity
What school building capacity will be required to house projected enrollment in St. Louis schools by the target date? Is the capacity of presently operating schools adequate?
Directions from the Courts.
Consolidation of the city school district is the key to an effective capital improvements program. The vitality of open schools must be closely scrutinized in light of declining enrollment. Schools with low enrollments which will probably be closed in the next five years should be *702 abandoned or given a low priority for renovation.
L(680)86, page 7.
Nonintegrated elementary and middle school classrooms should have P/T ratios of 20/1 by 1987-88, excluding remedial and compensatory program staff.
Liddell IX, 801 F.2d 280-281.
Integrated and nonintegrated high schools should have P/T ratios meeting AAA Standards (35/1). Integrated elementary and middle schools should have ratios of 30/1.
Id., at 281-282.
Magnets should have the same P/T ratios as nonintegrated schools.
Id., at 283-284.
The requirements of Liddell VII (i.e. P/T ratios of 20:1 in nonintegrated elementary and middle schools) are to be met at the earliest possible time.
Liddell XII, 823 F.2d at 1254.
(2) Even though the goal of twenty to one may not be fully achieved in the 1987-88 school year, it is apparent that some reduction in class size in the nonintegrated elementary and middle schools can be made at the beginning of the 1987-88 school year by making more efficient use of classrooms in the elementary and middle school buildings.
Liddell XII, at 1254.
In determining the facilities needed to reach the twenty to one pupil/teacher ratio in the nonintegrated elementary and middle schools, the parties are to assume  and accomplish as a fact  that by the 1990-91 school year, an additional 5,500 black city students will be attending county schools, that by the same year an additional 2,750 black city students will be attending magnet schools in the city, and that there will be some space available for additional black students in the integrated comprehensive schools. Thus, unless demographic factors clearly indicte otherwise, planning should assume that by 1990, fewer than 15,000 black students will be attending nonintegrated schools in the city.
Liddell XII, at 1254.
(4) The record reveals that many of the nonintegrated elementary and middle schools are very small. For example, sixteen nonintegrated elementary schools have enrollments of fewer than 250 students per school, with an average enrollment of 170 students. The record also reveals that many of the nonintegrated elementary and middle schools are poorly maintained and located and would be very expensive to rehabilitate.
In its long-term planning for the nonintegrated elementary and middle schools, the City Board should carefully consider closing the smaller, poorly maintained and poorly located nonintegrated elementary and middle schools and consolidating the students in either new or existing buildings that are well located and designed specifically to meet a pupil/teacher ratio of twenty to one, the goal being to achieve significant operating savings while providing the students with suitable facilities.
Liddell XII, at 1254. (See Liddell XII, footnote 1 regarding consolidation).
The Board states that the necessary reconfiguration required to accommodate all Settlement Plan programs will cause a drastic reduction in pupil capacity of each school. It assumes that program fitness has been minimally and essentially described in the Winsor Model. L(852)86, page 14. Building capacities, present and future, listed in the Plan 680 are based upon the Winsor Model. The Board downgrades a number of schools to a lower capacity category because the Order, L(680)86, precludes building additions which provide Winsor-model facilities. Id., page 22. The Plan 680 shows inadequate building capacity by the year 2000. The unhoused enrollment is expected to be: elementary, 9,200 (page 63); middle, 637 (page 46); high school, 530 (page 35).
The State uses the Board's own building capacity data as shown in the Plan 680 to show that future enrollments can be housed in fewer buildings. These capacities allow for libraries, music, art and other special rooms and for generous storage space. They also provide for some programs *703 which the State claims are unrelated to desegregation. L(1047)86, page 11 and Attachment 1.
The State's capacity projections also assume that provision of classrooms  other than in nonintegrated schools  to house students in ratios lower than required by AAA standards is not required for desegregation purposes. If it is done, the State contends that the local board should pay for the extra classrooms needed to meet desired class sizes. Most of the Board's proposed 12(c) reconfiguration is not required for desegregation. Id., pages 30-34. The Board's class size goals (K-15/1; elementary20/1; middle20/1; high school  25/1) in all schools greatly exceed Liddell IX mandates, AAA standards and suburban school ratios.
Dr. Brown's analysis of capacity focuses on the facilities needed to house anticipated regular enrollment in integrated and nonintegrated schools, K-12, by the year 1990-91. The procedure for determining available spaces differs for each level of instruction: high school, middle school, and elementary school. The data base for determining available school building capacity is the current number of schools serving students in instructional programs in the 1986-87 school year. Closed schools are not considered, per L(680)86.
The P/T ratio used by Dr. Brown in assigning classroom space in the integrated elementary and middle schools is 26/1. Although this P/T ratio is below the AAA standards as required by Liddell IX, Dr. Brown chose to keep this P/T ratio in his calculations because it is consistent with the capacity analyses used by the City Board and the State; and many of these schools are already at or near this P/T ratio. He further chose to accept the City Board's capacity estimates for the eight regular high schools currently in operation (integrated and nonintegrated). These capacity estimates are based on a P/T ratio of 28/1, which also exceeds AAA accreditation and Liddell IX requirements. He created a new model for the nonintegrated elementary and middle schools to account for the P/T ratio of 20/1 as mandated by Liddell IX and XII.
Dr. Brown's capacity analysis concludes that a surplus of instructional space will exist at all levels.[8] He surmises that by 1990-91, there will be a surplus capacity in the regular high schools of 8,007; equivalent to 285 classrooms. In the integrated middle schools, a surplus of 86 regular classrooms will remain in 1990. A surplus of 99 classrooms will remain in the nonintegrated middle schools in 1990. Finally, he concludes that an excess of 75 regular classrooms will remain in 1990 in the integrated elementary schools and an excess of 53 regular classrooms in the nonintegrated elementary schools. He further found present intradistrict magnet capacities to be adequate. Since the Magnet Panel is currently studying all magnets, capacities in the Settlement Plan magnets were not considered. There is abundant space available for vocational education (O'Fallon) and for the three special program schools: Gallaudet, Gratiot and Michael.
City Board's Plan 680 assumes the same P/T ratio in all schools. This is inconsistent with the directives of Liddell IX and XII. The Winsor Model prototype is an unrealistic model for facilities planning within the purview of Court requirements for desegregation. The St. Louis City school system is an old urban school system. None of its facilities could ever approximate the Winsor Model. The Winsor Model is an idealistic contemporary educational facility. The City Board's facilities are structurally sound old buildings. Simply because they are not new does not mean they are not usable. This Court and the Eighth Circuit have repeatedly stressed the rehabilitation and utilization of existing buildings. This is the main thrust of a capital improvements plan for the St. Louis City school system. The Winsor Model impairs realistic planning, which should begin with conditions as they now exist. For example, the downgrading of schools' capacities for minor inconsistencies with the Winsor Model(s) eliminates about 900 classroom spaces from the City Board's original *704 capacities. L(852)86, pgs. 21-28. Such effects from using the Winsor Model directly conflicts with Liddell XII's directives for consolidation of facilities and more efficient use of classrooms. The Winsor Model is unacceptable for capital improvements planning for the St. Louis City school district.
The class size standards used by the State in L(1047)86, p. 41, to determine building capacities are essentially the same as those cited by the Eighth Circuit. However, the State's use of City Board's capacity estimates is inadequate because it does not adjust for the pupil/teacher ratios required by Liddell IX. Furthermore, the State has consolidated too compactly to meet a reasonable estimate of 1990-91 enrollment and valid 12(c) program goals.
The Court finds that Dr. Brown's capacity analysis provides the most reasonable basis for capital improvements planning. It takes into account current capacity data, enrollment distribution trends, Court-mandated pupil/teacher ratios,[9] and housing of approved 12(c) programs. It adhers to this Court's and the Eighth Circuit's advertisements regarding efficient use of classroom space. Foremost, existing school buildings are shown to possess the capacity to house students in the near future. With realistic rehabilitation, present buildings can be turned into the educational facilities required by the Courts and expected by the teachers, students and parents in St. Louis City.

Consolidation of Facilities.
How shall the current school facilities be consolidated so that maximum effective use may be made of buildings needed in the foreseeable future?
Directions from the Courts.
Consolidation ... is the key to an effective capital improvements program ... Buildings closed as of this date are not to be considered for renovation ... Schools with low enrollments which in all reasonable probability should close in the next five years are good candidates for consolidation and the capital improvement needs for some should be abandoned or prioritized accordingly.
L(680)86, page 7.
The Board ... shall prepare a capital improvement program for the nonintegrated elementary and middle schools ... provid[ing] for the complete rehabilitation of the buildings and grounds of those ... schools which are (1) in the worst physical condition, and (2) are so located that the best available demographic studies indicate that they will continue to serve students in the foreseeable future.
Liddell IX, 801 F.2d at 284.
The record reveals that many of the nonintegrated elementary and middle schools are very small. For example, sixteen nonintegrated elementary schools have enrollments of fewer than 250 students per schools, with an average enrollment of 170 students. The record also reveals that many of nonintegrated elementary and middle schools are poorly maintained and located and would be very expensive to rehabilitate.
Liddell XII, 823 F.2d at 1254.
In its long-term planning for the nonintegrated elementary and middle schools, the City Board should carefully consider closing the smaller, poorly maintained and poorly located nonintegrated elementary and middle schools and consolidating the students in either new or existing buildings that are well located and designed specifically to meet a pupil/teacher ratio of twenty to one, the goal being *705 to achieve significant operating savings while providing the students with suitable facilities.
Liddell XII, at 1254. (See, Liddell XII, footnote 1 regarding consolidation).
The Board believes that 149 of its current inventory of 151 school buildings  operating and closed  will be needed to house students in the year 2000. L(852)86, p. 27. Further, additional buildings will be needed to accommodate anticipated enrollment, staff ratios and 12(c) programs.
The State contends that the entire 1990-91 St. Louis public school enrollment in integrated, nonintegrated, intradistrict magnets and Settlement Plan magnets can be housed in 67 school buildings. L(1047)86, pgs. 35-38.
When addressing the issue of consolidation, the Court considered three factors:
(1) What facilities should be removed from service;
(2) How reconfigurations can be used to provide for all program needs;
(3) What actions are needed to offset the loss of space resulting from consolidation and closing of school buildings.
After reviewing the City Board's 680 Plan, the alternative City Board plans, the State's plan, and consultation with Dr. Brown, and on-site visits, the Court determines that the following action is necessary to reduce plant capacity to provide a better cost-effective school system while still providing a quality education.
1. Close seven elementary schools whose condition makes rehabilitation impractical. These are: Adams, Hodgen, Arlington, Carver, Field, Harrison and Irving. Due to their age, condition of deterioration, and limited site space, these schools should be phased out of operation over the next two or three years as declining enrollment permits. Students should be reassigned to facilities with excess capacity as soon as a reasonable reassignment plan is developed. Meanwhile, only minimal improvements to provide weatherproof, functional educational facilities should be undertaken as necessary.
The discontinuance of Adams and Hodgen as integrated elementary attendance centers would reduce plant capacity by 27 classrooms. However, after additions proposed later in this section, the excess capacity of integrated elementary schools will permit expansion of court-approved preschool centers among neighborhood schools. Thus, no new integrated elementary schools are indicated in the foreseeable future.
The discontinuance of five nonintegrated elementary schools will reduce capacity as follows:

School Classrooms Lost
Carver (Old section not counted
 in room allocation chart)
Arlington 11
Field 14
Harrison 14
Irvin 15
 __
 54

This loss of capacity must be offset by additions to existing facilities.
2. Consolidate elementary enrollment by closing eight small, noncontiguous branch schools as attendance centers. The fixed costs of their continued existence are excessive. These are: Cook Branch, Farragut Branch 1, Farragut Branch 2, Hamilton Branch 1, Hamilton Branch 2, Hempstead Branch, Mitchell Branch and Williams Branch.
The City Board's 680 Plan proposed discontinuing the use of these branch schools (as regular elementary schools) except it listed Dunbar Branch and omitted Mitchell Branch. The City Board further proposed using these branch schools as preschool centers. The Court has included Mitchell Branch in its closing list because this school is a small underenrolled noncontiguous branch school. However, Dunbar Branch is not included in the Court's list because it is located on the Dunbar Site and is considered a part of the Dunbar School.
Concerning preschool centers, the Court is convinced that the Board's anticipated preschool population (2,400 students) can be housed in neighborhood elementary schools by 1990-91. First, the proposed *706 P/T ratios for the preschool program15 pupils per classroom per day  exceed the standards of the present court-approved preschool program. Second, using neighborhood schools for preschool programs consolidates a number of small buildings (eight classrooms each) as preschool centers. Although nine of these buildings are currently available to house children, the Board chooses now to use them for other purposes. The current preschool program is housed in neighborhood elementary and middle schools. The Board's Plan 680 would reopen these nine schools which could be, but are not now used to house children. There will be enough capacity in 1990 for continued housing of an expanded preschool program in regular school buildings. Housing the preschool program in regular neighborhood schools rather than in isolated small buildings has many advantages in addition to enrollment consolidation. One important advantage is closeness. Children would have to travel farther to 20 small preschool centers than to neighborhood elementary and middle schools. Preschool children attending regular neighborhood elementary schools would be advantaged by plant accommodations and staff services such as the following: an experienced leadership staff, art and music specialists, nurses, counselors, social workers, security guards; library and audio-visual services; physical education and lunchroom facilities. Preschool staff would also have clerical staff and office equipment available. Therefore, the present pattern for preschools should be continued.
3. Close the Franklin School where the City Board's Management Center magnet is located. Franklin is an old building with a low enrollment, located in an area largely surrounded by commercial buildings. Since this is not a court-approved interdistrict magnet, rehabilitation of this magnet site would not be considered desegregation-related.
4. Close Longfellow as an attendance center. The Court recommends that consideration be given to moving the Honor Arts program to Central High School (where the VPA magnet is now located). The Court believes that Central has sufficient capacity to house this program and the curriculum of this part-time magnet could be enriched by its incorporation in a visual and performing arts context.
The Court is well aware that it is ordering the closing of 16 buildings including approximately 154 classrooms. In order to offset this reduction of plant capacity, the following steps should be taken:
1. Construction of new elementary gymnasium facilities and reconfiguration of current playrooms (where full-size gyms are not now available). Considerable amount of instructional space will be opened by the reconfiguration of existing playrooms.[10]
2. Reinstate two elementary schools by adapting two nonintegrated middle schools such as Ford and branch and Turner and branch. Since these middle schools served as elementary schools prior to 1980, minor changes would only be necessary. Approximately 43 additional elementary schools would thus be made available.
3. Construct 12-classroom additions to each of four nonintegrated elementary schools. These schools are: Carver, Herzog, Lexington and Lowell. Four additions, each providing twelve (12) classrooms, would increase nonintegrated elementary capacity by 48 classrooms.
Although Court Order L(680)86 did not provide for the construction of additions, the Court must now reconsider this matter as a part of the necessary consolidation and reconfiguration process. The additional construction, as set out here, would reap substantial benefits at minimal cost. These additions, therefore, will become a part of the capital improvement plan.
Substantial data reveals that the physical education facilities in 19 nonintegrated schools, 17 integrated schools, and seven magnet schools are inadequate for present-day physical education programs. The playrooms in these 43 schools are not comparable to gym facilities found in the county *707 districts. By providing adequate gyms, this plan not only accommodates current physical education program needs, but it also makes space available for assemblies and parent meetings, and community use. Further, it would greatly improve management of students during inclement weather. Existing playrooms may then be reconfigured to provide additional instructional space, thereby increasing the capacities of the schools affected. (Also, lunchroom space is provided as needed by use of some playrooms.) Reconfiguring 51 present playrooms in these 43 schools to provide additional instructional space, consistent with the need for safe pupil access, will make each school more efficient in size.
Available data also indicates that surplus middle school space will exist in the near future while elementary space may be tight. Readapting Ford and Turner to elementary schools makes excellent use of available space.
Carver, Herzog, Lexington and Lowell are four nonintegrated elementary schools that will have low capacity after needed nonclassroom space is set aside. They have sites large enough to accommodate new classroom wings. These wings are cost-effective measures which will increase instructional space capacity.
After these steps are taken, the St. Louis City School District's capacity should exceed its anticipated classroom needs for regular integrated and nonintegrated schools, current intradistrict and 12(c) magnets, and special and vocational schools. Reallocation of excess space district-wide will open up elementary school space for preschool centers. Excess capacity in the high schools will become available for other uses. At least four of the eight regular high schools should become available for magnets, middle schools, or administrative space. The current regular high school enrollment could be housed in five of the larger schools. Additional attrition may release one more. The most obvious candidates for other use are: Soldan, Northwest, McKinley and Vashon. Smaller high school buildings could be reconverted to middle school centers of from 600 to 1,200 students. This would make possible closing some middle schools, thus permitting the release of additional elementary or magnet space. Two groupings of geographically close middle schools appear to have sufficient capacity to release one building in each group for other use: Group 1L'Overture, Mullanphy, Grant and Fanning; Group 2Nottingham and Dewey.
Consolidation of facilities is no longer avoidable by the City Board. Current and projected enrollments do not justify the number of facilities in operation. It simply is not fiscally prudent or educationally sound to spread limited resources so thin. Underenrolled and underutilized buildings are an enormous financial drain on the City Board. Cutting back on the number of facilities in operation is a reasonable and feasible first step to minimizing the waste of limited resources.

Number of Buildings
How many schools will be needed to house estimated enrollment on the target date? This portion of the plan addresses the number of buildings to be rehabilitated in order to accommodate the target enrollment, given adjustments to current plant capacity discussed previously.
Directions from the Courts.
Settlement Plan 12(c) magnets are a totally separate matter.
L(680)86, page 7.
Buildings closed as of this date are not to be considered for renovation.
Id.
Nonintegrated and magnet schools need earliest attention. Settlement Plan magnets are to be considered separately from other schools.
Liddell VIII, 758 F.2d 302-303.
The Board shall prepare a capital improvements program for the nonintegrated elementary schools and middle schools which is estimated to cost not more than $40 million. (Liddell IX).
In determining the facilities needed to reach the twenty to one pupil/teacher ratio in the nonintegrated elementary *708 and middle schools, the parties are to assume  and accomplish as a fact  that by the 1990-91 school year, an additional 5,500 black City students will be attending county schools, that by the same year an additional 2,750 black City students will be attending magnet schools in the City, and that there will be some space available for additional black students in the integrated comprehensive schools. Thus, unless demographic factors clearly indicate otherwise, planning should assume that by 1990, fewer than 15,000 black students will be attending nonintegrated schools in the City.
Liddell XII, 823 F.2d at 1254.
(4) The record reveals that many of the nonintegrated elementary and middle schools are very small. For example, sixteen nonintegrated elementary schools have enrollments of fewer than 250 students per school, with an average enrollment of 170 students. The record also reveals that many of the nonintegrated elementary and middle schools are poorly maintained and located and would be very expensive to rehabilitate.
In its long-term planning for the nonintegrated elementary and middle schools, the City Board should carefully consider closing the smaller, poorly maintained and poorly located nonintegrated elementary and middle schools and consolidating the students in either new or existing buildings that are well located and designed specifically to meet a pupil/teacher ratio of twenty to one, the goal being to achieve significant operating savings while providing the students with suitable facilities.
Liddell XII, at 1254.
The Board lists an inventory of 151 school buildings (counting Marshall and Marshall Branch as two units) in the Plan 680 and other filings. In the original ZH plan, the board shows an inventory of 151 buildings scheduled for renovation, reconfiguration and additions at a total cost of $320,960,655. [L(598)85, pages 32-37]. These schools are listed in the index pages which appear in numerous places in Board filings L(598)85 and L(852)86.
The Board currently operates a total of 126 schools, including six Settlement Plan magnets, to house a 1986-87 enrollment of 48,319 in integrated, nonintegrated, magnet, vocational and special schools. There are 25 schools not being used to house students in instructional programs:
School used for adult education: Clark Branch I.
Schools used for administrative offices: Busch, Curriculum, Clark Branch II, Emerson Branch, Euclid Branch, Field Branch, Kennard.
Schools leased for non-Board use: Gardenville, Howard Branch, Simmons Branch, Smith, Williams Branch II.
Schools Closed: Benton, Fremont, Monroe, Carr, Carr Lane Branch, Charless, Clinton Branch, Howard, Lindenwood, Maddox, Riddick, Windsor.
In the Plan 680 the Board indicates its intention to use a total of 145 of its schools for instructional purposes through the year 2000. The Board schedules 128 schools for rehabilitation (counting Marshall and Branch as two units), including nine reopened branch schools proposed as preschool centers. Six Settlement Plan magnets, plus Soldan  removed from the rehabilitation list per the Board's interpretation of L(680)86  will continue in operation. Also, 10 closed schools are set aside for future Settlement Plan magnets.
The Board proposes to reopen 20 schools which are not now being used to accommodate students in instructional programs. Busch  now housing offices  is proposed, but not budgeted, for use as a relocated academic/athletic middle school magnet. (Hamilton Branch would become a preschool center.) Nine branches not housing students are proposed as preschool centers. Ten closed schools are proposed as future 12(c) magnets.
In addition to the 145 schools proposed for regular and magnet instruction, Curriculum and Kennard would house administrative offices. Gardenville would remain leased as a community center. The net result of Plan 680 is consolidation of three schools, two of which are up for sale: Carr School and Carr Lane Branch.
*709 The Board states that consolidation of schools cannot be accomplished because of the following factors: additional population growth; the requirements of the Year 2000 Curriculum Plan; the addition of 20 pre-schools; and a proposed district-wide reduction of P/T ratios to 20/1 except in integrated high schools (25/1). Further, if the Court restricts the Board's proposed reconfigurations and additions by enforcing the provisions of L(680)86, needed building additions would be left out. Then, 24 new schools would be needed to house enrollment in the year 2000 at an additional cost of $141,000,000.00. L(852)86, p. 27.
The State suggests that, by consolidating attendance centers and using the biggest and best buildings in St. Louis, the entire 1990-91 regular and magnet public school enrollment could be housed in 67 buildings. Such consolidation would meet constitutional requirements through more effective utilization of buildings. Any additional buildings used to provide more instructional space should be rehabilitated through use of local funds. The State includes six current 12(c) magnet facilities in its proposal (contrary to L(680)86) on the grounds that they will house St. Louis students, thus reducing facilities needed for integrated and nonintegrated schools. L(1047)86, pp. 35-38. The State assumes that pre-school children can be accommodated in existing elementary schools. Its list of 67 schools does not take into account four special schools now in operation.
After review of the submitted plans, review of the Zurheide-Herrmann data and consultation with the financial advisor, this Court finds that a total of 111 buildings on 106 campuses should suffice to accommodate projected enrollment in the foreseeable future at P/T ratios and with the instructional resources required by the Settlement Plan and the courts. The school closings, rehabilitation of plants, additions, and reconfigurations proposed herein will completely rehabilitate St. Louis public school buildings, providing facilities comparable to those in participating school districts. According to the analysis herein, a total of 111 schoolsof which 104 would be scheduled for rehabilitationwill meet the requirements of the order L(680)86 and related orders of the Eighth Circuit. The remaining seven are court-approved 12(c) magnets (including Euclid Branch) which are to be refurbished and financed in a separate plan.
The following is a list of buildings which this Court considers obsolescent. Relevant Zurheide-Herrmann data reveals these buildings to be poorly maintained and located and too expensive to rehabilitate. These buildings are to be eliminated from the City Board's inventory as soon as possible.

 Current Use
Adams K-5
Arlington K-5
Benton Closed
Carr Closed
Carr Lane Branch 1 Closed
Charless Closed
Clinton Branch 1 Closed
Field K-5
Fremont Closed
Hodgen K-5
Harrison K-5
Howard Closed
Howard Branch Leased
Irving K-5
Longfellow Honors Art
Maddox Closed
Monroe Closed
Riddick Closed
Simmons Branch 1 Leased
Smith Closed
Williams Branch 2 Leased

The following is a list of buildings which the Court recommends the City Board retain in its inventory as a hedge against unforeseen enrollment expansion. All are in sound condition and could be rehabilitated at a reasonable cost. These buildings could be utilized by the City Board as offices or leased while future demographic trends unfold.

*710
Full-sized Schools Current Use
Busch Offices
Curriculum Offices
Gardenville Leased
Franklin Management magnet
Kennard Closed
Lindenwood Closed
Windsor Closed
Branch schools (8 classrooms)
Clark 1 Adult education
Clark 2 Offices
Cook 1 Grades K-4
Emerson 1 Offices
Farragut 1 Grades K-2
Farragut 2 Offices
Field 1 Preschool
Hamilton 1 Grades K-5
Hamilton 2 Grades K-5
Hempstead Grades K-5
Mitchell 1 Grades K-5
Williams 1 Grades K-5

Summarily, the approved number of schools earmarked for desegregation-related capital improvements and total recommended inventory for the St. Louis City School District is as follows:

Schools recommended for rehabilitation 104
Approved Settlement Plan Magnets 7
 ___
Total facilities recommended for 1990-91 111
Schools to be retained and used for purposes
other than instruction 19
Schools to be eliminated from inventory 21
 ___
Total current inventory 151

Construction Projects Proposed for Budgeting
What construction projects are necessary to meet court-approved standards for complete rehabilitation of buildings and grounds? This section of the plan discusses desegregation-related construction work required for rehabilitation of those facilities to be continued in operation for the foreseeable future. The units of work become the basis for budgeting and scheduling the facilities improvement program.

Directions from the Courts.
Projects should fulfill the bare minimum requirements of the St. Louis city safety and health codes.
L(680)86, p. 7.
A facility improvement is renovation or rehabilitation work on an existing building.
Id.
The Court will not accept construction of a new building or annex.
Id.
If the project involves a facility modification in order to provide a suitable environment for a specific desegregation activity, the Board should identify the Plan budget function which requires the improvement.
Id.
All needed physical improvements, including those which are desegregation-related, cannot be built at once. The projects having the highest priority must be scheduled for completion at the earliest possible date.
Id., p. 8.
The Zurheide-Herrmann model standard is higher than this Court has pronounced or will accept.
Id.
The City Board is to prepare promptly a building program not to exceed $40,000,000.00 to meet the most urgent capital needs of the district, with emphasis on the all-black schools and the magnet schools.
Liddell VIII, 758 F.2d at 302.
The Board shall provide for the replacement or complete rehabilitation of the buildings and grounds of those nonintegrated elementary and middle schools which (1) are in the worst physical condition and (2) will serve students in the foreseeable future according to the best demographic studies available.
Liddell IX, 801 F.2d at 284.
The Board includes all construction projects proposed in its original 1985 Zurheide-Herrmann facilities study fitting the Court's standard in L(680)86. It uses the BOCA-PM code to justify a broad range of cosmetic, mechanical, structural, electrical, *711 exterior, safety and site projects. L(852)86, pp. 12-16; addendum B.
The State objects to use of the BOCA code, arguing that it is too broad and vague. The State claims that the Board's proposal exceeds the bare minimum health and safety requirements and includes expenditures which are not desegregation-related. The State accepts Zurheide-Hermann unit costs as reasonable and agrees with many projects proposed by the Board (for the 67 schools it accepts for renovation): roofs; exterior walls; windows; doors; some classroom lights; fire alarms; sprinklers; corrective mechanical work; necessary electrical work; and health/safety items. It disagrees with other kinds of projects: site work; heating and ventilating; lights for nonclassroom areas; energy conservation; building interior painting; floors; ceilings.
The State also demurs from participation in landscaping, replacement of paving and equipment, new acoustical ceilings, removal of graffiti, facilities for handicapped persons, provision for computer rooms, counseling offices for middle and high schools, and Winsor Model standards such as elementary foreign language. L(1047), pp. 18-25.
The Order L(680)86 states that desegregation-related capital improvements are those costs needed to fulfill the bare minimum health and safety code requirements. The Board's Plan 680 goes farther than that, proposing improvements in eight areas, based on a broad interpretation of the BOCA code. Although the Plan 680 exceeds the Court's definition of standards, the proposals may approach the Liddell IX statement, "replacement or complete rehabilitation of buildings and grounds in nonintegrated elementary and middle schools ..." 801 F.2d at 284. It appears that the requirement of "complete rehabilitation of buildings and grounds" includes more Zurheide-Herrmann projects than the State accepts, but it does not suggest new buildings, additions to every facility, elaborate internal reconfiguration and unnecessary mechanical work. It appears to support the L(680)86 standard with a more generous interpretation of basic minimum standards. On the other hand, the State's proposal is too limited, both as to the number of buildings to be refurbished and the number of projects proposed. The State's plan would not thoroughly rehabilitate enough buildings to house even its own conservative enrollment projections.
Upon request, the financial advisor provided the Court with an analysis of cost data.[11] This cost analysis revealed significant discrepancies in the project cost data supplied by the Zurheide-Herrmann facilities study and relied upon both by the City Board and the State. The discretion left to the individual engineering firms resulted in substantially different cost estimates for various work projects:
1. Differences in the kind of project listed as needed for rehabilitation. (One firm did not allow any funds for staff parking; another provided for new parking in six of eight schools surveyed.)
2. Differences in the amounts of funds allocated to similar kinds of projects. (One firm surveyed six elementary schools and recommended an average of $107,487.00 for tuckpointing; another surveyed seven schools and recommended an average of $8,069.00 for tuckpointing.)
3. Differences in the standards applied in recommending work projects. (Various A/E firms recommended from 40 to 70 foot-candles for multipurpose classrooms as a basic lighting standard).
4. Differences in the unit costs assigned to identical projects. (Costs per square foot for kindergarten reconfiguration vary from $.17 to $57.71).
5. In some cases it appears that buildings were not thoroughly inspected before reports were submitted. (One firm recommended completely new lighting after taking a foot-candle reading in one room only).
6. One can find boilerplate narrative which has no relationship to the particular *712 school surveyed. (One firm used the same paragraph on fire alarms for each school surveyed, but it budgeted from $0 to $28,500.00 for fire alarms).
Parameters for determining repair, replacement or new installation are lacking. Even if the Court were to order full implementation of all the work projects in the facilities study, the buildings would be left in substantially differing states of repair.
Since the State accepted the Zurheide-Herrmann unit costs as reasonable, the Court instructed the financial advisor to focus on the Plan 680 cost data and to make adjustments to remove extreme discrepancies. He recommended the following adjustments:
1. Since new parking was proposed for only 24 of the 108 sites surveyed, new parking construction should be disallowed.
2. "New sodding" should be eliminated. New sodding was recommended for only four (4) schools.
3. Since Ford, Farragut and Marshall schools have recently received roof repairs, there should be removal of roof repair costs of $383,518.00 from the proposed expenditures. Corresponding reduction for any other roofs repaired since the Zurheide-Herrmann report was filed should be made.
4. Amounts requested for gutters and downspouts should be disallowed due to recent repair work by City Board.
5. Amounts for tuckpointing in excess of $50,000.00 per building should be disallowed. The various engineering firms proposed a total of $2,399,531.00, an average of $30,373.00 per building, for tuckpointing 79 buildings. Less than $20,000.00 for tuckpointing was proposed for each of 33 buildings. No tuckpointing was proposed for three buildings.
6. The amount proposed for new lighting fixtures should be reduced by 35%. City Board proposed new lighting fixtures for 99 schools at a cost of $10,842,104.00. New lighting was not proposed for nine schools. The various surveying firms used at least four different lighting standards and reported substantially different foot-candle readings. A reduction of 35% would still provide new light fixtures needed to meet City Board's lighting standard in all buildings and provide for cleaning, replacing, and repairing diffusers, replacing louvers and replacing inoperative fixtures.
7. Among the 108 buildings surveyed, $0 was proposed for fire alarm systems in 27 buildings, and $15,000.00 or less was proposed for repair or total replacement of fire alarm systems in 51 buildings. Due to extreme variances (e.g. some firms proposed over seven times as much as others for replacement of fire alarm systems in schools of similar age and size), amounts in excess of $15,000.00 per building should be disallowed.
8. Under the heading "electric service", $0 was proposed for 20 buildings, and $50,000.00 or less was proposed for 68 buildings. Amounts in excess of $50,000.00 per building should be disallowed for the remaining buildings.
9. The City Board requests 26 new boilers at a cost of $1,352,800.00. Presently all boilers are in working condition. $10,000.00 should be budgeted for repairs at each of the 26 schools.
10. Energy conservation projects, i.e. all items with a payback in energy cost savings, should be eliminated from the capital improvements budget. These items include the amounts listed under the category "energy conservation", new outside automatic dampers, new air return systems and replacement of noninsulated glass. With energy conservation projects, there is a cost payback in the form of reduced operating costs for energy. There is no practical, concise, equitable procedure to account for and reimburse the State for its half of operating cost savings resulting from energy conservation measures paid out as one-time capital outlay expenditures.
11. The expenditure of $291,500.00 for elevators (handicapped person access) should be disallowed since it was proposed only for four (4) out of 108 schools surveyed.

*713 12. The expenditure of $85,500.00 for wheelchair lifts at only six (6) schools should be disallowed.
The Court has carefully reviewed these deducted items and concurs with the recommendations. Items such as employee parking do not conform to this Court's standard for desegregation-relatedness. Other high cost items for isolated placement such as new sodding, elevators and wheelchair lifts are excessive. If lighting and heating is in a good state of repair, there is no need to fix or replace the systems. Wholesale replacement of boilers or lights, in working condition, only because of age is a waste of funds. Finally, with respect to the energy-conservation projects, to budget these expenditures as desegregation-related and to require joint State and City Board funding, would allow the City Board to recover not only its investment, but also that of the State. The Court finds such projects to be commendable and would recommend to the City Board to carry out these energy conservation projects on its own since it will reap the benefits in the long run; however, funds for these items will not be allotted in this facilities plan.
In a capital improvement project of the magnitude contemplated here, some attention must be given to the possibility of encountering an asbestos problem. At the hearing, the Court discussed this with all counsel off the record. Thereafter, the City Board made further investigation and after consultation with school personnel and members of the Zurheide-Herrmann firm, reported to the Court on January 6, 1987.
A primary concern regarding asbestos in schools is with "friable" asbestos-containing materials. Those in turn are materials applied to ceilings, walls, structural members, piping, boilers, ductwork and the like, which, when dry, may be easily crumbled, pulverized or reduced to powder. In that state, those materials may emit asbestos fibers, which present a potential health hazard.
In 1978 and 1979, the St. Louis Public Schools voluntarily initiated inspection and abatement action with respect to asbestos found in the schools. During that period, extensive amounts of potentially hazardous asbestos materials were removed from some five school buildings. The St. Louis Public School system was one of the first school systems in the country to voluntarily initiate action concerning asbestos. The St. Louis Public Schools generated certain records with respect to the inspection and handling of asbestos in that time period.
In 1983, the federal EPA notified the St. Louis Public Schools concerning certain statutory and regulatory requirements related to asbestos, resulting from the federal Toxic Substances Control Act. The St. Louis Public Schools at that time were advised that those regulations required all school districts in the country to inspect school facilities for friable asbestos containing building materials, to maintain records of the findings, to provide custodial employees with a guide for reducing asbestos exposure, and to notify parent-teacher organizations, or parents, of those inspection results.
In response to the EPA, the St. Louis Public Schools initiated inspections of the school facilities, and prepared and submitted inspection reports to the EPA. Discussions concerning those findings likewise were held with the EPA. The inspections revealed that all school facilities contained boiler and pipe insulating materials containing asbestos. However, as confirmed by the EPA, boiler and pipe insulating materials normally do not present a health hazard if they are properly maintained, because those materials generally are provided with protective coverings and wrappings. When those protective coverings are damaged or wear out, certain corrective action then is advisable. As a result, it was determined that asbestos containing materials with protective coatings, such as boilers and pipes, would be monitored and repaired or removed as deemed necessary, whenever a potential health hazard was determined to be present.
The inspections likewise revealed friable or potentially friable asbestos containing acoustical and insulating materials at some *714 seven school facilities. Based on discussions with the EPA, and with outside consultants, certain abatement actions were recommended and implemented at that time.
The St. Louis Public Schools have continued to monitor the condition of asbestos in the boilers and pipes, and the EPA has undertaken certain inspections of the school facilities since 1983 to determine on-going compliance with the Toxic Substances Control Act. As necessary, the EPA has pointed out any existing problems, for example, the posting of asbestos notices in all required places in a school facility. Apparently, the EPA has expressed no significant concerns in connection with those subsequent inspections.
The St. Louis Public Schools are engaged in on-going inspections and necessary corrective action, primarily with respect to the boilers and pipes, and have prepared and retained required reports and records. The necessary remedial action has been undertaken primarily by outside contractors. Apparently, during the Zurheide-Herrmann survey of the school facilities no asbestos hazards requiring corrective action were found.
The Court finds, therefore, that there is no discernable problem with asbestos not now being monitored and handled properly by the City Board. Should an asbestos problem arise in the implementation of the project contemplated by this opinion, the Court will review it at that time and make additional findings and orders as may be necessary to resolve the difficulty.

Recommended Capital Projects Budget
The Board's attorney pointed out cogently in closing remarks at the December 1986 hearing that the capital decisions facing the Court deal with budgeting, not with precise financial commitments. In that same vein, the proposed budget herein is to be considered as a tool for planning and action. It has been carefully developed, with the goal of precise estimating. A well-prepared budget is a policy statement which defines priorities and sets limits in the allocation of scarce financial resources. Actual experience  specifically, developing plans and specifications and awarding construction contracts  will certainly modify cost allocations within the constraints of the basic budget structure. Some costs will be higher and some lower than original estimates. The Court believes that this budget provides generously for all projects to rehabilitate, reconfigure and add to the school buildings needed by the Board in the foreseeable future.
Directions from the Courts.
Each project should describe a particular facility improvement in detail. A `school-by-school' breakdown, similar to the (ZH) report format, is preferable.
L(680)86, p. 7.
"... the Board of Education of the City of St. Louis shall prepare a capital improvement program for the non-integrated elementary and middle schools which is estimated to cost not more than $40,000,000.00"
Liddell IX, 801 F.2d at 284.
The Board estimates (ZH) costs of "code requirements" (rehabilitation only) of 127 buildings in the 680 Plan to be $98,713,511.00 exclusive of design costs (10%). L(852)86, page 98. It derives the $144,000,000.00 price tag as follows:

 Rehabilitation of 127 schools $ 98,713,511
 12(c) reconfigurations 10,032,097
 Magnet reconfigurations 3,736,118
 10 percent design fee 11,248,179
 ____________
 $123,729,905
 Construction escalation at
 five percent annual rate $ 21,023,710
 ____________
 $144,753,615

Additionally, the Plan 680 estimates new construction to accommodate projected enrollment increases and building additions necessary to accommodate 12(c) and interdistrict magnets to cost $144,840,062. The capital cost estimated in the Plan 680 totals $289,593,677. The Plan 680 suggests the Court may wish to approve capital funding at $210,406,615 for the first four years. Later, in L(857)86, the Board estimates the total cost of its Long-Range Facilities Plan at $420,630,007.00 (p. 97).
Within this total, the Board's estimate of (ZH) costs for rehabilitation of 37 elementary *715 and 14 middle, nonintegrated schools can be derived from data in its Appendix B. That cost, for rehabilitation only, is $39,186,868.00 exclusive of design fees, reconfiguration and escalation. This would fall within limits ($40,000,000.00) suggested by Liddell IX for early action.
The State believes that necessary rehabilitation on 67 buildings will cost $44,638,830.00. The State's cost data is difficult to allocate with respect to the nonintegrated elementary and middle schools because the State's cost extrapolation applies to all 67 schools it believes to be sufficient for the near future.
Two other capital improvements programs, within the $40,000,000.00 parameters set forth by Liddell IX, were submitted to the Court for consideration. The Committee for Quality Education's (CQ) proposal suggested rehabilitating (to code requirements) 30-35 nonintegrated schools in the "worst physical condition." L(1176)86. The City of St. Louis suggested rehabilitating approximately 27 nonintegrated elementary schools to meet code requirements; set aside approximately $4,000,000.00 for quality education programs-related capital improvements; and renovate or newly construct no more than three (3) schools to approximate the Winsor Model. L(1198)86.
Working with the financial advisor, the Court developed the district-wide capital outlay budget outlined herein which will rehabilitate 104 buildings, including five contiguous branch schools and Soldan High School. Seven court-approved 12(c) magnets are omitted.[12] Thus, although 111 schools are recommended for housing projected enrollment in the near future, only 104 are proposed for rehabilitation at this time. The City Board's own cost-data, with minor modifications, has been utilized. This budget adds a 10% design fee to the basic costs of rehabilitation, reconfiguration, and additions. The Court-approved budget for capital improvements totals $114,717,941.00.
The following attached tables outline this budget: Table VIII shows a breakdown of budgeted costs by type of school and by major project categories. Table IX lists each of the 104 schools proposed for renovation according to its date of construction and allocates a budget for each school by major project category. Table X shows a summary of the original Plan 680 project costs which were reduced, as discussed previously.

*716
 TABLE VIII
 Summary of Recommended Capital Improvements Budget
 Rehabilitation and New Construction
 Description Elementary Middle School High School Special Magnets Total
Site work $ 1,983,981 $ 722,802 $ 442,014 $ 138,317 $ 138,317 $ 3,969,932
Building envelope 6,407,101 4,387,087 2,396,974 902,636 2,518,263 16,612,061
Building interior 8,620,261 2,698,547 5,807,044 989,185 2,945,899 21,060,936
Mechanical 1,328,541 1,026,602 1,944,624 39,669 759,287 5,098,723
Electrical 6,046,675 3,424,848 3,838,520 444,148 2,289,008 16,043,199
Health, safety, handicap 4,924,424 2,297,720 1,289,771 717,791 1,682,802 10,912,508
New construction
 Gyms 13,500,000 0 0 0 2,625,000 16,125,000
 Classrooms 6,223,360 0 0 0 0 6,223,360
9% escalation to update
 ZH 1984 data to 1985 0 0 1,414,704 0 353,301 1,768,005
Convert regular classrooms
 to special education rooms 540,000 540,000
Convert playrooms to classrooms 1,390,000 0 0 0 180,000 1,570,000
Magnet reconfiguration 4,365,314 4,365,314
 ___________ ___________ ___________ __________ ___________ ____________
 $50,964,343 $14,557,606 $17,133,651 $3,231,746 $17,857,191 $104,289,038
10% design fee 5,096,434 1,455,761 1,713,365 323,174 1,784,719 10,428,903
 ___________ ___________ ___________ __________ ___________ ____________
Totals $56,060,777 $16,013,367 $18,847,016 $3,554,920 $19,641,910 $114,717,941

*717
 TABLE IX
 Recommended Capital Improvements BudgetDistribution of Project Categories by School
 New Construction 9%
 Building Building Health, Safety, Energy Escalation
 School Site Work Envelope Interior Mechanical Electrical Handicap Conservation Gym Classrooms 1984 to 1985 Total
Irving $ 0 $ 0 $ 0 $ 0 $ 0 $ 0 $ 0 $ 0 $ 0 $ 0
Adams 0 0 0 0 0 0 0 0 0 0
Carver 27,546 0 0 0 0 0 0 0 1,555,840 1,583,386
Hodgen 0 0 0 0 0 0 0 0 0 0
Froebel 91,212 144,724 150,398 25,718 92,767 125,137 0 375,000 0 1,004,976
Harrison 0 0 0 0 0 0 0 0 0 0
Eliot 88,714 230,827 233,447 16,713 111,833 123,940 0 375,000 0 1,180,474
Jackson 11,676 96,286 131,094 3,600 181,624 144,505 0 0 0 568,785
Arlington 0 0 0 0 0 0 0 0 0 0
Sherman 9,541 102,061 180,044 3,600 174,007 160,805 0 375,000 0 1,005,058
Marshall and Branch 25,156 214,611 316,374 95,070 224,782 141,842 0 0 0 1,017,835
Field 0 0 0 0 0 0 0 0 0 0
Wyman 38,060 89,225 117,747 35,100 182,692 149,029 0 375,000 0 986,853
Emerson 58,993 92,585 131,060 87,020 148,361 114,157 0 375,000 0 1,007,176
Clay 76,834 195,768 151,876 30,106 119,302 158,815 0 375,000 0 1,107,701
Cote Brilliante 21,880 126,948 270,524 25,014 184,417 127,720 0 375,000 0 1,131,503
Hempstead 93,917 120,246 290,771 109,930 211,585 137,410 0 375,000 0 1,338,859
Shepard 76,045 156,320 238,585 14,938 130,474 153,183 0 375,000 0 1,144,545
Farragut 42,497 58,418 123,162 47,400 139,069 126,133 0 375,000 0 911,679
Henry 32,364 175,388 138,840 600 210,394 172,580 0 375,000 0 1,105,166
Sigel 75,775 144,406 238,018 59,619 190,726 113,772 0 0 0 822,316
Clark 24,522 99,410 238,043 53,713 130,689 98,046 0 375,000 0 1,019,423
Lafayette 31,800 128,296 124,638 42,000 125,359 71,721 0 375,000 0 898,814
Baden 28,608 90,860 148,888 38,900 117,748 120,680 0 375,000 0 920,684
Oak Hill 60,475 141,610 178,915 16,588 115,749 130,158 0 375,000 0 1,018,495
Walnut Park 41,333 191,151 122,726 16,000 111,671 91,480 0 375,000 0 949,361
Meramec 63,602 97,363 140,318 14,982 78,617 60,657 0 375,000 0 830,539
Ashland 49,400 176,963 238,037 12,425 145,633 176,913 0 375,000 0 1,174,371
 Ashland Branch 20,981 155,971 62,712 1,700 29,196 47,528 0 0 0 318,088
Mann 99,662 177,438 234,658 20,821 128,494 159,182 0 375,000 0 1,195,255

*718
Dunbar 43,487 168,412 135,808 48,807 188,708 103,931 0 375,000 0 1,064,153
 Dunbar Branch 6,073 62,197 26,994 36,650 32,138 23,246 0 0 0 187,298
Mark Twain 2,456 154,097 202,360 4,163 113,976 86,641 0 375,000 0 938,693
Laclede 49,865 163,369 408,907 20,138 133,353 77,126 0 375,000 0 1,227,758
Scruggs 93,645 104,196 184,577 21,932 137,399 100,027 0 375,000 0 1,016,776
Cupples 42,525 112,688 242,445 23,193 107,545 100,026 0 375,000 0 1,003,422
Hamilton 28,419 106,112 197,346 39,000 175,728 81,128 0 375,000 0 1,002,733
Roe 66,433 36,679 53,677 4,500 12,400 103,979 0 375,000 0 652,668
Buder 18,208 55,573 221,765 34,527 139,099 116,707 0 375,000 0 950,879
Woodward 27,888 40,637 110,296 22,389 111,237 120,579 0 375,000 0 808,026
Walbridge 31,556 193,356 277,472 29,731 132,743 112,594 0 0 0 777,452
Lowell 26,448 93,124 118,480 20,251 109,839 78,829 0 375,000 1,555,840 2,377,811
Shenandoah 26,410 48,995 48,799 42,126 115,515 72,733 0 375,000 0 729,578
Scullin 46,074 221,011 172,408 39,919 85,978 49,659 0 375,000 0 990,049
Cole 5,361 90,748 190,598 11,744 138,260 13,418 0 0 0 450,129
Gundlach 58,088 135,556 281,484 16,919 151,373 71,881 0 375,000 0 1,090,301
Herzog 26,794 102,116 125,336 7,575 66,660 97,642 0 375,000 1,555,840 2,356,963
Garfield 7,872 162,488 112,402 12,150 82,170 77,420 0 375,000 0 829,502
Banneker 10,701 93,885 215,662 37,244 118,956 61,366 0 0 0 537,814
Mitchell 6,719 273,718 122,445 1,500 89,519 77,095 0 0 0 570,996
 Mitchell Branch 0 0 0 0 0 0 0 0 0 0
Peabody 26,433 162,041 192,861 10,488 14,139 86,499 0 0 0 492,461
Carr Lane 51,828 202,305 269,335 6,188 145,983 72,557 0 0 0 748,196
Jefferson 55,040 233,822 303,818 56,081 137,793 77,254 0 0 0 863,808
Lexington 6,020 66,623 66,403 2,500 80,555 31,593 0 375,000 1,555,840 2,184,534
Bryan Hill 29,045 116,478 137,708 17,269 140,420 125,081 0 375,000 0 941,001
Williams Branch 0 0 0 0 0 0 0 0 0 0
Cook Branch #1 0 0 0 0 0 0 0 0 0 0
Hamilton Branch #1 0 0 0 0 0 0 0 0 0 0
Hamilton Branch #2 0 0 0 0 0 0 0 0 0 0
Hempstead Branch 0 0 0 0 0 0 0 0 0 0
Farragut Branch #1 0 0 0 0 0 0 0 0 0 0
Farragut Branch #2 0 0 0 0 0 0 0 0 0 0
 __________ __________ __________ __________ ___________ ___________ _______ ___________ _________ ______________
Subtotal,
Elementary $1,983,981 $ 6,407,101 $ 8,620,261 $1,328,541 $ 6,046,675 $ 4,924,424 0 $13,500,000 $6,223,360 $ 49,034,343
 __________ ___________ ___________ __________ ___________ ____________ _______ ___________ __________ ______________

*719
Webster $ 32,958 $ 143,112 $ 50,452 $ 72,550 $ 223,912 $ 114,416 $ 0 $ 0 $ 0 $ 637,400
Blow 23,952 78,817 182,603 62,500 175,714 163,743 0 0 0 687,329
Fanning 14,309 75,634 157,112 68,100 138,849 127,338 0 0 0 581,342
Dewey 32,926 51,273 124,620 72,300 218,793 97,411 0 0 0 597,323
Long 22,761 150,444 169,565 83,200 175,696 129,196 0 0 0 730,862
Grant 10,213 112,430 140,956 47,600 112,892 102,023 0 0 0 526,114
Simmons 37,882 275,203 130,420 109,050 106,142 168,771 0 0 0 827,468
Mullanphy 53,821 298,911 181,275 91,800 275,994 135,414 0 0 0 1,037,215
Columbia 16,217 128,182 110,088 71,000 102,290 96,381 0 0 0 524,158
Clinton 5,019 102,103 182,902 15,200 100,230 98,387 0 0 0 503,841
King 24,687 132,322 212,975 57,041 98,118 101,799 0 0 0 626,942
Turner 22,510 214,474 84,672 4,438 40,158 85,601 0 0 0 451,853
 Turner Branch 31,751 175,006 71,554 49,319 56,475 74,558 0 0 0 458,663
L'Ouverture 37,840 251,238 163,168 96,100 322,232 96,287 0 0 0 966,865
Nottingham 6,000 255,799 32,429 12,850 68,089 33,864 0 0 0 409,031
Blewett 48,609 252,078 84,070 19,988 292,082 6,244 0 0 0 703,071
Washington 25,920 202,581 54,335 3,050 132,857 52,048 0 0 0 470,791
Stevens 35,304 35,300 196,198 16,438 121,181 45,101 0 0 0 449,522
Cook 35,521 112,882 69,874 2,525 42,256 138,980 0 0 0 402,038
Ford 495 58,687 44,063 6,932 93,057 80,109 0 0 0 283,343
 Ford Branch 64 80,827 17,922 3,257 30,313 30,016 0 0 0 162,399
Langston 137,745 395,092 27,341 24,800 82,523 30,147 0 0 0 697,648
Williams 6,579 57,446 69,792 7,388 53,649 67,112 0 0 0 261,966
Hickey 9,240 247,280 57,596 16,300 209,634 76,671 0 0 0 616,721
Stowe 30,934 251,744 47,501 2,294 96,997 77,683 0 0 0 507,153
Yeatman 19,545 248,222 35,064 10,582 54,715 68,420 0 0 0 436,548
 __________ ___________ ___________ __________ ___________ ___________ _____________ ____________ __________ ____________
Subtotal, Middle $ 722,802 $ 4,387,087 $ 2,698,547 $1,026,602 $ 3,424,848 $ 2,297,720 $ 0 $ 0 $ 0 $ 14,557,606
 __________ ___________ ___________ __________ ___________ ___________ _____________ ____________ __________ ____________
Beaumont $ 87,889 $ 73,548 $ 795,440 $ 257,646 $ 719,033 $ 164,969 $ 0 $ 0 $ 0 $ 188,867 $ 2,287,392
McKinley 44,023 338,722 314,273 212,077 463,639 164,678 0 0 0 138,367 1,675,779
Northwest 18,452 29,778 249,778 24,686 215,186 246,084 0 0 0 70,556 854,520
Roosevelt 46,052 177,675 725,967 143,868 327,981 162,332 0 0 0 142,549 1,726,424
Southwest 77,759 407,407 668,959 104,306 351,816 224,564 0 0 0 165,133 1,999,944
Sumner 33,824 172,698 822,567 628,151 454,735 143,902 0 0 0 203,029 2,458,906
Vashon 78,092 472,778 1,357,416 472,564 730,345 20,229 0 0 0 281,828 3,413,252
Soldan 55,923 724,368 872,644 101,326 575,785 163,013 0 0 0 224,375 2,717,434
 __________ ___________ ___________ __________ ___________ ___________ _____________ ____________ __________ __________ ____________
Subtotal, High $ 442,014 $ 2,396,974 $ 5,807,044 $1,944,624 $ 3,838,520 $ 1,289,771 $ 0 $ 0 $ 0 $1,414,704 $ 17,133,651
 __________ ___________ ___________ __________ ___________ ___________ _____________ ____________ __________ __________ ____________

*720
Central VPA $ 34,558 $ 244,681 $ 502,339 $ 336,819 $ 447,419 $ 154,666 $ 0 $ 0 $ 0 $ 154,843 $ 1,875,325
Cleveland NJROTC 292,185 553,565 569,824 95,302 508,972 185,239 0 0 0 198,458 2,403,545
Health Care 0 143,151 35,917 0 54,304 48,739 0 0 0 282,111
Math/Science 3,494 55,326 154,485 33,288 84,500 158,069 0 0 0 489,162
Metro 25,697 78,035 67,113 0 33,036 89,172 0 0 0 293,053
Management Center 0 0 0 0 0 0 0 0 0 0
Enright CJA 109,357 220,815 166,513 16,219 244,475 236,768 0 0 0 994,147
Madison 10,110 144,996 249,870 71,000 132,650 109,239 0 375,000 0 1,092,865
Mallinckrodt 9,851 115,092 259,916 606 16,974 79,375 0 375,000 0 856,814
Wade 16,204 58,234 140,684 13,406 119,211 99,849 0 375,000 0 822,588
AAA Academy 20,012 72,610 39,317 0 42,199 37,565 0 0 0 211,703
Ames 29,259 168,909 50,782 4,919 104,682 59,079 0 0 0 417,630
Euclid 4,677 107,832 168,277 104,263 121,766 98,699 0 0 0 605,514
Shaw 67,038 223,240 121,504 35,100 163,992 81,656 0 375,000 0 1,067,530
Stix 19,170 109,579 153,654 20,938 118,031 93,516 0 375,000 0 889,888
Waring 29,080 139,831 150,377 23,107 75,066 82,436 0 375,000 0 874,897
Wilkinson 12,126 82,367 115,327 4,320 21,731 68,735 0 375,000 0 679,606
 __________ ___________ ___________ __________ ___________ ___________ _____________ ____________ __________ __________ ____________
Subtotal, Magnets $ 682,818 $ 2,518,263 $ 2,945,899 $ 759,287 $ 2,289,008 $ 1,682,802 $ 0 $ 2,625,000 $ 0 $ 353,301 $ 13,856,378
 __________ ___________ ___________ __________ ___________ ___________ _____________ ____________ __________ __________ ____________
O'Fallon $ 80,521 $ 623,680 $ 652,152 $ 0 $ 181,177 $ 541,270 $ 0 $ 0 $ 0 $ 2,078,800
Continuing Ed. 46,080 72,004 104,447 8,825 65,970 9,497 0 0 0 306,823
Gallaudet 8,884 52,515 74,943 17,800 78,563 81,447 0 0 0 314,152
Michael 2,832 154,437 157,643 13,044 118,438 85,577 0 0 0 531,971
Longfellow 0 0 0 0 0 0 0 0 0 0
 __________ ___________ ___________ __________ ___________ ___________ _____________ ____________ __________ ____________
Subtotal, Special $ 138,317 $ 902,636 $ 989,185 $ 39,669 $ 444,148 $ 717,791 $ 0 $ 0 $ 0 $ 3,231,746
 __________ ___________ ___________ __________ ___________ ___________ _____________ ____________ __________ ____________
 Totals $3,969,932 $16,612,061 $21,060,936 $5,098,723 $16,043,199 $10,912,508 $ 0 $ 16,125,000 $6,223,360 $1,768,005 $ 97,813,724
Reconfigure playrooms to instruction rooms 1,570,000
Regular classrooms to Special Education 540,000
Magnet reconfiguration 4,365,314
 ____________
 $104,289,038
10% design fee 10,428,903
 ____________
 $114,717,941

*721
 TABLE X
 Recommended Deductions from Desegregation-Related
 Capital Improvements Plan, L(852)86, April 1986
 Description Elementary Middle School High School Special Magnets Total
 Sodding $ 34,391 $ 52,000 $ 12,369 $ 0 $ 13,250 $ 112,010
 New parking 380,000 62,500 0 0 52,500 495,000
 Tuckpointing 401,878 33,367 0 0 21,355 456,600
 Noninsulated glass 198,754 274,047 0 7,379 60,793 540,973
 Roofs 159,728 223,790 0 0 0 383,518
 Gutters/downspouts 82,425 26,665 1,576 8,700 2,910 122,276
 New boilers 567,800 640,000 0 42,000 103,000 1,352,800
 New air dampers 699,610 73,640 0 0 63,000 836,250
 New air return 785,351 268,150 0 0 106,000 1,159,501
 Fire alarm 180,700 144,810 0 70,000 25,000 420,510
 Replace lights 1,979,158 976,084 640,687 118,025 358,853 4,072,807
 New electrical service 744,000 89,000 0 0 5,000 838,000
 Elevators/lifts 180,500 100,500 103,500 0 96,000 480,500
 Energy conservation 1,330,893 1,157,347 793,434 111,101 557,262 3,950,037
 Building closures 6,442,043 0 0 526,869 815,903 7,784,815
 ___________ __________ __________ ________ __________ ___________
 Totals $14,167,231 $4,121,900 $1,551,566 $884,074 $2,280,826 $23,005,597

FINANCING THE CAPITAL IMPROVEMENTS BUDGET
The capital improvements budget calls for a total expenditure of $114,717,941.00 to rehabilitate 104 schools (excluding the Settlement Plan magnets) which will accommodate projected enrollment and desegregation programs by 1990-91. The plan of financing now to be addressed will make funds immediately available to "restore, maintain or enhance" the City Board's educational facilities, plus sustain a fiscal reserve for continued maintenance and additional capital improvements in the future.
Directions from the Court.
Funding for facility improvement shall come mainly from local revenues with one-time assistance from the State. Improvement of facilities is a Board obligation, part of its desegregation efforts.
H(2503)83, page 3.
The State is to pay one-half of capital costs necessary to restore city facilities to a constitutionally acceptable level.
Liddell VII, 731 F.2d at 1319.
In regards to a capital improvements plan, "[t]he City Board should consider the desirability of a referendum on a bond issue which can be initiated at a very early date and a subsequent bond issue for those projects to be built in later years."
Liddell VII, at 1319.
After submitting a plan to the district court (and assuming Court approval), "a new bond issue shall be submitted to the voters. If it is defeated again, the district court shall determine how the improvements will be funded."
Liddell VII, at 1319.
"[t]he district court's broad equitable powers to remedy the evils of segregation include a narrowly defined power to order increases in local tax levies on real *722 estate. Limitations on this power require that it be exercised only after exploration of every other fiscal alternative."
Liddell VII, at 1320.
City Board is to prepare a capital improvements plan, not exceeding $40,000,000.00, to address the needs of the non-integrated schools especially. Upon district court approval, the City Board is to submit a $20,000,000.00 bond issue to the voters to be matched by the State. If the bond issue fails to receive the necessary two-thirds majority, then judgment is to be entered against the City Board and the State in equal amounts.
Liddell VIII, 758 F.2d at 302-303.
After citing City Board's non-compliance with Liddell VIII, City Board was again directed to prepare a $40,000,000.00 capital improvements plan for the non-integrated elementary and middle schools. After submission to the district court, and upon approval by the district court, a $20,000,000.00 bond issue shall be submitted to the voters of St. Louis City. If the bond issue fails, the district court shall follow the course set forth in Liddell VII and Liddell VIII.

Liddell IX, 801 F.2d at 284.
In reference to a substantial balance at the end of the 1986-87 school year, "[w]e direct the district court to determine the amount of this balance and direct that not less than fifty percent of that balance be used to fund a portion of the City Board's share of the cost of providing the facilities set forth in paragraphs B(3) and B(4) of this order."
Liddell XII, 823 F.2d at 1255.
In reference to savings from consolidation of school facilities, "[t]hese savings are to be earmarked for assisting the City Board in retiring a bond issue necessary to finance its share of the capital improvements program."
Liddell XII, at 1255.
If the sources of funding identified in Liddell XII are insufficient to fund City Board's $20,000,000.00 share of a $40,000,000.00 capital improvements program for the nonintegrated elementary and middle schools, the district court shall enter an order consistent with Liddell VII, Liddell VIII and Liddell IX to make resources available to assist the City Board with a bond issue.
Liddell XII, at 1255.
The most important objective in this capital improvements program to rehabilitate the City Board's school facilities is to commence work immediately and continue all work until completed. With this in mind, the Court has sought to develop a plan of financing which will insure: 1) that the City Board will move forward decisively and effectively to carry out the capital improvements program; and 2) that progress will not be retarded by cost or project objections, or by insufficient cash flow.
The Eighth Circuit has often referred to a bond issue as a means of financing a capital improvements program. However, a bond issue is not the only means available to fund the capital improvements program. This Court is empowered to order a property tax increase or any other fiscal alternative it deems necessary and reasonable to remedy the situation. See Liddell VII, at 1320.
Although the City Board may attempt to finance its obligation for the cost of the project by a bond issue, this Court will not order it to do so. The City Board has requested this Court to exempt a capital improvements bond issue from the required two-thirds majority vote requirement. See, City Board Motion for Order Establishing Adequate Funding to Implement Facilities Plan, L(1364)87. This Court is not prepared to begin carving out judicially mandated exemptions to state statutes in which constitutionality is not at issue. Furthermore, although the two-thirds majority *723 vote requirement has prevented the passage of several bond issues, these bond issues were for exorbitant amounts. If the City Board had heeded the directives of the Eighth Circuit for smaller bond issues, the two-thirds majority vote requirement may have well been met. Since a bond issue is not the only fiscal option open, this Court will not interfere with the State constitutional taxing limitations presently in force.
A property tax increase was another option explored and rejected by the Court.
Liddell XII directs the district court to determine the amount of the fund balance at the end of the 1986-87 school year with the parties to determine the annual savings from consolidating school facilities. There is no doubt that these two sources will substantially assist the City Board in funding its share of a capital improvements program. However, it will take months, even a year to make these determinations. These sources of funding will have significant impact in the years to come, but simply are not available now to grant immediate relief. The Court believes that there are other means to provide the required funding immediately.
The Court requested the Financial Advisor to investigate the possibility of the City Board funding its capital improvements costs from its own present reserves. The Financial Advisor was instructed to analyze the City Board's revenues and expenditures (for the last year available), to compare its expenditure patterns with other school districts, and to identify areas where funds could be freed up for capital outlay. The City Board has conceded that it does have unencumbered excess funds available, which this Court and the Court of Appeals believe might be sufficient to assist the City Board in funding its part of the capital improvements program now. See, Liddell XII, at 1255, footnote 2.
The Financial Advisor utilized financial data for his analysis from the city and county school districts' Annual Secretary of the Board Reports and from the Financial Report for Missouri Public Schools, Fiscal Year 1985-86. The enrollment data used in his analysis are from District Profiles V and VI, Reports P.S.026 PE and P.S.026 PF, dated December 19, 1986. There are two terms used frequently in the Financial Advisor's data compilation: "eligible pupil" (EP) and "current operating expense." They are defined as follows:
1. Eligible pupil (EP) is the unit measure used in Missouri school accounting. It is a number derived from averaging enrollment and attendance. It is less than reported enrollment but greater than average daily attendance. EP is the basis for distribution to local districts of most state school funds. The 24 suburban districts had an EP count of 127,343 during 1985-86. The city school system had an EP count of 49,151. Use of EP as the cost accounting unit permits expenditure comparisons between districts of different sizes.
2. Current operating expense is defined by the DESE as the total expenditures for instruction and support services, objects 6110 through 6400 on the Secretary's Report, less revenues from food services, student activities and payments from other districts. In effect, current expenditures are those made during the current year. Expenditures in excess of receipts for partially self-supporting programs  food service and student activities  are included in order to reflect only the district subsidy for these functions. Expenditures involving long periods of time  capital outlay including instructional equipment; debt service principal and interest; facilities acquisition and construction are excluded. Other excluded expenditures are those which are not made by all districts: adult basic education, adult continuing education, community services.
*724 The Court's review and correlation of the Financial Advisor's data[13] reveals that the City Board's present allocation of expenditures to capital outlay is less than one-tenth (1/10) of one percent (1%). Fiscal year 1985-86 (unaudited) had expenditures of $242,000,000.00 with disbursements of $141,423.00 from the building fund and $25,000.00 from the debt service fund. These disbursements amount to only seven hundredths (7/100) of one percent (1%). A summary of receipts and expenditures is provided in Table XI (excepted from Attachment 6) attached.
A comparison of 1985-86 expenditure patterns in participating county school districts indicates that the Board has resources which may be allocated to capital outlay without damage to its instructional program. The county districts, despite their tight budgets, have been able to do so. The comparisons depict the following:

*725
 TABLE XI
 SUMMARY OF RECEIPTS AND EXPENDITURES
 JULY 1, 1985 THROUGH JUNE 30, 1986
 RECEIPTS EXPENDITURES
 TOTAL
 YR. TO DATE AVAILABLE AVAILABLE YR. TO DATE CASH BALANCE
FUND DESCRIPTION JUNE 6/30/86 BALANCE 6/30/86 JUNE 6/30/86 6/30/86 
 GENERAL FUND
66-116 Incidental $ 3,747,377 $ 77,483,880 $ 9,691,458 $ 87,175,338 $ 3,602,117 $ 80,538,024 $ 6,637,314
66-126 Teachers 6,459,512 91,193,696 3,592,051 94,785,747 6,012,610 93,903,092 882,655
66-136 Building 1,436 88,521 334,654 423,175 1,462 141,423 281,752
66-156 Free Textbook -0- 2,972,989 88,083 3,061,072 34,355 3,061,072 -0-
66-246 Adult Education 7,282 1,479,018 1,016,781 2,495,799 181,806 2,466,428 29,371
66-286 HB 474 Reimbursements 200,000 2,352,644 137,528 2,490,172 222,980 2,445,806 44,366
64-346 Metro Deseg. Stlment Plan 83/84 -0- -0- 27,874 27,874 -0- 27,874 -0-
65-346 Metro Deseg. Stlment Plan 84/85 -0- 1,063,850 6,389,329 7,453,179 1,554 7,438,252 14,927
66-346 Metro Deseg. Stlment Plan 85/86 3,838,691 24,350,073 365,735 24,715,808 1,828,992 20,944,307 3,771,501
64-536 Metro Deseg. Stlment Plan 83/84 -0- 196,956 (191,975) 4,981 -0- 4,981 -0-
65-536 Metro Deseg. Stlment Plan 84/85 -0- 167,182 1,238,588 1,405,770 69 1,405,482 288
66-536 Metro Deseg. Stlment Plan 85/86 1,310,101 10,005,349 45,842 10,051,191 894,469 9,268,632 782,559
64-556 Voc. Educ. Deseg. Stlment Plan 83/84 -0- -0- 1,851 1,851 -0- 1,851 -0-
65-556 Voc. Educ. Deseg. Stlment Plan 84/85 579 13,056 211,691 224,747 -0- 102,700 122,047
66-556 Voc. Educ. Deseg. Stlment Plan 85/86 262,896 807,794 -0- 807,794 62,532 600,344 207,450
63-576 IntraCity Deseg. Plan 82/83 -0- -0- 42,655 42,655 -0- 42,655 -0-
64-576 IntraCity Deseg. Plan 83/84 -0- 405 769 1,174 -0- 1,174 -0-
65-576 IntraCity Deseg. Plan 84/85 -0- 208,726 3,012,170 3,220,896 40 3,055,362 165,534
66-576 IntraCity Deseg. Plan 85/86 2,498,797 16,197,961 3,671,187 19,869,148 1,201,438 17,408,775 2,460,373
 ___________ ____________ ____________ ____________ ____________ ____________ ____________
 TOTALS $18,326,671 $228,582,100 $ 29,676,271 $258,258,371 $ 14,044,424 $242,858,234 $ 15,400,137
66-616 SCHOOL BOND DEBT REVENUE FUND -0- -0- 25,000 25,000 -0- 25,000 -0-
66-166 ESCROW FUND 1,870,260 22,610,258 2,562,258 25,172,516 2,207,865 22,354,230 2,818,286
66-516 SCHOOL LUNCHROOM FUND 1,179,074 13,074,266 2,097,362 15,171,628 1,047,879 12,238,156 2,933,472
 FOUNDATION, CONTRS. & INC. 100,096 1,516,805 3,171,331 4,688,136 287,850 4,146,316 541,820
 FEDERAL PROGRAMS 1,483,211 17,350,121 539,994 17,890,115 2,032,115 18,140,204 (250,089)
 ___________ ____________ ____________ ____________ ____________ ____________ ____________
 GRAND TOTAL $22,959,312 $283,133,550 $ 38,072,216 $321,205,766 $ 19,620,133 $299,762,140 $ 21,443,626
 =========== ============ ============ ============ ============ ============ ============

*726 1) The total local tax rates for the City Board and the average county district were similar: City Board  $3.16 and average county district (ACD)  $3.14. However, the ACD tax rate included $.44 (14%) for building and debt service funds, while the City Board's tax rate included $0 for these funds. If the City Board had included $.44 for building and debt service funds, it could have raised over $8,000,000.00 for capital expenditures.
2) The City Board has more total current receipts (local taxes, state funds  including desegregation funds, and federal funds) per EP than the ACD.
3) The City Board spends more per EP than the ACD: City Board  $4,288.00 per EP; ACD$3,752.00 per EP. It breaks down as follows:

 City Board $2,456.00 per EP for instruction;
 City Board $1,832.00 per EP for support services;
 ACD $2,337.00 per EP for instruction;
 ACD $1,415.00 per EP for support services.

4) The City board spent in excess of $26,000,000.00 more than ACD for instructional and support services.
5) The City Board staff ratios compare favorably with those of the ACD.
The Court then compared the City Board's total costs with those of the four largest county districts (Parkway, Hazelwood, Rockwood, and Ferguson-Florissant). The total EP in these four districts was 57,403 compared to the City Board's EP of 49,151. The Court found that:
1) The City Board spent an equated total amount of $18,000,000.00 more than the four largest county districts in 1985-86.
2) The City Board spent slightly more ($3,000,000.00) for instruction than these same districts.
3) The county districts spent $19,000,000.00 more than the City Board for facilities acquisition and debt service.
4) The City Board spent $34,000,000.00 more than these county districts for support services and community programs.
The purpose of this comparative analysis by the Court was to compare the City Board's revenues and spending patterns with those of the county districts to note variations which might suggest reallocation of resources to fund the City Board's share of capital improvements. The Court realizes that this analysis is not truly equitable because each school district is unique in its demographic conditions, community aspirations, financial resources and instructional needs. However, this analysis does clearly illustrate the difference in priorities set by the City Board's budget and the county districts' budgets. Expenditures express a school district's priorities. When funds are allocated to expenditure categories, purposeful decisions have been made reflecting a school district's objectives and priorities in implementing its educational program. The City Board's budgets have historically failed to allocate resources to a building fund despite the deteriorating condition of its facilities. The county districts have always allocated monies to a building fund. It is time for the City Board to reappraise its management decisions on resource allocation.
This Court is convinced that the City Board has within its means the funds necessary for its share of the capital improvements program. It is obvious that if the City Board initiated cost cuts, especially in the support services areas, and strove to develop an expenditure pattern similar to those of the large county districts, funds could be freed up for capital expenditures. Furthermore, the closing of the smaller facilities and scheduling of all students more efficiently should assist the City Board in making monies available for capital expenses.
Accordingly, the Court now sets forth the funding formula and schedule for the implementation of a capital improvements program for the schools in the City of St. Louis:
1) The budget for the capital improvements program is set in the amount of $114,717,941.00, subject to modification by this Court. The City Board and the State of Missouri shall share equally the costs of the capital improvements program. Their respective costs are $57,358,970.50.
*727 2) The City Board is to establish a separate special Capital Projects Fund (Fund) as an accounting vehicle for administering the capital improvements program. The City Board will place in the Fund: (1) State receipts pursuant to this Order; (2) the proceeds from any local capital improvements bond issue; (3) receipts from a building improvements revenue allocation, such as a sales tax or other revenue; and (4) donations from outside sources. Monies deposited into the Fund shall be invested as provided by State law. Expenditures will be made solely for the purpose of carrying out the activities outlined in this Order. All receipt to and expenditures from the Fund shall be reported annually to the Court following a fiscal year independent audit, in accordance with court-approved procedures for desegregation accounting and reporting. The City Board and the State shall share equally the costs of the independent audit.
3) The State will make three installment payments, each in the amount of $19,119,656.83. The DESE shall timely certify to the Commissioner of Administration (Commissioner) the amount needed to make the State's payments and to whom the payments are to be made. Within two working days after such certification, the Commissioner shall issue warrants in the amounts and to the party set forth in the DESE's certification. Within two working days of receipt of each of said warrants, the Treasurer of the State of Missouri shall issue and sign checks in the amounts and to the party set forth in said warrants.
4) The State's first payment of $19,119,656.83 shall be made thirty-one (31) days from the date of this order. If an appeal is taken, the State's first payment shall be made thirty (30) days from the date of affirmance. In the event of reversal, the Court will modify as directed by the Eighth Circuit and will set a new time for payment. After the first payment is made, the second and third payments shall be made annually from the date of the first payment. The State's one-time funding obligation to share the costs of a capital improvements program for the St. Louis City Schools shall be deemed fulfilled and satisfied upon the deposit of its third and last payment.[14] The State's payments are exclusive of its funding obligation for the capital costs of Settlement Plan magnets.
5) The City Board shall make eight (8) installment payments, each in the amount of $7,000,000.00. A ninth (9th) payment shall be made in the amount of $1,358,970.50. These payments shall be made annually according to the same schedule as outlined above for the State. Thereafter, the City Board shall continue to deposit annually (until further notice of the Court) the amount of $5,000,000.00 into the Fund for continued maintenance and additional capital improvements. Interest on the unused balance of State and City Board payments shall be credited against the capital costs funding obligation of each entity regarding Settlement Plan magnets, or in some other way as the Court may later direct.
6) This Court believes that cash flow should meet construction cost pacing, and that all construction projects (as prescribed by this Order) should be completed within six (6) years from the date of the final order.
7) In the event construction costs become due when the Fund's monies are insufficient to meet these costs because the City Board's payment is not yet due, the City Board and the State shall enter into a loan agreement. In so doing, the State shall loan the City Board the necessary funds to meet the due and owing construction costs, and the City Board shall repay the loan amount, plus interest, out of its forthcoming payment. The City Board's last payment (i.e. 9th payment) shall include, in addition, any interest paid out of prior payments and not used to fund construction projects. Interest on the loan amount shall be calculated as simple interest from the date of the loan until date of repayment. The rate of interest shall be 1% less than the average of the commercial prime lending rates of the Boatmen's National Bank of St. Louis, Centerre Bank *728 N.A. and Mercantile Bank N.A., during each year preceding the due date of City Board's forthcoming payment. For example, if City Board's payment is due on July 1, 1992, then the loan interest rate is 1% less than the average of the three named banks' commercial prime lending rates for the year beginning July 1, 1991, and ending July 1, 1992.
The City Board is not obligated to borrow the funds from the State. It is free to secure the funds from other sources or to make a loan arrangement elsewhere if the terms are comparable or superior to the conditions set forth above.
8) The Court reserves the right to appoint a committee to monitor the construction projects and the Fund. The committee members and their duties will be announced when a final order is entered. However, the Court emphasizes that the City Board is responsible for the implementation of this capital improvements program, subject to the monitoring of the committee to be named later.
9) The City Board is to begin immediately to prepare specifications for major improvement projects, pursuant to this court-approved capital budget, in the nonintegrated elementary and middle schools, Cleveland, Central and the other intradistrict magnets. The following priorities should be set, stressing early commencement of projects which will seal the buildings from further deterioration. Most of these projects should be scheduled so as not to greatly interfere with the students' education, particularly the urgent work of sealing the buildings' exteriors as follows:
(1) Roofs;
(2) Tuckpointing;
(3) Exterior caulking and painting;
(4) Repair and replacement of windows;
(5) Exterior doors;
(6) Repair of safety hazards on site.
Since a great many of the City Board's proposed rehabilitation projects involve similar operations in a number of schools, it seems more cost-effective to group schools for bidding purposes and to develop plans and specifications which can be used in a number of similar applications. Examples are: roof repair and replacement; tuckpointing; caulking, scraping and painting of outside wood surfaces; boiler inspection and repair; electric service to schools, classroom lights; ceilings, interior paint; basic specifications for elementary gymnasiums.
The Court directs that the Board solicit bids for similar projects to be completed in groups of schools in close geographic proximity, where the projects involve a particular expertise. In this way a number of contractors can be put to work simultaneously in their area of expertise. Basic work can be completed more quickly, and useful cost comparisons can be made.
After completing most urgently needed plans and specifications, the Board should plan for orderly completion of the entire program approved by the Court. The Board's annual dollar allocation, plus the State's up-front monies (and subsequent payments) should provide monies to complete all basic needs in six years.
10) The City Board shall report to this Court semi-annually the work projects completed, work in progress and work scheduled for future completion.
The extent of the responsibility of the State of Missouri to fund capital improvements for the St. Louis city schools must be reexamined at this juncture. As stated earlier in the opinion, this Court is mindful of the finding in Liddell VII, supra, at p. 1319 "that the State had an obligation to pay one-half of the costs of the capital improvements program necessary to restore the city facilities to a constitutional, acceptable level...." This Court now holds that the payment by the State of one-half of the sum required by this opinion meets that obligation except perhaps for possible funding requirements of 12(c) magnet capital improvements which will be considered after examination of the upcoming long-range magnet review committee report and recommendation.
In fact, after examination of evidence now available but not before the Court when Liddell VII was handed down, it might appear the State of Missouri had no *729 desegregation-related capital improvement obligation in any event.
It is no secret that the City of St. Louis, residentially, is a segregated community. An area constituting a corridor running west from the Mississippi River to the west boundary line of the city bounded generally on the North by Delmar Boulevard and U.S. Highway 40 in the south, is inhabited almost equally by blacks and whites. Almost 95% of the city residents to the north of the corridor are black and about the same percent to the south are white.
The media observe this in every election report when the so-called traditionally black wards and white wards are referred to. This Court and the Court of Appeals have observed this fact in prior opinions, as well.
Yet, the deplorable condition of the St. Louis city schools is as evident generally in the south as in the north. It is as evident in those schools attended mainly by white students as it is in those schools in which blacks constitute the majority of the enrollees. It is also evident in the mixed schools as well as in the intra-magnet schools. These facts are established as a result of this Court's personal touring and observation of the schools and on the basis of all the evidence now presented.
If there is fault, it rests with the School Board which through the years has failed to allocate any appreciable amount of its revenue to maintain the physical integrity of its schools whether the schools are attended largely by whites or blacks or mixed or whether the schools are in an area in which blacks or whites are the predominant residents.
Downtown St. Louis is an exciting place. It is teeming with new construction and a refurbishing of hallowed landmarks. The development and use of the greatest natural resource, the river, is being taken advantage of. The service industry and its direct and indirect benefits abounds. Full attention is being directed to the safety and well being of those who live or work there.
The regular upgrading of the city school system remains to be accomplished in order for this community to be competitive with other thriving metropolitan areas and in order to guarantee excellent educational opportunities to all persons whatever their race or minority background.
The refurbishing of the school facilities as provided for herein is a large step in the right direction. What is mandated here, however, satisfies only constitutional requirements. Utilization of modern engineering and architectural approaches and asthetic potential as well as sound, economic structural facilities with first class equipment must come from other sources. Thus, this Court is requiring permanent, regular funding for improvements. But, the sum required may be only enough to satisfy constitutional obligations.
An enterprising school board can find innovative ways to achieve those goals of structural upgrading beyond the minimum standards contemplated by the constitution, that is, for sound and safe structures. But this worthy objective requires support of a substantial magnitude. Business, organized labor, the city administration and the community as a whole must join in a concerted effort if the St. Louis educational system is to be a part of the lustre that is beginning to shine downtown. Such an endeavor, however, does not require judicial involvement.

ORDER
In accordance with the Memorandum filed herein this date,
IT IS HEREBY ORDERED that the City Board shall implement the capital improvements program for the schools in the City of St. Louis as set forth in the accompanying memorandum.
IT IS FURTHER ORDERED that the budget for this Court-approved capital improvements program is set in the amount of $114,717,941.00, subject to modification by the Court. The City Board and the State shall share equally the costs of the capital improvements program. Their respective costs are $57,358,970.50. Funding of these costs and payment of costs shall be in accordance with the accompanying memorandum.
*730 IT IS FURTHER ORDERED that the City Board and State shall carry out fully their obligations as set forth in the accompanying memorandum.
IT IS FURTHER ORDERED that the City Board's Desegregation-Related Capital Improvements Plan ("Order 680 Plan"), L(852)86 and the State's Alternative Capital Improvements Plan, L(1047)86 be and are DISAPPROVED as set forth in the accompanying memorandum.
IT IS FURTHER ORDERED that the City Board's $40,000,000.00 Capital Improvements Plan (pursuant to Court of Appeals' mandate), L(1093)86 be and is DISAPPROVED as set forth in the accompanying memorandum.
IT IS FURTHER ORDERED that the following motions filed by the City Board be and are DENIED.
1. L(854)86Motion for Order Requiring Funding of Desegregation-Related Capital Improvements Plan ("Order 680 Plan");
2. L(1192)86Motion for Approval of Facilities Plan (Long-Range Plan L(857)86);
3. L(1364)87Motion for Order Establishing Adequate Funding to Implement Facilities Plan.
IT IS FINALLY ORDERED that the City Board's Motion for Reconsideration of Provisions of Court Order L(680)86, L(855)86, be and is GRANTED in part only insofar as the Court will allow the construction of additional classrooms and new gymnasiums as set forth in the accompanying memorandum.

ATTACHMENT 1

Cohort Survival Enrollment Projection

Calculation of Enrollment Projections
The Board, through Billingsley Consultants, projects 1990 enrollment at 53,399. The technique employed was to extract public school enrollment from projected total school-age population, based on an assumed "capture ratio." The State assumes that 1985-86 enrollment will remain stable through 1990-91, and it reduces total enrollment to reflect additional city-to-county transfers and increased magnet enrollment. The State projects 1990-91 enrollment at 42,298. Neither technique considers changes in student survival rates resulting from improved opportunities through quality education, magnet schools and interdistrict transfers.
Sources of data. Enrollment data used in this analysis was obtained from several sources:
1. The Board's annual October enrollment reports required by paragraph 14 of the District Court order of May 21, 1980.
2. Kindergarten enrollment for the years 1971 through 1980 as reported by the Board to the DESE. Enrollment for the years 1980 through 1986 was obtained from the Board's annual October enrollment reports.
3. First grade enrollment for the years 1971 to 1986 as reported by the Board to the DESE.
4. Interdistrict transfers as reported by VICC.
5. Vocational interdistrict transfers as reported by MCC.
Current enrollment. Table 1 shows the October enrollment in the St. Louis public schools reported by the Board for the years 1980 through 1986. The Board's reporting format groups elementary (K-8), secondary (9-12) and special education. Enrollment is not reported by grade except for kindergarten.

 Table I
 Actual October Enrollment by Level
 St. Louis Public Schools
Year Kindergarten Grades 1-8 Grades 9-12 Total Enrollment
 1980 4,060 39,955 18,735 62,750
 1981 4,090 38,478 18,007 60,575
 1982 4,351 36,545 18,301 59,197

*731
 Table I
 Actual October Enrollment by Level
 St. Louis Public Schools
 Year Kindergarten Grades 1-8 Grades 9-12 Total Enrollment
 1983 4,264 35,926 16,210 56,400
 1984 4,629 34,029 14,406 53,064
 1985 4,674 32,934 13,628 51,236
 1986 4,485 31,473 12,361 48,319

Resident enrollment. These enrollments do not accurately reflect the Board's resident student population because of student relocation resulting from court orders. Table II shows interdistrict transfers resulting in an enrollment decrease for the St. Louis public schools.

 Table II
 Interdistrict Transfers
 1980 1981 1982 1983 1984 1985 1986
 City-to County
 Kindergarten 0 0 0 43 177 252 387
 Grades 1-8 0 0 0 1,765 3,290 4,609 6,003
 High School 0 0 0 688 1,403 2,016 3,293
 9-12
 Vocational 0 36 132 178 172 175 160
 9-12
 County-to-City
 Kindergarten 0 0 0 18 17 28 30
 Grades 1-8 0 0 0 247 339 381 406
 High School 0 0 0 104 143 160 171
 9-12
 Vocational 0 4 52 77 134 107 179
 9-12
 ___ ___ ___ ____ ___ ___ ___
 Total K-12 0 4 52 446 633 676 786

To avoid distortions in survival rates, it is necessary to restore the city schools' enrollment to what it would be absent any student relocation resulting from court orders. City-to-county transfers should be added, and county-to-city transfers should be deducted. The VICC sending school analysis reports that 11 percent of the city-to-county transfers were from private and parochial schools. Therefore, only 89 percent of the transfers was added to the city enrollment in this analysis. Table III shows city enrollment for the years 1980 through 1986 adjusted for interdistrict transfers. Resident enrollment has declined in excess of 10 percent since 1980. However, the enrollment for the past three years shows a very modest decline.

 Table III
 Resident October Enrollment by Level
 (Adjusted for Interdistrict Transfers)
 Year Kindergarten Grades 1-8 Grades 9-12 Total Enrollment
 1980 4,060 39,955 18,735 62,750
 1981 4,090 38,478 18,007 60,575
 1982 4,351 36,545 18,301 59,197

*732
 Table III
 Resident October Enrollment by Level
 (Adjusted for Interdistrict Transfers)
 Year Kindergarten Grades 1-8 Grades 9-12 Total Enrollment
 1983 4,264 37,250 16,819 58,353
 1984 4,770 36,618 15,550 56,938
 1985 4,870 36,655 15,330 56,855
 1986 4,799 36,410 15,102 56,311

Historical data. This analysis employs a cohort survival technique to observe trends over a period of years. It then uses the observed trends to project enrollment by level through the schoolyear 1990-91. Table IV shows October kindergarten enrollments for the years 1981 through 1986 adjusted for interdistrict transfers. Table V shows October enrollment for first grade for the years 1971 through 1986 adjusted for interdistrict transfers. A very irregular and unpredictable relationship was observed between entering kindergarten and first grade classes. For example, in 1971 the Board reported kindergarten enrollment at 6,973. This class produced a first grade enrollment in 1972 of 11,351, an increase of 63 percent.

 Table IV
 Kindergarten October Enrollment
 (Adjusted for Interdistrict Transfers)
 Adjusted
 Actual Resident
 Kindergarten Add City to Deduct County Kindergarten
 Year Enrollment County to City Enrollment 
 1971 6,973 0 0 6,973
 1972 6,806 0 0 6,806
 1973 6,187 0 0 6,187
 1974 5,968 0 0 5,968
 1975 5,599 0 0 5,599
 1976 5,265 0 0 5,265
 1977 5,218 0 0 5,218
 1978 4,809 0 0 4,809
 1979 4,517 0 0 4,517
 1980 4,060 0 0 4,060
 1981 4,090 0 0 4,090
 1982 4,351 0 0 4,351
 1983 4,264 38 18 4,284
 1984 4,629 158 17 4,770
 1985 4,674 224 28 4,870
 1986 4,485 344 30 4,799
* 89% of actual transfers (11% from private/parochial schools)

*733
 Table V
 First Grade October Enrollment
 (Adjusted for Interdistrict Transfers)
 Adjusted
 Actual Resident
 Kindergarten Add City to Deduct County Kindergarten
 Year Enrollment County to City Enrollment 
 1971 11,833 0 0 11,833
 1972 11,351 0 0 11,351
 1973 9,682 0 0 9,682
 1974 8,280 0 0 8,280
 1975 7,773 0 0 7,773
 1976 5,961 0 0 5,961
 1977 7,427 0 0 7,427
 1978 6,984 0 0 6,984
 1979 7,195 0 0 7,195
 1980 6,116 0 0 6,116
 1981 5,775 0 0 5,775
 1982 5,430 0 0 5,430
 1983 5,241 158 13 5,386
 1984 5,013 305 19 5,299
 1985 5,040 418 22 5,436
 1986 4,818 533 23 5,328
 *89% of actual transfers (11% from private/parochial schools)

Enrollment projection. First grade enrollments are used in the cohort survival technique employed in this analysis because (1) there is a wide variance between kindergarten and first grade enrollments; and (2) first grade students may be considered to have committed to public schools. The survival rate of first grade students was observed as the students moved through the grades. The survival rates were determined for a number of years, and the rates and trends were employed to predict enrollments. The grade configuration used in this analysis  kindergarten, grades 1-8 and 9-12  is the reporting format used by the Board in the annual October enrollment report.
Students entering first grade in September 1975, 1976, 1977 and 1978 were reported in the secondary enrollment, grades 9-12, in October 1986. The survival rate was determined. This procedure was repeated for secondary enrollments reported in October 1985, 1984, 1983 and 1982, and the following survival rates were determined:

 Year Survival Rate
 1982 44.5%
 1983 45.4
 1984 49.1
 1985 52.1
 1986 53.7

The retention rate has been steadily improving at an average annual rate of 1.84 percent over a five-year period. In predicting secondary enrollment through the year 1990-91, the survival rate of 1986 was increased by 1.84 percent for each year.
A similar procedure was employed for observing survival rates for grades 1-8. Kindergarten enrollment was not included in survival rate projections because kindergarten enrollments have fluctuated widely over the past years. Estimated kindergarten enrollment, adjusted for interdistrict transfers, was predicted separately and added to the predicted enrollment in other grades.
The following survival rates were determined for grades 1-8:

 Year Survival Rate
 1982 69.4%
 1983 74.1
 1984 73.8
 1985 77.0
 1986 79.2

The retention rate for grades 1-8 has been steadily improving at an annual rate of 1.96 percent over a five-year period.
In predicting elementary enrollment through the year 1990-91, the survival rate for 1986 was increased by 1.96 percent for *734 each year. Actual first grade enrollments were employed in determining survival rates for secondary students through the year 1990-91. Estimated first grade enrollments were used for predicting enrollments for grades 1-8 through the year 1990-91. First grade enrollments have averaged 5,376 for the past five years with a variance of 77 or fewer students from the average each year.
Table VI shows the projected regular enrollment by level, magnet enrollment by level and vocational enrollment. The magnet enrollment total of 11,633  when added to the 1,243 county-to-city transfers  totals 12,876. This is the magnet enrollment projected by the Board in L(852)86, page 19.

 Table VI
 Summary Enrollment Projections by Level
 1990-91
 Regular Enrollment
 High School (9-12) 5,301
 Middle/Elementary (1-8) 21,460
 Kindergarten 4,500
 ______
 Subtotal 31,261
 Magnet Enrollment
 High School (9-12) 4,530
 Elementary/Middle 7,103
 ______
 Subtotal 11,633
 Vocational 600
 County Students 1,243
 ______
 Grand Total 44,737

Cohort Survival Analysis and Calculation

Procedure for determining secondary survival rates
The October 1982 secondary enrollment totaled 18,301 as reported in the October enrollment report. No adjustment were necessary for interdistrict transfers. The twelfth grade students entered first grade in 171; the eleventh grade students entered first grade in 1972; the tenth grade students entered first grade in 1973, and the ninth grade students entered as first graders in 1974. Entering first grades:

 Year Enrollment
 1971 11,833
 1972 11,351
 1973 9,682
 1974 8,280
 Total 41,146

The survival rate for this group of first grade students was 44.5 percent (18,301 + 41,146).
The October 1983 secondary enrollment totaled 16,819 after adjustment for interdistrict transfers. (October enrollment report at 16,210 plus 612 regular and 178 city-to-county transfers minus 104 regular and 77 vocational county-to-city transfers). Note: Table II shows 688 regular city-to-county transfers; however, only 612 (688 × 89%) were from city public schools.
The twelfth grade students entered first grade in 1972, eleventh grade in 1973, tenth grade in 1974 and ninth grade in 1975. Entering first grade:

Year Survival Rate
1972 11,351
1973 9,682
1974 8,280
1975 7,773
 ______
Total 37,086

*735 The survival rate for this group of first grade students was 45.4 percent (16,819 + 37,086).
The October 1984 secondary enrollment totaled 15,550 after adjustment for interdistrict transfers (October enrollment report at 14,406 plus 1,249 regular and 172 vocational city-to-county transfers minus 143 regular and 134 vocational county-to-city transfers). Note: Table II shows 1,403 regular city-to-county transfers; however, only 1,249 (1,403 × 89%) were from city public schools.
The twelfth grade students entered first grade in 1973, eleventh grade in 1974, tenth grade in 1975, and ninth grade in 1976. Entering first grades:

 Year Enrollment
 1973 9,682
 1974 8,280
 1975 7,773
 1976 5,961
 ______
 Total 31,696

The survival rate for this group of first grade students was 49.1 percent (15,550 + 31,696).
The October 1985 secondary enrollment totaled 15,330 after adjustment for interdistrict transfers (October enrollment report at 13,628 plus 1,794 regular and 175 vocational city-to-county transfers minus 160 regular and 107 vocational county-to-city transfers). Note: Table II shows 2,016 regular city-to-county transfers; however, only 1,794 (2,016 × 89%) were from city public schools.
The twelfth grade students entered first grade in 1974, eleventh grade in 1975, tenth grade in 1976 and ninth grade in 1977. Entering first grades:

 Year Enrollment
 1974 8,280
 1975 7,773
 1976 5,961
 1977 7,427
 _______
 Total 29,441

The survival rate for this group of first grade students was 52.1 percent (15,330 + 29,441).
The October 1986 secondary enrollment totaled 15,102 after adjustment for interditrict transfers (October enrollment report at 12,361 plus 2,931 regular and 160 vocational city-to-county transfers minus 171 regular and 179 vocational county-to-city transfers). Note: Table II shows 3,293 regular city-to-county transfers; however, only 2,931 (3,292 × 89%) were from city public schools.
The twelfth grade students entered first grade in 1975, eleventh grade in 1976, tenth grade in 1977 and the ninth grade in 1978. Entering first grades:

 Year Enrollment
 1975 7,773
 1976 5,961
 1977 7,427
 1978 6,984
 ______
 Total 28,145

The survival rate for this group of first grade students was 53.7 percent (15,102 + 28,145).
High schools survival rates have steadily improved during the past five years:

 Year Survival Rate
 1982 44.5%
 1983 45.4
 1984 49.1
 1985 52.1
 1986 53.7

The average annual survival rate has improved by 1.84 percent.

Procedure for determining elementary survival rates.
The October 1982 elementary (grades 1-8) enrollment totaled 36,545 as reported in the October enrollment report. This total includes special education students. No adjustments were necessary for interdistrict transfers.
The eighth grade students entered first grade in 1975, the seventh grade in 1976, sixth grade in 1977, fifth grade in 1978, fourth grade in 1979, third grade in 1980, and second grade in 1981. Entering first grades:

*736
 Year Enrollment
 1975 7,773
 1976 5,961
 1977 7,427
 1978 6,984
 1979 7,195
 1980 6,116
 1981 5,775
 1982 5,430
 ______
 Total 52,661

The survival rate for this group of first grade students was 69.4 percent (36,545 + 52,661).
The October 1983 elementary (grades 1-8) enrollment totaled 37,250 after adjusting for interdistrict transfers (October enrollment report at 35,926 plus 1,571 city-to-county transfers less 247 county-to-city transfers). Note: Table II shows 1,765 regular city-to-county transfers; however, only 1,571 (L,765 × 89%) were from city public schools. This total includes special education students. Entering first grades 1976 through 1983:

 Year Enrollment
 1976 5,961
 1977 7,427
 1978 6,984
 1979 7,195
 1980 6,116
 1981 5,775
 1982 5,430
 1983 5,386
 ______
 Total 50,274

The survival rate for this group of first grade students was 74.1 percent (37,250 + 50,274).
The October 1984 elementary (grades 1-8) enrollment totaled 36,618 after adjusting for interdistrict transfers (October enrollment report at 34,029 plus 2,928 city-to-county transfers minus 339 county-to-city transfers). Note: Table II shows 3,290 city-to-county transfers; however, only 2,928 (3,290 × 89%) were from the city public schools. This total includes special education students. Entering first grades 1977 through 1984:

 Year Enrollment
 1977 7,427
 1978 6,984
 1979 7,195
 1980 6,116
 1981 5,775
 1982 5,430
 1983 5,386
 1984 5,299
 ______
 Total 49,612

The survival rate for this group of first grade students was 73.8 percent (36,618 + 49,612).
The October 1985 elementary (grades 1-8) enrollment totaled 36,655 after adjusting for interdistrict transfers (October enrollment report at 32,934 plus 4,102 city-to-county transfers minus 381 county-to-city transfers). Note: Table II shows 4,609 city-to-county transfer students; however, only 4,102 (4,609 × 89%) were from city public schools. This total includes special education students. Entering first grades 1978 through 1985:

 Year Enrollment
 1978 6,984
 1979 7,195
 1980 6,116
 1981 5,775
 1982 5,430
 1983 5,386
 1984 5,299
 1985 5,436
 ______
 Total 47,621

The survival rate for this group of first grade students is 77.0 percent (36,655 + 47,621).
The October 1986 elementary (grades 1-8) enrollment totaled 36,410 after adjusting for interdistrict transfers (October enrollment report at 31,473 plus 5,343 city-to-county transfers minus 406 county-to-city transfers). Note: Table II shows 6,003 city-to-county transfers; however, only 5,343 (6,003 × 89%) were from city public schools. This total includes special education students. Entering first grades 1979 through 1986:

 Year Enrollment
 1979 7,195
 1980 6,116
 1981 5,775
 1982 5,430
 1983 5,386
 1984 5,299
 1985 5,436
 1986 5,315
 ______
 Total 45,952

*737 The survival rate for this group of first grade students was 79.2 percent (36,410 + 45,952).
Elementary survival rates have steadily improved during the last five years:

 Year Survival Rate
 1982 69.4
 1983 74.1
 1984 73.8
 1985 77.0
 1986 79.2

The average improvement in elementary survival rates is 1.96 percent over the past five years.

Projection of Historical Data

Predicting secondary (grades 9-12) enrollment.
The survival rates observed over a five-year period show a continued improvement in student retention of 1.84 percent annually. The 1986 survival rate is increased by 1.84 percent annually for each predicted enrollment year through 1990-91. First grade students entering school in the years 1976 through 1979 will be reported in the October 1987 secondary enrollment.

 Predicted October 1987 Enrollment
 Year Grade Enrollment
 1976 1 5,961
 1977 1 7,427
 1978 1 6,984
 1979 1 7,195
 ______
 27,567
 .5554 (1986 survival rate 53.7% + 1.84%)
 ______
 1987 15,311 Predicted 9-12 enrollment
 Predicted October 1988 Enrollment
 Year Grade Enrollment
 1977 1 7,427
 1978 1 6,984
 1979 1 7,195
 1980 1 6,116
 ______
 27,722
 .5738 (1987 survival rate 55.54% + 1.84%)
 ______
 1988 15,907 Predicted 9-12 enrollment
 Predicted October 1989 Enrollment
 Year Grade Enrollment
 1978 1 6,984
 1979 1 7,195
 1980 1 6,116
 1981 1 5,775
 ______
 26,070
 .5922 (1986 survival rate 57.38% + 1.84%)
 ______
 1989 15,349 Predicted 9-12 enrollment
 Predicted October 1990 Enrollment
 Year Grade Enrollment
 1979 1 7,195
 1980 1 6,116
 1981 1 5,775
 1982 1 5,430
 ______
 24,516
 .6106 (1986 survival rate 59.22% + 1.84%)
 ______
 1990 14,969 Predicted 9-12 enrollment

*738 Predicting elementary (grades 1-8) enrollment

The survival rates observed over a five-year period show a continued improvement in student retention. The 1986 survival rate is increased by 1.96 percent annually for each predicted enrollment year through 1990-91. First grade enrollments through 1986 are actual, and enrollments for 1987 through 1990 are estimated. Estimated first grade enrollments of 5,376 are based upon the average first grade class size over the past five years, adjusted for interdistrict transfers. Table V shows first grade classes remaining quite stable from 1982 through 1986. The variance from the average is 77 or fewer students each year.
First grade students entering school in the years 1980 through 1987 will be reported in the October 1987 elementary enrollment (grades 1-8).

 Predicted October 1987 Enrollment
 Year Grade Enrollment
 1980 1 6,116
 1981 1 5,775
 1982 1 5,430
 1983 1 5,386
 1984 1 5,299
 1985 1 5,436
 1986 1 5,315
 1987 1 5,376[*]
 44,133
 .8116 (1986 survival rate 79.2% + 1.96%)
 ______
 1987 35,818 Predicted 1-8 enrollment

 Predicted October 1988 Enrollment
 Year Grade Enrollment
 1981 1 5,775
 1982 1 5,430
 1983 1 5,386
 1984 1 5,299
 1985 1 5,436
 1986 1 5,315
 1987 1 5,376
 1988 1 5,376[*]
 43,393
 .8312 (1987 survival rate 81.16% + 1.96%)
 ______
 1988 36,068 Predicted 1-8 enrollment

 Predicted October 1989 Enrollment
 Year Grade Enrollment
 1982 1 5,430
 1983 1 5,386
 1984 1 5,299
 1985 1 5,436
 1986 1 5,315
 1987 1 5,376
 1988 1 5,376
 1989 1 5,376[*]
 42,994
 .8508 (1988 survival rate 81.16% + 1.96%)
 ______
 1988 36,579 Predicted 1-8 enrollment

*739
 Predicted October 1990 Enrollment
 Year Grade Enrollment
 1983 1 5,386
 1984 1 5,299
 1985 1 5,436
 1986 1 5,315
 1987 1 5,376
 1988 1 5,376
 1989 1 5,376
 1990 1 5,376[*]
 42,940
 .8704 (1989 survival rate 85.08% + 1.96%)
 ______
 1988 37,375 Predicted 1-8 enrollment

Distribution of students. Interdistrict transfer students were returned to city schools in predicting enrollment. If the goal of 15,000 transfer students is reached by 1990-91, the predicted school enrollment must be adjusted. VICC sending school analysis for 1985-86 reveals that 11 percent of interdistrict transfer students are from private and parochial schools. Eighty-nine percent (89%) of the 15,000 city-to-county transfer students will come from city public schools. VICC data showed that the interdistrict transfer students were distributed: 39 percent elementary; 27 percent middle school; and 34 percent high school. The distribution of city-to county transfer students is calculated as follows:

 15,000 City-to-county transfers permitted
 89% From city schools
 ______
 13,350 Transfers from city schools
 5,270 Elementary (39%)
 3,605 Middle school (27%)
 4,538 High school (34%)
 ______
 13,350 Total

The Board predicts magnet enrollment at 12,876, L(852)86, for the 1990-91 school year. The predicted distribution:

 Level City County Total
 High School 4,530 484 5,014
F S| Middle and Elementary 7,103 759 7,862
 ______ _____ ______
 Total 11,633 1,243 12,876

The vocational enrollment is assumed to remain at 600. Any increases in vocational enrollment would result in a reduction in regular enrollment. An increase in vocational enrollment would not pose a housing problem.
Kindergarten enrollment has stabilized during the past three years and the 1990-91 class is predicted to be 4,500, after adjustment for interdistrict transfers.
The following table shows the distribution of the projected 1990-91 enrollment, by level, in regular integrated and nonintegrated schools.

*740
 Table VII
 Predicted Regular Enrollment by Level
 October 1990
 Total students in grades 9-12 14,969
 Less:
 City to county transfers 4,538
 High school magnets 4,530
 Vocational 600 9,668
 ______ _____
 Regular 9-12 Enrollment 5,301
 Total students in grades 1-8 37,375
 Kindergarten 4,500 41,875
 Less:
 City to county transfers 8,812
 Elementary/Middle school magnets 7,103 15,915
 _____ ______
 Regular K-8 enrollment 25,960
 ______
 Resident enrollment 56,844
 Regular K-12 enrollment 31,261
 ______

During the 1990-91 school year, facilities must be provided to house 31,261 regular students (5,301 + 25,960).
In addition to the capacity needed for regular schools, space must be provided for 12,876 magnet school students from city and county (4,530 grades 9-12 city; 7,103 grades K-8 city; and 1,243 grades K-12 county). Seats are available for more than the 600 vocational students from city and county students estimated herein for housing at O'Fallon High School.
The October 1986 enrollment report shows 47.8 percent of regular high school students, 38.9 percent of regularmiddle school students and 35.3 percent of regular elementary students attend integrated schools. Middle schools account for 25.3 percent of the total K-8 enrollment. Using these percentages and the same proportion of students in special education, the predicted 1990-91 enrollment is shown in the following table:

 Table VIII
 Distribution of Projected 1990-91 Enrollment
 Level Integrated Nonintegrated Total
 Regular High School 2,533 2,768 5,301
 Regular Middle School 2,309 3,628 5,937
 Middle Special Education 245 385 630
 Regular Elementary 6,393 11,720 18,113
 Elementary Special Education 452 828 1,280
 All Magnets 12,876 12,876
 Vocational 600 600
 ______ ______ ______
 Totals 25,408 19,329 44,737

ATTACHMENT 2

Accommodating 12(c) Programs
A comparison of the Board's capacity data with current enrollments shows that there is currently a surplus of instructional space in high schools. The October 1986 enrollment is 8,782 in eight regular high schools. A current capacity surplus of 4,526 is identified when 1986-87 enrollment is subtracted from the Board's estimated *741 capacity of 13,308 for these schools (13,308 -8,782 = 4,526).
This surplus capacity is likely to increase according to enrollment estimates herein for 1990-91. It is expected that high school enrollment will continue to decline as smaller classes enter high school from lower grades, Settlement Plan magnets are expanded to meet the court-approved goal of 6,000 in grades K-12, and the Settlement Plan target of 15,000 inter-district transfers in grades K-12 is reached. Assuming a 1990-91 enrollment of 5,301 in grades 9-12, there will be a surplus capacity in regular high schools of 8,007, exclusive of unused space at O'Fallon High School, as shown below:

 Projected High School Capacity, 1990-91
 Projected Surplus Classroom
 Capacity Enrollment Capacity Equivalent
 Integrated 6,274 2,533 3,741 133
 Nonintegrated 7,034 2,768 4,266 152
 ___
 Total 13,308 5,301 8,007 285

These projections prompt the following observations:
1. O'Fallon has substantial unused capacity to provide for future enrollments. If vocational enrollments increase, more spaces will be freed up in regular high schools.
2. It appears that three or four regular high school buildings may be available in 1990 for other purposes, such as middle schools, magnet schools or offices.
3. The substantial surplus of high school space should reduce the need for reconfiguration of high school facilities since whole classrooms can be used in place of smaller rooms for such functions as special education, counseling and administration.
Middle school capacity. The Board currently operates 24 middle schools (two with contiguous branches) with a reported capacity of 10,317. Ten integrated middle schools have a reported capacity of 3,787 and 14 nonintegrated schools have a reported capacity of 6,621, L(852)86, page 45. (There is an addition error in the present capacity column on the Board's filing. The correct total should read 10,408). Capacities reported in Plan 680 are based on a class size of 26 and the Winsor model school prototype.
Since the middle school capacities shown in filings of the Board and State are not adjusted to meet class sizes of 20 mandated by the Court for nonintegrated middle schools, a new analysis is required. The procedure used began with the identification of the total number of rooms available for instructional use in each middle school currently in operation. The count was derived from building floor plans filed by the Board and verified by on-site inspections of facilities to determine current building use. Deductions were made from total instructional rooms in each school to provide facilities other than classrooms, required for 12(c) programs and AAA classification standards.
The following factors impact significantly upon building capacities: DESE requirements for AAA classification; court-approved 12(c) programs; special education; P/T ratios, and the scheduling of classes.
The following AAA requirements affect scheduling and building capacities in both integrated and nonintegrated schools:
1. Art  Available to all students for at least two periods per week;
2. Music  Available to all students for at least two periods per week;
3. Physical education shall be taught to all students for at least two periods per week.
4. Home economics and industrial arts shall be available to all students in grades *742 7, 8 and 9 for at least two periods per week.
5. Language arts, social studies, science and math shall be taught to all students a minimum of 800 minutes per week with a minimum of 150 minutes per week to be spent teaching each of these four areas.
6. A media center (library) shall be established in each school.
7. All teachers shall have planning time scheduled within the school day and shall devote no more than an average of 310 minutes of the six-hour day to teaching and study halls, except that full-time librarians and guidance counselors may devote 360 minutes of the six-hour day to these duties.
Settlement Plan 12(c) programs also requiring space allocation in nonintegrated schools are enrichment, schools of emphasis and computer labs.
The model employed in determining middle school building capacity herein is a schedule of classes using a seven-period, six-hour day (360 minutes of supervised instruction) with 15 sections (three grades each with five classes). The following schedule satisfies AAA requirements for art, music, physical education, home economics and industrial arts and teacher preparation time: 15 sections × 7 periods/day × 5 days/week = 525 sections/periods of supervised instruction required per week.

 Sections/Periods
 per Week 
 1 art teacher × 6 periods (310 minutes) × 5 days 30
 1 music teacher × 6 periods (310 minutes) × 5 days 30
 1 physical education teacher × 6 periods (310 minutes) × 5
 days 30
 1 home economics teacher × 6 periods (310 minutes) × 5
 days 30
 1 industrial arts teacher × 6 periods (310 minutes) × 5 days 30
 12.5 language arts, social studies, science, math and electives
 × 6 periods × 5 days 375
 ___
 Total 525

In this model the full-time art, music and physical education teachers satisfy the AAA requirements in these areas and also provide the required teacher preparation time (90 periods provided and 72.5 required). It is not necessary to schedule home economics and industrial arts teachers to provide teacher preparation time. These teachers are scheduled in the same manner as all other regular teachers. This procedure meets AAA time requirements and adds to building capacity. Twelve and one-half teachers are scheduled for language arts, social studies, science, math and electives. While only 240 periods per week are required for language arts, social studies, science and math, 375 periods are available. This leaves 135 periods to be scheduled at the option of the local district. In this model, 14.5 FTEs (12.5 regular FTEs plus home economics and industrial arts) are assigned to teaching stations and contribute to building capacity. Art, music and physical education classes plus enrichment, schools of emphasis and computer labs require teaching stations but do not add to capacity. Art, music and physical education rooms could be used by a second teacher during preparation time (one period per day per teacher). Therefore, it is not necessary to add a second art or music room until the school exceeds 18 sections.

*743
 Buildings Buildings
 up to 18 sections over 18 sections
 Rooms Provided Integrated Non-Integrated Integrated Non-Integrated
 Library 1.0 1.0 1.0 1.0
 Art 1.0 1.0 2.0 2.0
 Music 1.0 1.0 2.0 2.0
 Home Econ. 1.0 1.0 1.0 1.0
 Ind. Arts 1.0 1.0 1.0 1.0
 Enrich. Lab 0.0 1.0 0.0 1.0
 School of Emphasis 0.0 1.0 0.0 1.0
 Computer Lab 0.0 1.0 0.0 1.0
 Phy. Ed. Facility 1.0 1.0 1.0 1.0
 Spec. Ed. 6.8 5.7 6.8 5.7

An analysis of middle school floor plans and on-site building inspections reveals a need to reallocate some classroom facilities for special purposes. The room allocation charts show net available classrooms after classroom space is allocated for libraries, art, music and special education in all schools and for enrichment, schools of emphasis and computer labs in the nonintegrated schools.
The net classroom count in the 24 middle schools currently operated by the Board after allowing non-classroom instructional spaces as indicated in the room allocation chartsis summarized below.

 Middle School Classrooms Needed and Available
 Projected
 1990 P/T Classrooms Classrooms Excess
 Enrollmt. Ration Needed Available (Deficit)
 Integrated Schools (10)
 Regular 2,309 26/1 89 175[*] 86
 Special Ed. 245 10/1 25 58 33
 Nonintegrated Schools (14)
 Regular 3,628 20/1 182 281[**] 99
 Special Ed. 385 10/1 39 80 41

An excess of 86 regular classrooms in the integrated middle schools will remain in 1990 after space is provided to meet AAA requirements and special education needs. At a P/T ratio of 26/1, the excess capacity would accommodate 2,236 students. After special education requirements are met, 33 small rooms are available for Chapter 1 reading and math pullout programs.
An excess of 99 classrooms in nonintegrated middle schools will remain in 1990 after space is provided to meet AAA requirements, special education needs and rooms for enrichment, schools of emphasis and computer labs. At P/T ratio of 20/1, the excess capacity would accommodate 1,980 students. After special education requirements are met, 41 small classrooms are available for Chapter 1 reading and math pullout programs.
The room allocation charts show that 20 regular classrooms in integrated schools and 17 regular classrooms in nonintegrated schools have been allocated to special education. *744 Since special education classes are limited to 10 students, these regular classrooms can be divided to provide 40 classrooms in integrated schools and 34 classrooms in nonintegrated schools. When added to existing small rooms, they would provide a total of 58 special education rooms in integrated schools and 80 special education rooms in nonintegrated schools.

 Room Allocation Chart
 Integrated Middle Schools
 Regular Home Industrial Special Education
 School Classrooms Economics Arts Reg. Rms. Sm. Rms. Library Art Music Offices
 Blow 16 1 1 2 1 1 1 1 0
 Clinton 16 1 1 2 2 1 1 1 0
 Dewey 13 1 1 3 0 1 1 1 0
 Fanning 17 1 1 3 0 1 1 1 0
 Grant 11 1 1 2 2 1 1 1 0
 Long 17 1 1 3 0 1 1 1 1
 L'Ouverture 22 1 1 3 0 1 2 1 0
 Mullanphy 19 1 1 0 8 1 2 1 0
 Nottingham 8 1 1 1 0 1 1 0 0
 Webster 16 1 1 1 5 1 1 1 0
 __ _ _ _ _ _ _ _ _
 Totals 155[*] 10[*] 10[*] 20[**] 18 10 12 9 1

 Nonintegrated Middle Schools
 Regular Home Industrial Special Education Enrichment Emphasis Computer
 School Classrooms Economics Arts Reg. Rms. Sm. Rms. Library Lab Lab Art Music Lab
Simmons 23 1 1 1 5 1 1 1 2 2 1
Stevens 18 1 1 0 5 1 1 1 2 2 1
Stowe 20 1 1 2 2 1 1 1 2 1 1
Turner 19 1 1 1 3 1 1 1 2 1 1
Washington 12 1 1 1 3 1 1 1 1 0 1
Yeatman 19 1 1 2 2 1 1 1 2 2 1
Blewett 21 1 1 2 2 1 1 1 2 1 1
Columbia 17 1 1 1 3 1 1 1 1 1 1
Cook 15 1 1 1 4 1 1 1 1 1 1
Ford 24 1 1 1 5 1 1 1 1 1 1
Hickey 12 1 1 3 0 1 1 1 1 1 1
King 16 1 1 0 5 1 1 1 1 1 1
Langston 21 2 2 1 3 1 1 1 2 1 1
Williams 16 1 1 1 4 1 1 1 1 1 1
 __ _ _ _ _ _ _ _ _ _ _
Totals 253[*] 15[*] 15[*] 17[**] 46 14 14 14 21 16 14

The net result of this analysis indicates that enrollment in some middle schools may be consolidated by 1990-91, releasing currently operated middle schools for other uses, such as nonintegrated elementary schools or elementary or middle magnet schools. If high schools are released as regular middle schools, as suggested in the previous section, the surplus capacity available for elementary schools or for new magnets would increase further.
Elementary school capacity. The Board currently operates 63 regular elementary schools: 20 integrated schools with a reported capacity of 7,925 and 43 nonintegrated schools with a reported capacity of 15,774, as shown in L(852)86, pages 61-62. Since the Board's capacity data is based upon current pupil/teacher ratios and the Winsor model school prototype, it is necessary to recalculate capacities to comply with court orders, including *745 the required P/T ratio of 20/1 in nonintegrated schools.
In this analysis, elementary school capacities were derived by counting the number of full-size and small rooms in each of the 63 elementary schools currently operated by the Board. From these totals were deducted sufficient rooms to meet 12(c) program and AAA accreditation standards. The rooms remaining in each school were assigned as classrooms at P/T ratios of 20/1 in nonintegrated schools and 26/1 in integrated schools. These ratios meet or exceed court requirements and AAA standards. The net capacity in terms of classrooms and students was compared with projected 1990-91 enrollment in regular elementary grades, K-5.
There are temporary, "portable," nonmasonry buildings on some elementary sites. They were placed on playground space to accommodate the enrollment explosion of the decade of the 1960s. None of these "portables" has been counted in this capacity analysis.
Impacting significantly upon building capacities are:
(1) DESE requirements for AAA classification; (2) special education needs; (3) required P/T ratios; and (4) 12(c) requirements for enrichment labs and schools of emphasis in nonintegrated schools. Office space also has some impact on building capacity.
AAA requirements impacting on building capacity in both integrated and nonintegrated schools are the following:
1. Physical education  two 30-minute periods per week;
2. Art  60 minutes per week;
3. Music  60 minutes per week;
4. Library  facilities required in each school;
5. Teacher preparation time  all teachers shall have planning time scheduled within the school day; they shall devote no more than an average of 310 minutes of the six-hour day to teaching, except that full-time librarians and guidance counselors may devote 360 minutes of the six-hour school day to these duties.
Properly scheduling staff to meet AAA requirements for art, music and physical education will also meet AAA requirements for teacher preparation time.
A school model with three classes at each grade level (K-5) will have 18 sections. Three FTEs are necessary to provide the necessary teacher preparation time; 18 classes at 360 minutes per day = 6,480 section minutes required.

18 classroom teachers at 310 minutes = 5,580 minutes for
per day regular staff
1 art teacher at 310 minutes per = 310 minutes
day
1 music teacher at 310 minutes per = 310 minutes
day
1 physical education teacher at 310 = 310 minutes
minutes per day
 Total = 6,510 minutes

While only 54 hours per week are required for art, music and physical education (art 18 hours, music 18 hours and physical education 18 hours), 75 hours per week are established in this schedule. This exceeds AAA requirements by 21 hours per week, which may be used for teaching other subjects. However, the 75 hours per week are necessary to meet the AAA requirement for teacher preparation time.
Classrooms needed to meet all court and AAA requirements are shown below. Note that schools with more than 18 sections of regular classes need additional art and music classes.

*746
 Buildings Buildings
 up to 18 sections over 18 sections
Rooms Provided Non-Integrated Integrated Integrated Non-Integrated
Library 1.0 1.0 1.0 1.0
Art 1.0 1.0 2.0 2.0
Music 1.0 1.0 2.0 2.0
Enrichment Lab 0.0 1.0 0.0 1.0
School of Emphasis 0.0 1.0 0.0 1.0
Phy. Ed. Facility 1.0 1.0 1.0 1.0
Spec. Ed. and
Chapter 1 
Half Rooms (aver.) 6.1 5.9 6.1 5.9

An analysis of elementary school floor plans, verified by on-site building inspections, reveals a need to reallocate some classroom facilities for special purposes. The room allocation charts are based on the Board's current use of 63 elementary schools. They identify remaining available classrooms after space is allocated for libraries, art, music and special education for all schools. Additional rooms in non-integrated schools are allocated for enrichment labs and schools of emphasis. Also, some classrooms are allocated for general upgrading of office space.
In order to determine needed capacity for 1990-91, it is necessary to compare room allocations for 63 elementary schools currently in operation with projected 1990-91 enrollments. This process identifies future surplus classroom capacity in nonintegrated and integrated schools. The classroom requirement chart below compares classrooms needed to house projected 1990-91 enrollment with available classroom capacity in the Board's 63 operating elementary schools. The available classroom capacity remains after all required rooms are set aside, as noted in the room allocation charts.

 Room Allocation Chart
 Integrated Elementary Schools
 Enrichment Emphasis General Special Education Regular
 School Library Art Music Lab Lab Offices Reg. Rms. Sm. Rms. Classrooms
Adams 1 1 1 0 0 0 3 0 17
Buder 1 1 0 0 0 1 3 1 20
Clay 1 1 1 0 0 0 3 0 18
Froebel 1 1 1 0 0 1 3 1 12
Garfield 1 1 1 0 0 0 3 0 12
Hamilton 1 1 1 0 0 0 2 2 20
Henry 1 1 1 0 0 1 2 2 18
Hodgen 1 1 1 0 0 0 3 0 20
Lafayette 1 1 1 0 0 1 3 0 18
Mann 1 1 1 0 0 0 3 1 13
Meramec 1 1 1 0 0 1 2 1 9
Oak Hill 1 1 1 0 0 1 3 0 14
Roe 1 1 1 0 0 0 3 1 15
Scruggs 1 1 1 0 0 0 3 0 18
Shenandoah 1 1 1 0 0 0 2 1 10
Shepard 1 1 1 0 0 1 3 0 17
Sherman 1 1 1 0 0 0 3 0 13
Sigel 1 1 1 0 0 0 1 4 20
Woodward 1 1 1 0 0 0 3 0 20
Wyman 1 1 1 0 0 0 1 5 17
 -- -- -- - - - -- -- ---
 Totals 20 20 19 0 0 7 52[*] 19 321

*747
 Room Allocation Chart
 Nonintegrated Elementary Schools
 Enrichment Emphasis General Special Education Regular
 School Library Art Music Lab Lab Offices Reg. Rms. Sm. Rms. Classrooms
Arlington 1 1 1 1 1 0 1 4 11
Ashland/Branch 1 1 1 1 1 0 2 2 36
Baden 1 1 0 1 1 0 2 1 15
Banneker 1 1 1 1 1 0 2 2 19
Bryan Hill 1 1 1 1 1 0 2 3 16
Carr Lane 1 1 1 1 1 0 3 0 26
Carver-Addition 0 0 0 0 0 0 0 5 9
Clark 1 1 0 1 1 1 2 2 18
Cole 1 1 1 1 1 1 2 2 20
Cook Branch 0 0 0 0 0 0 0 2 8
Cote Brilliante 1 1 1 1 1 1 3 0 17
Cupples 1 1 1 1 1 0 3 0 18
Dunbar 1 1 1 1 1 0 0 6 19
Dunbar Branch 0 0 0 0 0 0 0 0 8
Eliot 1 1 1 1 1 0 2 2 11
Emerson 1 1 1 1 1 0 3 0 14
Farragut 1 1 1 1 1 0 1 2 17
Farragut Branch 1 0 0 0 0 0 0 0 0 8
Farragut Branch 2 0 0 0 0 0 0 0 0 8
Field 1 1 1 1 1 0 2 2 14
Gundlach 1 1 1 1 1 0 1 4 20
Hamilton Branch 1 0 0 0 0 0 0 0 0 8
Hamilton Branch 2 0 0 0 0 0 0 0 0 8
Harrison 1 1 0 1 1 0 2 2 14
Hempstead 1 1 1 1 1 0 3 0 18
Hempstead Branch 1 0 0 0 0 0 0 0 0 8
Herzog 1 1 1 1 1 0 0 0 9
Irving 1 1 1 1 1 0 3 0 15
Jackson 1 1 1 1 1 0 1 4 14
Jefferson 1 1 1 1 1 0 2 2 26
Laclede 1 1 1 1 1 0 1 4 16
Lexington 1 1 1 1 1 0 0 0 11
Lowell 1 1 1 1 1 0 2 0 7
Mark Twain 1 1 1 1 1 0 2 2 14
Marshall/Branch[*] 1 1 1 1 1 0 2 2 23
Mitchell 1 1 1 1 1 0 0 6 21
Mitchell Branch 0 0 0 0 0 0 0 0 8
Peabody 1 1 1 1 1 0 1 4 23
Scullin 1 1 1 1 1 0 2 1 16
Walbridge 1 1 1 1 1 0 1 4 25
Walnut Park 1 1 1 1 1 1 3 0 16
Williams Branch 1 0 0 0 0 0 0 0 0 7
 -- -- -- -- -- - -- -- ---
 Totals 32 32 29 32 32 4 56[**] 70 639

 Elementary School Classrooms Needed and Available
 Projected
 1990 P/T Classrooms Classrooms Excess
 Enrollmt. Ratio Needed Available (Deficit)
 Integrated Schools
 Regular 6,393 26/1 246 321 75
 Special Ed. 452 10/1 46 123 77
 Nonintegrated Schools
 Regular 11,720 20/1 586 639 53
 Special Ed. 828 10/1 83 182 99

*748 An excess of 75 regular classrooms will remain in 1990 in integrated elementary schools after rooms are set aside for AAA and special education requirements. At a P/T ratio of 26/1, the excess capacity would accommodate 1,950 students. After special education requirements are met, 77 small rooms are available for Chapter 1 reading and math pullout programs.
An excess of 53 regular classrooms will remain in 1990 in nonintegrated elementary schools after rooms are set aside to provide for AAA requirements, special education needs, enrichment labs and schools of emphasis. At a P/T ratio of 20/1, the excess capacity would accommodate 1,060 students. After special education requirements are met, 99 small rooms are available for Chapter 1 reading and math pullout programs.
The room allocation charts show that 52 regular classrooms in integrated schools and 56 regular classrooms in nonintegrated schools have been allocated to special education. Since special education classes are limited to 10 students, these regular classrooms can be divided to provide 104 classrooms in the integrated schools and 112 classrooms in the nonintegrated schools. When added to existing small rooms, they would provide a total of 123 special education rooms in the integrated schools and 182 rooms in the nonintegrated schools. Since full-time special education students are mainstreamed in art, music and physical education, they do not impact on the regular 20/1 P/T ratios.

 ATTACHMENT 3
 Consolidation of Facilities
Additional Instruction Rooms Provided by Adding New Gymnasiums
 Nonintegrated Schools
 Present Playroom
 Facilities Renovated Small
 School No. Sq. Feet Classrooms Rooms
 Ashland 2 2,448 2
 Baden 2 4,308 4
 Bryan Hill 1 1,656 2
 Clark 1 2,016 2
 Cote Brilliante 2 4,280 2 2
 Cupples 1 2,736 2
 Dunbar 2 5,112 4
 Eliot 1 1,375 1 1
 Emerson 1 1,904 1 1
 Farragut 2 3,848 2 2
 Gundlach 1 2,520 2
 Hempstead 2 3,640 4
 Herzog 1 2,072 2
 Laclede 1 2,318 2
 Lexington 0 0 0
 Lowell 1 1,704 2
 Mark Twain 1 2,304 1 1
 Scullin 1 1,200 1 1
 Walnut Park 1 960 1
 -- -- --
 Total 24 37 8

*749
 Integrated Schools
 Present Playroom
 Facilities Renovated Small
 School No. Sq. Feet Classrooms Rooms
 Froebel 1 1,512 0 0
 Sherman 1 1,598 1 1
 Wyman 2 3,952 1 1
 Clay 1 1,775 2 0
 Shepard 1 1,775 2 0
 Henry 1 1,750 2 0
 Lafayette 1 2,280 1 1
 Oak Hill 1 1,752 2 0
 Meramec 1 2,272 1 1
 Mann 2 3,787 2 0
 Scruggs 1 3,232 2 1
 Hamilton 1 2,304 1 1
 Roe 1 1,664 1 0
 Buder 2 7,560 2 1
 Woodward 2 5,568 3 2
 Shenandoah 1 1,360 1 0
 Garfield 1 1,920 0 0
 __ __ __
 21 24 9
 Intracity Magnets
 Present Playroom
 Facilities Renovated Small
 School No. Sq. Feet Classrooms Rooms
 Madison 1 3,168 2 2
 Mallinckrodt 1 2,176 0 0
 Shaw 1 1,904 1 1
 Stix 1 2,516 1 0
 Wade 1 2,184 2 1
 Waring 0 0 0 0
 Wilkinson 1 1,147 1 0
 __ _____ ___
 6 7 4

ATTACHMENT 4

Excerpts from Zurheide-Herrmann Cost Proposals
The Board's Desegregation Related Analysis of Facility Evaluation Surveys, Volume 5, Book A through P, dated April 19, 1986, contains work items and their associated costs. Each school is listed separately, and the work items are identified as necessary to meet: (1) city codes; (2) 12(c) Settlement Plan requirements, including reconfigurations; (3) reconfigurations to meet requirements of magnet school programs; (4) building additions to provide for 12(c) programs for each school's designated enrollment model; and (5) building additions to meet program requirements of magnet schools. The analysis was prepared by Zurheide-Herrmann, Inc., Engineers-Architects (ZH). The ZH firm itself surveyed 10 high schools. It also coordinated the work of 13 additional architectural/engineering (A/E) firms who surveyed the remaining schools.

*750 Inconsistencies in Reporting Format

The reporting format used by the ZH firm in estimating project costs for 10 high schools differed from that used by the 13 other A/E firms: (1) The ZH report included roofs as part of the building envelope while the other firms reported roofs separately; (2) the ZH firm reported two categories (heating and plumbing) under "mechanical" while the other 13 A/E firms reported mechanical as a single category; (3) the ZH firm reported fire protection as a separate category while the other Z/E firms included fire protection in the health, safety and handicapped category; (4) the ZH firm listed work projects within each of its own set of major categories. However, cost data were not reported for each separate work project; only a total cost for each major category was shown. The remaining A/E firms reported individual work projects within each major category, using a uniform classification system. Cost data for each work project were shown, along with a total cost for the major category.
The following examples show the different reporting formats:

 Major CategoryElectrical
 Zurheide-Herrmann
 Beaumont High School
Description Quantity Unit Total
New fire alarm 1 Lot -
Receptacle 1 Lot -
Electrical service 1 Lot -
Cable tray 1 Lot -
Emergency lighting 1 Lot -
New classroom lights 2,307 Each -
Corridor lights 639 Each -
Antivandal lights 1 Lot -
Upgrade power 1 Lot -
 Total $803,283

All other firms used a more detailed reporting format, as shown in the following example of Ford Middle School:

Description Quantity Unit $/Unit Total
New lights 13,666 S.F. $ 3.38 $ 46,191
New outlets 193 Each 81.00 15,633
Floor power bus 30 L.F. 20.00 600
New cable tray 1 L.S. 9,800.00 9,800
Repl. fire alarm 1 L.S. 33,000.00 33,000
Repl. security and Instrusion 1 L.S. 17,000.00 17,000
 alarm
 ________
 Total $122,224

The ZH reporting format for 10 high schools does not permit analysis of individual work projects. Nor can ZH work project costs be compared with those of other A/E firms who reported on most schools. This condition prohibits a comparative analysis of individual work projects in all schools. However, work projects may be compared among all of the remaining schools surveyed by the other 13 A/E firms coordinated by the ZH firm.

Inconsistent Cost Estimates for Similar Projects
The discretion left to the individual A/E firms resulted in substantially different cost estimates for similar work projects. Parameters for determining repair, replacement or new installation seem to be lacking. Full implementation of all work projects in the ZH report would leave buildings in substantially differing states of repair.
Variant costs for schools of the same age. In analyzing these estimated costs, significant differences in rehabilitation costs were observed. One would expect that buildings constructed at different time periods would require differing kinds and amounts of rehabilitation work. However, substantial cost differences were observed for buildings constructed during the same year under the same building code. Tables I and II illustrate these differences. Table I shows two elementary schools, Henry and Farragut, constructed in 1906 and three elementary schools, Cote Brilliante, Hempstead and Shepard, constructed in 1909. Table II shows three middle schools, Cook, Ford and Stevens, all constructed in 1964.

*751
 TABLE I
 Comparative Costs, Selected Elementary Schools
 Schools Constructed 1906 Schools Constructed 1905
 Item Henry Farragut Cote Brilliante Hempstead Shepard
Site Work
Concrete walks, steps $ 9,897 $ 2,835 $ 4,185 $ 6,144 $24,477
Asphalt, seal, curbs 17,040 7,266 2,454 17,396 23,298
Retaining walls 0 10,796 1,206 729 0
Fence, rails, paint/repl. 5,427 1,600 11,175 3,898 7,645
New parking 0 27,500 0 63,750 12,500
Security lights 0 20,000 0 20,000 20,000
Seed/sod 0 1,000 2,860 0 625
Building exterior
Tuckpoint 10,569 21,232 155,118 166,118 18,885
Reset walls 0 0 2,750 0 0
Exterior doors/hardware 8,625 8,126 9,875 4,688 5,625
Paint/caulk 26,674 21,420 31,130 29,096 21,420
Repl. window lights 44,561 6,995 32,046 0 72,847
Repl. noninsulated glass 0 7,448 0 12,038 0
Window guards/mesh 430 645 7,740 0 3,200
Roofs
Remove built-up roof 525 2,497 1,890 19,043 1,903
New roof 82,047 54,949 10,320 0 10,464
Remove gravel 0 1,998 0 0 0
New deck 0 0 0 0 10,156
Flashing, joists, timber 1,419 816 22,374 2,808 14,300
Caulk/tuck parapet 538 4,489 5,146 2,405 0
Gutters/downspouts 312 0 19,191 12,498 0
Building interior
Paint/plaster 13,306 38,257 46,066 55,778 49,631
Refinish hardwood floors 47,845 14,662 43,299 54,717 38,887
New resilient floor 0 499 0 6,973 52,112
Repr./repl. resilient floor 3,672 5,315 5,897 32,836 0
Concrete floor 0 6,878 25,934 34,574 0
New acoustical board/tile 58,156 37,002 0 20,491 57,066
Repl. acoustical board/tile 0 0 46,558 36,049 0
Toilet partitions 3,000 0 6,000 10,400 0
Paint casework/trim 12,861 0 0 421 39,792
Refinish casework/trim 0 20,529 96,270 38,136 0
Mechanical
New boiler/furnace 0 0 37,000 0 0
Repair boiler 0 6,000 0 0 5,000
Auto outside dampers 0 23,800 0 0 0
Controls repr./repl. 0 0 0 67,500 0
Repl. radiators 600 600 0 1,800 300
New return air system 80,000 8,500 101,500 0 0
New air filters 0 5,000 5,000 5,000 0
System pumps 0 0 5,000 0 3,500
Toilet/pipes 0 0 3,918 37,425 0
Unit ventilators 0 0 1,225 1,531 269

*752
 Comparative Costs, Selected Elementary Schools
 Schools Constructed 1906 Schools Constructed 1905
 Item Henry Farragut Cote Brilliante Hempstead Shepard
Electrical
Lights 156,311 110,222 134,588 175,361 151,556
Outlets 18,792 8,586 10,935 8,100 18,063
Fire alarm 20,000 4,686 20,000 28,500 0
Security/intrusion 20,000 8,821 12,000 15,500 0
Panels and additional service 293,000 38,311 73,000 52,000 13,900
Cable tray 0 7,021 4,000 4,000 0
Health, safety, handicap
Labeled doors/hardware 81,750 39,000 37,500 50,250 60,750
Egress hardware 1,000 0 0 2,500 2,000
Door magnetic hold open 12,765 5,980 5,750 8,280 9,775
1 hr. trnsm/sidelight 4,625 3,875 3,375 4,125 10,250
Exterior door security 5,820 4,850 6,305 7,760 8,245
Stairwell enclosure 45,000 30,000 30,000 30,000 30,000
Exit lights 0 0 1,720 1,290 2,064
Emergency lights 3,626 3,108 7,770 5,180 5,180
Stand pipes 17,994 13,770 20,250 18,225 15,119
Handicap restrooms 0 4,800 4,800 4,800 4,800
Handicap access 0 5,000 5,000 5,000 5,000
Wheelchair lifts 0 0 0 0 9,500
Sprinkler system 0 15,750 5,250 0 0
Energy conservation 7,525 24,815 24,560 198,815 26,790
12(c) reconfiguration 133,291 235,710 395,672 114,495 41,350

 TABLE II
 Comparative Costs, Selected Middle Schools
 Schools Constructed 1964
 Item Cook Ford Stevens
 Site work
 Concrete steps, walks, etc. $ 1,505 $ 0 $ 6,484
 Asphalt, seal, curbs 8,490 320 6,400
 Retaining walls 5,594 0 0
 Fence, rails, etc. 3,432 156 0
 New parking 0 0 62,500
 Security lights 0 0 20,000
 Sod/seed 39,000 19 2,420
 Building exterior
 Tuckpoint 12,377 9,070 7,896
 Exterior doors/hardware 6,500 7,219 8,250
 Paint/caulk 30 11,210 8,790
 Replace window lights lights 23,046 13,288 10,364
 Replace noninsulated glass 3,780 4,725 0
 Window guards/mesh 0 17,900 0
 Roofs
 Remove built-up roof 0 30,656 0
 New roof 70,929 168,609 0
 Remove gravel 0 24,525 0
 Building interior
 Paint/plaster 14,021 14,098 52,440
 New resilient floor 0 0 42,920
 Replace resilient floor 13,914 11,842 32,894
 New acoustical board/tile 0 0 51,163

*753
 TABLE II  Continued
 Comparative Costs, Selected Middle Schools  Continued
 Schools Constructed 1964
 Item Cook Ford Stevens
 Replace acoustical board/tile 12,348 0 8,866
 Toilet partitions 12,360 8,040 1,500
 Paint casework/trim 13,331 9,747 15,281
 Refinish casework 3,900 0 0
 Mechanical
 New air filters 275 700 0
 Replace/repair pumps 0 0 1,000
 Toilets/lavatories/pipes 150 6,232 4,925
 Unit ventilators 0 0 5,513
 Other 2,100 0 5,000
 Electrical
 Lights 43,781 46,191 131,857
 Outlets 8,748 15,633 12,474
 Fire alarm 1,000 33,000 7,000
 Security/intrusion 0 17,000 1,500
 Panels/additional service 4,500 0 14,500
 Cable tray 0 9,800 0
 Health, safety, handicap
 Labeled doors/hardware 21,000 39,000 10,670
 Egress hardware 37,500 0 0
 Door magnetic hold open 11,845 4,140 0
 Exterior door security 3,880 0 0
 Stairwell enclosures 50,000 0 0
 Exit lights 0 0 860
 Emergency lights 0 0 1,813
 Handicap toilets 4,800 4,800 4,800
 Handicap access 5,000 5,000 5,000
 Wheelchair lifts 0 9,500 0
 Sprinkler system 4,830 5,110 1,750
 Energy conservation 21,735 45,500 9,300
 12(c) reconfiguration 65,801 47,501 14,224

Examples of Cost Variances
Estimating errors. ZH recommended painting 2,420 lineal feet of iron fence at Lafayette and 2,824 lineal feet at Oak Hill at $9.10 per lineal foot. There are less than 575 lineal feet of iron fence at Lafayette and less than 750 lineal feet of iron fence at Oak Hill. ZH overestimated the cost of this item by more than $35,000 at these two schools.
Inconsistent unit costs. The unit cost for replacing lights at L'Ouverture and Langston is $4.50 per square foot. The unit cost for replacing lights at Blewett and Stevens is $3.38 per square foot. L'Ouverture and Langston are overestimated by $105,059 (93,803 square feet × $1.12), or Stevens and Yeatman are underestimated by $133,819 (119,482 square feet × $1.12).
Variant reconfiguration costs. In addition to general rehabilitation of the building, including kindergarten rooms, the ZH report recommends additional 12(c) kindergarten reconfiguration. The average cost per square foot for 46 elementary schools recommended for reconfiguration is $11.40 per square foot with a range of $.17 to $57.71 per square foot. The recommended reconfiguration for five schools is less than $1 per square foot:

*754
 Mitchell $.17 per square foot
 Lowell .40
 Mark Twain .59
 Bryan Hill .80
 Mann .87

The recommended reconfiguration cost for seven schools exceeds $25 per square foot:

 Irving $57.71 per square foot
 Walnut Park 38.27
 Cote Brilliante 31.10
 Herzog 25.85
 Roe 25.65
 Farragut 25.46
 Baden 25.17

ZH recommends spending 62 times as much per square foot for the five highest cost schools over the five lowest cost schools. It does not appear that any uniform standard was used in calculating kindergarten reconfiguration.

 Kindergarten Reconfiguration 12(c)
 School Cost per Sq. foot School Cost per Sq. foot
 Adams 1.09 Hodgen 18.97
 Arlington 12.12 Irving 57.71
 Ashland 8.18 Jackson 0
 Baden 25.17 Jefferson 13.14
 Banneker 1.20 Laclede 3.23
 Bryan Hill .80 Lafayette 6.06
 Buder 1.12 Lexington 0
 Carr Lane 13.58 Lowell .40
 Carver 0 Mann .87
 Clark 17.75 Mark Twain .59
 Clay 22.56 Marshall 19.48
 Cole 1.53 Meramec 5.89
 Cote Brilliante 31.10 Mitchell .17
 Cupples 19.47 Mitchell Branch 2.13
 Dunbar 4.63 Oak Hill 7.83
 Eliot 2.46 Peabody 0
 Emerson 7.37 Roe 25.65
 Farragut 25.46 Scruggs 0
 Field 1.88 Scullin 2.28
 Froeber 5.32 Shenandoah 7.18
 Garfield 2.01 Shepard 4.17
 Gundlach 17.32 Sherman 9.41
 Hamilton 7.78 Sigel 0
 Harrison 18.27 Walbridge 16.72
 Hempstead 9.25 Walnut Park 38.27
 Henry 0 Woodward 1.31
 Herzog 25.85 Wyman 0

Different Standards Applied by Various A/E Firms
The estimated cost data were analyzed to determine if the 14 A/E firms employed in the survey were consistent in the preparation of cost data. A lack of consistency was noted among A/E firms and also within a single A/E firm. Lack of application of a uniform standard among A/E Firms participating in the survey, and inconsistencies within an A/E firm, can be shown by using an example of two work projects, lighting and fire alarm systems.
Examples of narrative statements. Volume 4, Books A through P, of the ZH survey contains narrative statements concerning work projects and estimated costs. The following are actual statements included in the survey books concerning lighting needs:
Ferris & Hamig
The majority of the classrooms had lighting intensities of 40+ foot-candles and thereby conform with the general lighting design recommendations for illumination intensities. However, since new suspended accoustical ceilings must be installed to conform to recommended standards, new lighting fixtures must also be installed.
*755 Booker Associates, Inc.
The majority of the classrooms have lighting intensities of 50-60 foot-candles. This level of illumination is adequate for multi-purpose classrooms. For special purpose rooms, such as music, it is recommended that the classroom lighting be upgraded to 70 foot-candles.
Incandescent fixtures are presently in use in the corridors. Replacement with fluorescent fixtures is not recommended since the existing incandescent fixtures are decorative and provide sufficient illumination.
R.F. Burns
The majority of classrooms had lighting levels of 30-50 foot-candles. Lighting levels were lower in some rooms due to inoperative fixtures. Most of the light cent lighting. The only exception to this is the possibility of installing a decorative incandescent fixture in the main entrance to highlight the attractive features.
Campbell Design
Installation of new fluorescent light fixtures in all classrooms, to obtain 70 foot candle lighting levels as required by Board of Education is recommended. Remove all incandescent light fixtures in corridors, stairways, gyms, toilets and storage rooms and install new fluorescent light fixtures to insure 30 foot candle lighting level.
Fleming Corporation
The incandescent lighting in the corridors will be removed and new suspended ceiling with recessed fluorescent lighting installed. The existing classroom lighting fixtures will similarly be removed and replaced with recessed fluorescent fixtures in a suspended acoustical ceiling.
Gornet & Sherman
The existing lighting system in the building is obsolete and should be replaced with new energy efficient lighting fixtures and lamps with the following lighting levels to comply with the Board of Education standards:
(a) ClassroomsFluorescent 40 foot-candles
(b) CorridorsFluorescent 30 foot-candles
(c) LibraryFluorescent 70 foot-candles
(d) OfficeFluorescent 40 foot-candles
(e) Multi-purposeH.I.D. 40 foot-candles
T.D.P. St. Louis, Inc.
The majority of the school, with the exception of the hallways and basement area, has twin lamp, 40 watt fluorescent light fixtures. The fixtures are old, and numerous ones are in need of repair, and do not provide adequate light to meet model standards. It is recommended they be replaced. The incandescent lights in the hallways should be replaced with new fluorescent fixtures.
Manske, Dieckmann and Kostecki
The majority of classrooms had lighting intensities that were inadequate as specified in the model. In accordance with the illuminating engineering recommendations for illumination intensity, of classroom activities, new lighting should be provided to the proper level. Removal of existing incandescent fixtures and replacement with new fluorescent fixtures is also recommended.
Pearce Corp.
The majority of the school, with exception of the hallways and basement area, have twin lamp, 40 watt fluorescent light fixtures. The fixtures are old, and numerous ones are in need of repair, and do not provide adequate light to meet model standards. Light readings were taken in room ____ and ranged from 30 to 50 foot-candles. If the other rooms are similarly equipped, it is recommended they be replaced.
It is recommended the incandescent lights in the hallways be upgraded with new fluorescent fixtures.
NOTE: Foot-candle readings were taken and reported in one room only.
Hoener Associates
The majority of classrooms conform to the Board of Education's general lighting requirement of 40 foot-candles.
*756 NOTE: Recommends corridor lighting be increased to 30 foot-candles. Gym/auditorium to 60 foot-candles through addition of H.I.D. Fixtures and upgrade kitchen lighting to 30 foot-candles.
Wedemeyer-Cernik-Corrubia
The majority of the original building, with exception of the hallways and basement area, have twin lamp, 40 watt fluorescent light fixtures. The fixtures are old, and numerous ones are in need of repair, and do not provide adequate light to meet model standards. It is recommended they be replaced. The incandes-fixtures were suspended fluorescent type with louvers, some of which were damaged. It is recommended that new lighting be installed to increase illumination levels to 50 foot-candles and give a more uniform appearance.
All corridors and stairways had incandescent lighting. It is recommended that fluorescent lighting be installed in these areas and any other areas with incandescent lights in the hallways should be replaced with new fluorescent fixtures.
Zurheide-Herrmann
The majority of the classrooms have lighting intensities below 70 foot-candles. In conformance with the Illuminating Engineering recommendations for illumination intensity of many school activities, upgrading classroom lighting to 70 foot-candles is recommended.
Removal of existing incandescent fixtures and replacement with new fluorescent fixtures are recommended.

Differences Relating to Construction Projects
Lighting standards. A 40 foot-candle, a 50 foot-candle, and a 70 foot-candle standard for multipurpose classrooms has been described by several A/E firms, the Winsor school model by others, and one firm described no quantification standard at all.
1. 40 foot-candles in multipurpose classrooms
 Ferris & Hamig
 Gornet & Shearman
 Hoener Associates
2. 50 foot-candles in multipurpose classrooms
 Booker Associates
 R.F. Burns
3. 70 foot-candles in multipurpose classrooms
 Campbell Design
 Zurheide-Herrmann
4. Model school standard
 T.D.P. St. Louis, Inc.
 Manske, Dieckmann & Kostecki
 Pearce Corp.
 Wedemeyer-Cernik-Corrubia
5. No quantifiable standard
 Fleming Corporation
Booker and Associates found a classroom lighting intensity of 50 to 60 foot-candles. The R.F. Burns firm found lighting levels in classrooms to be between 30 to 50 foot-candles. Hoener Associates found a majority of classrooms conforming to the Board of Education's general lighting requirement of 40 foot-candles. The Pearce Corp. found light readings between 30 and 50 foot-candles and recommended replacement. The Zurheide-Herrmann firm found a majority of classrooms with light intensity of less than 70 foot-candles and recommended upgrading all classrooms to 70 foot-candles. The A/E firms exceeded the Board of Education lighting standards; however, there was no uniform higher standard observed.
Fire alarms. The T.D.P. St. Louis, Inc. engineering firm surveyed six regular elementary schools and described the fire alarm system in each with the following paragraph:
The present fire alarm system is inadequate. It is unable to signal an alarm prior to the development of visual smoke due to a fire condition. It is therefore recommended it be replaced with a system that will meet the model standard.
With this description for each school, the firm recommended $20,000 for Cote Brilliante, $0 for Clark, $28,500 for Hempstead, $0 for Arlington, $21,200 for Marshall, and $19,900 for Emerson.
The Manske, Dieckmann and Kostecki firm surveyed eight regular elementary *757 schools. Unlike the T.D.P. St. Louis, Inc. firm, the Manske firm did not mention fire alarms in the narrative description of needed work. There is no recommended expenditure for five of the eight schools, and a combined total of $7,975 is recommended for the three remaining schools.
Site improvements. The A/E firms R.F. Burns, and Gornet & Shearman, did not allow for any additional parking for elementary schools surveyed. The A/E firm Manske, Dieckmann and Kostecki provided new parking for six of the eight regular elementary schools surveyed.

 Work Project
 New Parking
 School Date Amount
Manske, Dieckmann and Kostecki
 Adams 1878 $ 7,500
 Eliot 1898 17,500
 Field 1901 0
 Froebel 1895/1937 7,500
 Mann 1911 0
 Meramec 1909 7,500
 Oak Hill 1908 7,500
 Shepard 1905 12,500
 Wyman 1901 0
Gornet & Shearman
 Carver 1882 0
 Henry 1906 0
 Hodgen 1884 0
 Jackson 1899 0
 Sherman 1899 0
 Sigel 1906 0
R. F. Burns
 Dunbar 1912 0
 Hamilton 1918 0
 Lafayette 1907 0
 Shenandoah 1926 0

Building exterior. Tuckpointing and windows were isolated for comparison. The T.D.P. St. Louis, Inc. A/E firm surveyed six elementary schools, and the tuckpointing costs averaged $107,487 with a range of $61,723 to $166,049. The Gornet & Shearman A/E firm surveyed seven elementary schools, and the tuckpointing costs averaged $8,069 with a range of $0 to $22,558. The T.D.P. firm estimated the tuckpointing costs for two buildings constructed in 1905 at $155,118 and $166,049 while the Gornet & Shearman firm estimated tuckpointing costs for two buildings constructed in 1906 at $2,514 and $10,569.
The R.F. Burns firm estimated window repair and replacement of lights for a 1907 building at $18,904 and a 1912 building at $22,240. The Manske firm estimated window repair and replacement for a 1905 building at $72,847, a 1908 building at $47,452 and a 1909 building at $50,896. It is not apparent that the same consideration was given to repair and replacement of windows.

*758
 Work Project
 Tuckpointing
 School Date Amount
T.D.P. St. Louis, Inc.
 Arlington 1899 $ 86,956
 Clark 1907 72,160
 Cote Brilliante 1905 155,118
 Emerson 1902 61,723
 Hempstead 1905 166,049
 Marshall 1900 102,917
Gornet & Shearman
 Carver 1882 0
 Henry 1906 10,569
 Hodgen 1884 0
 Jackson 1899 10,154
 Sherman 1899 10,690
 Sigel 1906 2,514
 Wyman 1901 22,558
 Work Project
 Windows
 School Date Amount
Manske, Dieckmann and Kostecki
 Adams 1878 $115,013
 Eliot 1898 95,730
 Field 1901 51,786
 Froebel 1895/1937 40,798
 Mann 1911 37,609
 Meramec 1909 50,896
 Oak Hill 1908 47,452
 Shepard 1905 72,847
R. F. Burns
 Dunbar 1912 22,240
 Hamilton 1918 26,826
 Lafayette 1907 18,904
 Shenandoah 1926 13,607
T.D.P. St. Louis, Inc.
 Arlington 1899 8,606
 Clark 1907 28,195
 Cote Brilliante 1905 32,046
 Emerson 1902 15,392
 Hempstead 1905 12,038
 Marshall 1900 176,432
Gornet & Shearman
 Carver 1882 0
 Henry 1906 44,561
 Hodgen 1884 9,194
 Jackson 1899 30,696
 Sherman 1899 20,431
 Sigel 1906 8,240
 Wyman 1901 34,242

*759 Building interior. The R.F. Burns firm surveyed four elementary schools and estimated the cost of repairing, refinishing and replacing floors at an average cost of $22,211 with a range of $0 to $34,518. The Booker Associates firm surveyed 10 elementary schools and estimated the cost of refinishing, repairing and replacing floors at an average cost of $86,655 with a range of $23,349 to $159,663. The Burns firm estimated the cost of a building constructed in 1907 at $23,767 and a building constructed in 1918 at $34,518. The Booker Associates firm estimated the cost for a building constructed in 1918 at $82,379 and a 1910 building at $123,109.

 Work Project
 Floors
 School Date Amount
R. F. Burns
 Dunbar 1912 $ 30,560
 Hamilton 1918 34,518
 Lafayette 1907 23,767
 Shenandoah 1926 0
Booker Associats, Inc.
 Cupples 1918 82,379
 Gundlach 1931 152,503
 Peabody 1957 29,902
 Roe 1919 24,389
 Ashland 1910 123,109
 Ashland Branch 1930 24,349
 Carr Lane 1959 70,117
 Herzog 1937 49,358
 Jefferson 1960 150,786
 Walbridge 1922 159,663

Mechanical. Automatic air dampers, new return air systems and pneumatic controls were isolated for a closer examination. The Booker Associates firm surveyed 10 elementary schools and was consistent in the amount recommended for automatic dampers for five of the 10 schools. No expenditures were recommended for the remaining five schools. The Ferris firm recommended an amount equal to the Booker estimate for one of five schools. No expenditures were recommended for the remaining four schools. Campbell Design surveyed nine elementary schools and recommended an expenditure similar to the Booker estimate for one school and no recommended expenditure for the remaining eight schools. The Manske firm recommended an estimated cost of $105,250 for a school constructed in 1898 and $152,400 for a school constructed in 1909. Campbell Design recommended an estimated cost of $20,000 for a building constructed in 1895, and the Booker firm recommended an estimated cost of $21,000 for a building constructed in 1910.
The Ferris & Hamig firm surveyed five regular elementary schools and recommended no expenditures for return air systems.
The Booker firm surveyed 10 elementary schools and recommended no expenditures for repair or replacement of pneumatic controls. The T.D.P. firm recommended repair, replacement or new pneumatic controls in five of six schools ranging in cost from $0 to $67,500.

*760
 Work Project
 New Automatic Outside Air Dampers
 School Date Amount
Booker Associates, Inc.
 Cupples 1918 $ 21,000
 Gundlach 1931 21,000
 Peabody 1957 0
 Roe 1919 0
 Ashland 1910 21,000
 Ashland Branch 1930 21,000
 Carr Lane 1959 0
 Herzog 1937 21,000
 Jefferson 1960 0
 Walbridge 1922 0
Ferris & Hamig, Inc.
 Bryan Hill - 0
 Buder 1920 21,000
 Lowell 1926 0
 Scruggs 1917 0
 Woodward 1921 0
Campbell Design
 Banneker 1940 0
 Cole 1931/1970 0
 Farragut 1906 23,800
 Garfield 1937 0
 Laclede 1915 0
 Lexington 1964 0
 Mark Twain 1912 0
 Mitchell 1964 0
 Mitchell Branch 1957 0
Manske, Dieckmann and Kostecki
 Adams 1878 21,000
 Eliot 1898 105,250
 Field 1901 0
 Froebel 1895/1937 70,960
 Mann 1911 0
 Meramec 1909 152,400
 Oak Hill 1908 0
 Shepard 1905 0
 Work Project
 New Return Air System
 School Date Amount
Gornet & Shearman
 Carver 1882 $ 0
 Henry 1906 80,000
 Hodgen 1884 0
 Jackson 1899 0
 Sherman 1899 71,000
 Sigel 1906 0
 Wyman 1901 35,000
Ferris & Hamig, Inc.
 Bryan Hill 0
 Buder 1920 0
 Lowell 1926 0
 Scruggs 1917 0
 Woodward 1921 0

*761
 Work Project
 Pneumatic Controls
 School Date Amount
Booker Associates
 Cupples 1918 $ 0
 Gundlach 1931 0
 Peabody 1957 0
 Roe 1919 0
 Ashland 1910 0
 Ashland Branch 1930 0
 Carr Lane 1959 0
 Herzog 1937 0
 Jefferson 1960 0
 Walbridge 1922 0
T.D.P. St. Louis, Inc.
 Arlington 1899 45,000
 Clark 1907 8,000
 Cote Brilliante 1905 0
 Emerson 1902 50,000
 Hempstead 1905 67,500
 Marshall 1900 41,000

Electrical. Booker Associates surveyed 10 schools and recommended repair, replacement or a new fire alarm system in only one of the 10 schools. The Gornet firm recommended repair, replacement or new fire alarm systems in six of seven schools surveyed, with costs ranging from $0 to $80,000.
Electrical outlets vary from $0 to $20,250 for schools of similar size.
Electrical service includes replacement of distribution panel boards, replacement of service panel name plates and replacement or new electrical service. Costs vary considerably for schools of similar age and construction.

 Work Project
 Fire Alarm Systems
 School Date Amount
Gornet & Shearman
 Carver 1882/1978 $ 0
 Henry 1906 20,000
 Hodgen 1884/1964 45,000
 Jackson 1899/1964 26,000
 Sherman 1899 80,000
 Sigel 1906/1978 80,000
 Wyman 1901 65,000
Booker Associates
 Cupples 1918 0
 Gundlach 1931 0
 Peabody 1957 0
 Roe 1919/1926 0
 Ashland 1910 0
 Ashland Branch 1930 10,800
 Carr Lane 1959 0
 Herzog 1937 0
 Jefferson 1960 0
 Walbridge 1922/1978 0

*762
 Work Project
 Electrical Outlets
 School Date Square Feet Amount
 Manske, Dieckmann and Kostecki
 Adams 1878 63,201 $ 6,966
 Eliot 1898 46,380 15,066
 Field 1901 47,030 12,393
 Froebel 1895/1937 41,741 13,284
 Mann 1911 52,452 16,767
 Meramec 1909 38,946 0
 Oak Hill 1908 49,531 14,418
 Shepard 1905 55,998 18,063
 Wyman 1901 53,224 10,692
 Gornet & Shearman
 Carver 1882/1978 51,760 4,212
 Henry 1906 66,645 18,792
 Hodgen 1884/1964 63,211 20,250
 Jackson 1899/1964 52,085 11,340
 Sherman 1899 47,698 14,742
 Sigel 1906/1978 67,605 13,446
 R. F. Burns
 Dunbar 1912 67,284 7,614
 Hamilton 1918 60,110 7,614
 Lafayette 1907 50,946 6,399
 Shenandoah 1926 34,344 3,159
 Ferris & Hamig
 Bryan Hill   $ 0
 Buder 1920  7,047
 Lowell 1926  6,561
 Scruggs 1917  7,290
 Woodward 1921  8,100
 Work Project
 Electrical Services
 School Date Amount
 Gornet & Shearman
 Carver 1882/1978 $ 0
 Henry 1906 293,000
 Hodgen 1884/1964 0
 Jackson 1899/1964 162,000
 Sherman 1899 174,000
 Sigel 1906/1978 150,000
 Wyman 1901 185,000
Booker Associates
 Cupples 1918 12,400
 Gundlach 1931 12,400
 Peabody 1957 0
 Roe 1919/1926 12,400
 Ashland 1910 0
 Ashland Branch 1930 75
 Carr Lane 1959 13,000
 Herzog 1937 0
 Jefferson 1960 0
 Walbridge 1922/1978 12,400
 T.D.P. St. Louis, Inc.
 Arlington 1899 0
 Clark 1907 0

*763
 School Date Amount
 Cote Brilliante 1905 73,000
 Emerson 1902 45,000
 Hempstead 1905 52,000
 Marshall/Branch 1900 46,500

Health, safety, handicapped. Three work projects, sprinkler systems, stairwell enclosures, and labeled doors (interior fire-retardant doors), were isolated for comparison among A/E firms. The Gornet firm surveyed seven elementary schools and did not recommend any sprinkler systems. Booker Associates surveyed 10 elementary schools and recommended sprinkler systems for three schools.
The T.D.P. firm recommended stairwell enclosures for all six elementary schools surveyed, the Manske firm for six of eight schools surveyed, and Campbell Design for only two of 10 elementary schools surveyed.
The R.F. Burns firm recommended labeled doors for only one of four elementary schools surveyed at an estimated cost of $10,000. T.D.P. recommended labeled doors for all six elementary schools surveyed, with costs ranging from $27,750 to $54,000.

 Work Project
 Sprinkler System
 School Date Amount
 Booker Associates
 Cupples 1918 $ 0
 Gundlach 1931 0
 Peabody 1957 0
 Roe 1919/1926 0
 Ashland 1910 7,350
 Ashland Branch 1930 0
 Carr Lane 1959 0
 Herzog 1937 7,350
 Jefferson 1960 0
 Walbridge 1922/1978 3,900
Gornet & Shearman
 Carver 1882 0
 Henry 1906 0
 Hodgen 1884 0
 Jackson 1899 0
 Sherman 1899 0
 Sigel 1906 0
 Wyman 1901 0
 Work Project
 Stairwell Enclosures
 School Date Amount
 Campbell Design
 Banneker 1940 $ 0
 Cole 1931/1970 0
 Farragut 1906 30,000
 Garfield 1937 30,000
 Laclede 1915 0
 Lexington 1964 0
 Mark Twain 1912 0
 Mitchell 1964 0
 Mitchell Branch 1957 0
 Scullin 1927/1970 0

*764
 School Date Amount
Manske, Dieckmann and Kostecki
 Adams 1878 0
 Eliot 1898 40,000
 Field 1901 0
 Froebel 1895/1937 30,000
 Mann 1911 50,000
 Meramec 1901 30,000
 Oak Hill 1908 30,000
 Shepard 1905 30,000
T.D.P. St. Louis, Inc.
 Arlington 1899 30,000
 Clark 1907 30,000
 Cote Brilliante 1905 30,000
 Emerson 1902 30,000
 Hempstead 1905 30,000
 Marshall 1900 40,000
 Work Project
 Labeled Doors
 School Date Amount
T.D.P. St. Louis, Inc.
 Arlington 1899 $ 27,750
 Clark 1907 36,000
 Cote Brilliante 1905 37,500
 Emerson 1902 37,500
 Hempstead 1905 50,250
 Marshall 1900 54,000
R. F. Burns
 Dunbar 1912 0
 Hamilton 1918 0
 Lafayette 1907 0
 Shenandoah 1926 10,000

Energy Conservation. The Gornet firm recommended energy conservation work projects in seven elementary schools surveyed averaging $11,800, with a range of $3,908 to $36,207. The R.F. Burns firm recommended energy conservation work projects in all four elementary schools surveyed averaging $108,828, with a range of $57,075 to $145,000.

 Work Project
 Energy Conservation
 School Date Amount
R. F. Burns
 Dunbar 1912 $122,000
 Hamilton 1918 145,000
 Lafayette 1907 111,240
 Shenandoah 1926 57,075
Gornet & Shearman
 Carver 1882 36,207
 Henry 1906 7,525
 Hodgen 1884 3,908
 Jackson 1899 9,387
 Sherman 1899 4,675

*765
 School Date Amount
 Sigel 1906 9,100
 Wyman 1901 6,800

12(c) reconfigurations. The estimated costs of 12(c) reconfigurations for elementary schools average $80,101 with a range of $0 to $395,672. The middle school 12(c) reconfiguration costs average $49,692 with a range of $2,354 for Grant School to a high of $161,450 for Langston School, one of the Board's newer schools constructed in 1964. The 12(c) reconfiguration costs for 16 intracity magnets average $109,642, with a range of $0 for Health Care and Wade to $469,086 for Enright.

Appendix A
 Schools Surveyed by 14 Engineering
 Firms in Zurheide-Herrmann Report
Zurheide-Herrmann, Inc.
Beaumont
Central VPA
Cleveland NJROTC
McKinley
Northwest
Roosevelt
Soldan
Southwest
Sumner
Vashon
Wedemeyer-Cernik-Corrubia, Inc.
Health Care
Math/Science
Blow
Dewey
Fanning
Grant
Long
Mason
Continued Education
Gallaudet
Longfellow
Michael
Clark Branch #1
R. L. Praprotnik & Associates, Inc.
Management Center
Metro
O'Fallon
Hoener Associates, Inc.
Academic/Athletic Academy
Cook
Enright
Ford
Stowe
Ford Branch
Pearce Corp.
Blewett
Columbia
Hickey
Langston
L'Ouverture
Marquette
Mullanphy
Nottingham
Simmons
Webster
Yeatman
Smith
Fleming Corporation
Benton
Fremont
Humboldt
Monroe
Pruitt
Baden
Busch
Clay
Harrison
Irving
Kennard
Riddick
Shaw
Walnut Park
Windsor
Gardenville
R. F. Burns
Madison
Dunbar
Hamilton
Lafayette
Shenandoah
Simmons Branch
Ferris & Hamig, Inc.
Wade
Bryan Hill
Buder
Lowell
Scruggs
Stix
Woodward
Booker Associates, Inc.
Mallinckrodt
Cupples
Gundlach
Peabody
Roe
Wilkinson
*766
Woerner
Ashland
Ashland Branch
Carr Lane
Herzog
Jefferson
Walbridge
Manske, Dieckmann and Kostecki
Adams
Eliot
Field
Froebel
Mann
Meramec
Oak Hill
Shepard
Field Branch
Gornet & Shearman Architects & Engineers
Carver
Henry
Hodgen
Jackson
Sherman
Sigel
Wyman
T.D.P. St. Louis, Inc.
Arlington
Clark
Cote Brilliante
Emerson
Euclid
Hempstead
Lyon
Marshall
Marshall Branch
Campbell Design
Clinton
King
Stevens
Turner
Turner Branch
Washington
Williams
Ames
Banneker
Cole
Curriculum
Emerson Branch
Farragut
Garfield
Laclede
Lexington
Mark Twain
Mitchell Branch
Mitchell
Scullin
Waring
Clark Branch #2
Cook Branch #1
Dunbar Branch
Euclid Branch
Farragut Br. #1
Farragut Branch #2
Hamilton Branch #1
Hamilton Branch #2
Hempstead Branch
Williams Branch #1
Norman Stanley Fott & Assoc.
Carr
Carr Lane Branch
Charless
Clinton Branch
Howard
Howard Branch
Lindenwood
Maddox
Williams Branch #2

ATTACHMENT 5

Construction Projects Proposed for Budgeting
Cost of added facilities. New construction should replace space lost as a result of consolidation of enrollment and closing of obsolete buildings. The method of assigning proposed budgeted costs for these building additions is shown below:
1. Classroom additions to four nonintegrated elementary schools: Carver, Herzog, Lexington, Lowell. Each would be a two-story, masonry, classroom addition at grade entry of 19,448 square feet. This would provide 12 classrooms of 840 square feet each, two 12-foot corridors 1,560 square feet each, four toilets at 560 square feet each, and two stairwells at 1,120 square feet each. Add 10 percent to the total of 17,680 above for service area space (17,680 + 1,768 = 19,448 square feet per addition). At $80 per square foot, each addition would cost $1,555,840.00. The total budgeted cost is $6,223,360.00.
2. As noted previously, 19 nonintegrated, 17 integrated and seven magnet elementary school playrooms are substandard in size and height. Forty-three new elementary gymnasiums shall be constructed on existing sites. Unit prices for construction of elementary gymnasiums found in the Board's report and as proposed by various Z/E firms, varied from a low of $51 per *767 square foot to a high of $80.16 per square foot. A unit cost of $75 per square foot is used in this budget. Thus, a 5,000-square foot gymnasium would cost $375,000.00. Forty-three new gymnasiums at a total cost not to exceed $16,125,000. Present playrooms shall be reconfigured to provide additional regular instructional rooms and small classrooms.
3. Present elementary playrooms to be replaced by proposed gymnasium additions can be reconfigured to free up 37 regular classrooms and eight small rooms (equivalent to 41 regular classrooms) in nonintegrated schools; 24 regular and nine small classrooms (equivalent to 28 regular classrooms) in the integrated elementary schools; and seven regular and four small classrooms (equivalent of nine regular classrooms) in intradistrict magnets. The cost of such reconfigurations is estimated to be $20,000.00 per regular classroom and $10,000.00 for a small room. The total cost to reconfigure all playrooms would be $1,570,000.00. (Zurheide-Herrmann unit costs have been used in setting these estimated costs.)
4. One hundred twelve regular classrooms reserved for special education (see room allocation charts) shall be divided into 224 small classrooms. At $5,000.00 per room, this cost would be $540,000.00.

ATTACHMENT 6

BOARD RECEIPTS, EXPENDITURES 1985-86
July 17, 1986
Members
St. Louis Board of Education
Dear Member:
We enclose the Consolidated Income Report for the period ending June 30, 1986. With the close of the fiscal year, we present an analysis of our income compared with income received for the previous year.

 LOCAL AND COUNTY TAXES
 Source/Type 1984-85 1985-86 Gain/Loss
Current Taxes
 Real Property $36,393,697 $38,005,792 $+1,612,095
 Personal Property 11,462,195 10,509,637 - 952,558
 Surplus Commissions 397,528 430,347 + 32,819
 Merch. & Mfctrs. Inv.[*] 9,472,573 9,076,509 - 396,064
 Railroads & Utilities[**] 1,814,951 2,796,999 + 982,048
 ___________ ___________ ___________
Totals $26,456,274 $26,669,484 $+ 213,210

CONCLUSION
Our gain in local income from real and personal property tax receipts amounts to approximately 2.1%. This minimum gain is insufficient to keep pace with the cost of goods and services being provided by the school district. Although our local receipts did show a minimum increase, the school district must, by necessity, seek a new local source of revenue.
The passage of a $3.75 tax levy was accomplished in June. This levy will support our operations in 1986-87. Any increase in the tax levy above $3.75 will require a super majority vote from the voters of St. Louis.

 SELECTED OTHER LOCAL INCOME
 Source/Type 1984-85 1985-86 Gain/Loss
 School District Trust Fund $21,721,435 $21,813,942 $+ 92,507
 Delinquent Real and
 Personal Property Tax 2,292,621 3,076,851 + 784,230
 Earnings on Investments 2,118,375 1,593,577 - 524,798
 Reim/Various Funds 323,843 185,114 - 138,729
 ___________ ___________ ___________
 Totals $26,456,274 $26,669,484 $+ 213,210

*768
 SELECTED STATE INCOME RECEIPTS
 Source/Type 1984-85 1985-86 Gain/Loss 
Minimum Guarantee $56,785,010 $64,946,502 $+8,161,492
Exceptional Children 6,447,637 7,494,271 +1,046,634
Pupil Transportation 4,784,135 4,660,685 - 123,450
Fiscal Incentive 1,817,054 948,503 - 868,551
Textbook Aid 2,938,288 2,952,130 + 13,842
Vocational Education 1,472,131 86,423 -1,385,708
Other State Income -0- 1,694,099 +1,694,099
 ___________ __________ ___________
Totals $74,244,255 $82,782,613 $+ 8,538,358

CONCLUSION
Minimum Guarantee  Increases in the State Aid Formula and the inclusion of Home District Fiscal Incentives were responsible for the significant increases shown.
Exceptional Children Aid  The allocation of unit costs and increases in our program provided the additional revenue received in 1985-86.
Fiscal Incentives  In 1984-85, we received a double payment that included monies due the district from 1983-84.
Vocational Education  Policy changes in the administration of vocational education monies provided a double payment in 1984-85.
Other State Income  The $1,694,099 represents a Court Order requiring the State of Missouri to pay legal fees associated with our desegregation case.
Very truly yours,
/s/ Sam Lawson
SAM LAWSON
Treasurer
SL/pp
Enclosures
cc: Jerome B. Jones
 John P. Archetko
 Norman Walsh
 William Pearson
 Louis Ratz
 Doris D. Eldridge
 James Lydon
 Walter Wallace
 Cozy Marks

 CONSOLIDATED INCOME REPORT
 JULY 1, 1985 THROUGH JUNE 30, 1986
 ESTIMATED REVISED TOTAL % OF INCOME % OF
 INCOME ESTIMATE INCOME INCOME RECEIVED INCOME
 SOURCE JULY 1, 1985 JUNE 4, 1986 JUNE 30, 1986 RECEIVED JUNE 30, 1985 RECEIVED
LOCAL INCOME
 Current Taxes
 Real Property $ 38,500,000 $ 37,419,262 $ 38,005,792 101.5 $ 36,393,697 99.7
 Personal Property 11,100,000 10,424,312 10,509,637 100.8 11,462,195 99.2
 Surplus Commissions 90,000 269,185 269,185 100.0 101,827 100.0
 Financial Institutions 220,000 430,347 430,347 100.0 397,528 100.0
 Merchants & Mfctrs. -0- 2,025,000 2,028,913 100.0 9,472,573 100.0
 School District Trust Fund 22,000,000 22,000,000 21,813,942 99.2 21,721,435 102.0
 Other Local Income 8,500,000 7,047,596 7,047,596 100.0 -0- -0-
 Interest on Taxes
 Financial Institutions 15,000 26,244 26,244 100.0 29,207 100.0
 Protested Taxes 200,000 396,768 396,768 100.0 369,022 100.0
 Delinquent Taxes
 Real Property 2,000,000 3,257,504 2,670,975 82.0 1,896,582 96.4
 Personal Property 300,000 491,201 405,876 82.6 396,039 98.0
 Merchants & Mfctrs. -0- 175,000 173,854 99.3 -0- -0-

*769
 ESTIMATED REVISED TOTAL % OF INCOME % OF
 INCOME ESTIMATE INCOME INCOME RECEIVED INCOME
 SOURCE JULY 1, 1985 JUNE 4, 1986 JUNE 30, 1986 RECEIVED JUNE 30, 1985 RECEIVED
LOCAL INCOME
 Other Local Income
 Earnings on Investments $ 1,400,000 $ 1,700,000 $ 1,593,577 93.7 $ 2,118,375 97.4
 Rentals 14,000 18,000 17,765 100.0 21,899 115.2
 Sale of Property 8,000 62,085 63,359 102.1 5,096 63.7
 Reim/Various Funds 325,000 125,000 185,114 148.1 323,843 88.5
 Sundries 250,000 285,000 319,706 112.2 308,854 103.0
 Tuition -0- -0- 5,240 -0- -0- -0-
 LRA Tax Suit Sale -0- 264,740 264,740 -0- -0- -0-
 Repayment of Loan -0- -0- -0- -0- 660,864 100.0
 ____________ ____________ _____________ ________ _____________ ________
TOTAL LOCAL INCOME $ 84,922,000 $ 86,417,243 $ 86,228,630 99.8 $ 85,679,036 100.0
 ____________ ____________ _____________ ________ _____________ ________
COUNTY INCOME
 Fees, Fines & Forfeitures $ 120,000 $ 110,000 $ 108,316 98.5 $ 112,976 94.1
 Railroad & Utilities 2,747,793 2,046,448 2,046,448 100.0 1,814,951 100.0
 Surcharge Taxes -0- 750,551 750,551 100.0 -0- -0-
 County Stock Insurance 73,000 64,900 64,900 100.0 74,359 100.0
 ____________ ____________ _____________ ________ _____________ ________
TOTAL COUNTY INCOME $ 2,940,793 $ 2,971,899 $ 2,970,215 99.9 $ 2,002,286 99.7
STATE INCOME
 Minimum Guarantee $ 63,107,000 $ 64,907,547 $ 64,946,502 100.1 $ 56,785,010 99.8
 Fair Share Fund 1,700,000 1,640,000 1,645,201 100.3 1,772,634 100.0
 Exceptional Children 6,500,000 7,304,434 7,494,271 102.6 6,447,637 99.3
 Handicapped Census 8,000 9,166 9,166 100.0 8,882 100.0
 Pupil Transportation 4,075,000 4,665,747 4,660,685 99.9 4,784,135 99.9
 Fiscal Incentives -0- 856,940 948,503 110.7 1,817,054 96.7
 Foreign Ins. Tax 2,850,000 2,952,130 2,952,130 100.0 2,938,288 100.0
 Vocational Education 740,000 86,423 86,423 100.0 1,472,131 192.4
 Other State Income -0- 1,689,099 1,694,099 100.3 -0- -0-
 ____________ ____________ _____________ ________ _____________ ________
TOTAL STATE INCOME $ 78,980,000 $ 84,111,486 $ 84,436,980 100.4 $ 76,025,771 100.6
 ____________ ____________ _____________ ________ _____________ ________
FEDERAL INCOME
 Public Law 874 $ 20,000 $ 52,831 $ 52,831 100.0 $ 29,291 36.6
 Vocational Education 400,000 67,938 23,868 35.2 576,191 62.5
 ____________ ____________ _____________ ________ _____________ ________
TOTAL FEDERAL INCOME $ 420,000 $ 120,769 $ 76,699 63.6 $ 605,482 60.5
 ____________ ____________ _____________ ________ _____________ ________
OTHER INCOME
 Transfers & Reassignments $ 25,000 $ 379,205 $ 379,205 100.0 $ 510,799 100.0
 ____________ ____________ _____________ ________ _____________ ________
TOTAL OTHER INCOME $ 25,000 $ 379,205 $ 379,205 100.0 $ 510,799 100.0
 ____________ ____________ _____________ ________ _____________ ________
GRAND TOTAL $167,287,793 $174,000,602 $174,091,729 100.1 $164,823,374 100.0
 ============ ============ ============= ======== ============= ========

*770
 SUMMARY OF RECEIPTS AND EXPENDITURES
 JULY 1, 1985 THROUGH JUNE 30, 1986
 RECEIPTS EXPENDITURES
 TOTAL
 YR. TO DATE AVAILABLE AVAILABLE YR. TO DATE CASH BALANCE
FUND DESCRIPTION JUNE 6/30/86 BALANCE 6/30/86 JUNE 6/30/86 6/30/86 
 FOUNDATIONS, CONTRIBUTIONS
 AND INCIDENTALS
64-356 Metro Des. Stl. Plan-Mini Contr. $ -0- $ -0- $ (312) $ (312) $ -0- $ -0- $ (312)
64-446 IntraCity Des.-Mini Contr. 83/84 -0- -0- 16,115 16,115 -0- 16,115 -0-
65-446 IntraCity Des.-Mini Contr. 84/85 -0- 58,516 47,241 105,757 -0- 105,757 -0-
66-446 IntraCity Des.-Mini Contr. 85/86 -0- 63,713 18,039 81,752 26,823 110,123 (28,371)
65-566 Voc. Educ. Des. Mini Contr. 84/85 -0- -0- 5,764 5,764 -0- 5,764 -0-
66-566 Voc. Educ. Des. Mini Contr. 85/86 -0- 52,557 -0- 52,557 6,751 84,751 (32,194)
64-736 Foundations, Contr. & Incid. 83/84 13,228 351,403 2,815,640 3,167,043 128,610 2,838,456 328,587
65-736 Foundations, Contr. & Incid. 84/85 2,066 138,270 132,246 270,516 11,098 246,504 24,012
66-736 Foundations, Contr. & Incid. 85/86 83,815 847,877 103,785 951,662 113,521 726,078 225,584
64-746 School Site Subsidy 987 4,469 32,813 37,282 1,047 12,768 24,514
 ___________ _____________ ____________ ____________ ___________ ____________ ____________
 TOTALS $ 100.096 $ 1,516,805 $ 3,171,331 $ 4,688,136 $ 287,850 $ 4,146,316 $ 541,820
 ___________ _____________ ____________ ____________ ___________ ____________ ____________
 FEDERAL PROGRAMS
65-236 Chapter I, ECIA, 84/85 $ -0- $ 486,702 $ (399,188) $ 87,514 $ -0- $ 87,514 $ -0-
66-236 Chapter I, ECIA, 85/86 15,305 8,737,888 -0- 8,737,888 631,223 8,838,899 (101,011)
65-256 Pl. 89-750 Adult Basic Educ. -0- 116,472 (53,786) 62,686 -0- 62,686 -0-
66-256 Pl. 89-750 Adult Basic Educ. -0- 422,175 1,673 423,848 34,651 440,938 (17,090)
65-266 Community Dev. Agency -0- 652,268 19,650 671,918 -0- 671,918 -0-
66-266 Community Dev. Agency 171,094 891,042 -0- 891,042 139,803 833,810 57,232
65-276 Pl. 94-142 Spec. Educ. 84/85 -0- 82,040 324,565 406,605 13 406,605 -0-
66-276 Pl. 94-142 Spec. Educ. 85/86 3,028 1,267,812 6,094 1,273,906 73,311 1,273,031 875
64-296 Mini Federal 83/84 49,141 62,140 43,616 105,756 37,216 74,375 31,381
65-296 Mini Federal 84/85 -0- 100,337 572,931 673,268 7,789 663,978 9,290
66-296 Mini Federal 85/86 23,003 299,374 -0- 299,374 100,142 324,618 (25,244)
66-586 Magnet Schls. Ass't IntraCity 85/86 1,200,002 3,410,325 -0- 3,410,325 899,509 3,266,417 143,908
65-596 IntraCity Des. Plan Chpt. II 84/85 -0- 322,729 (22,729) 300,000 -0- 300,000 -0-
66-596 IntraCity Des. Plan Chpt. II 85/86 17 190,816 -0- 190,816 46,243 417,357 (226,541)
65-626 Chapter II 84/85 -0- -0- 47,168 47,168 -0- 47,168 -0-
66-626 Chapter II 85/86 21,621 308,001 -0- 308,001 62,215 430,890 (122,889)
 ___________ _____________ ____________ ____________ ___________ ____________ ____________
 TOTALS $ 1,483,211 $ 17,350,121 $ 539,994 $ 17,890,115 $ 2,032,115 $ 18,140,204 $ (250,089)
 ___________ _____________ ____________ ____________ ___________ ____________ ____________

*771
 SUMMARY OF RECEIPTS AND EXPENDITURES
 JULY 1, 1985 THROUGH JUNE 30, 1986
 RECEIPTS EXPENDITURES
 TOTAL
 YR. TO DATE AVAILABLE AVAILABLE YR. TO DATE CASH BALANCE
FUND DESCRIPTION JUNE 6/30/86 BALANCE 6/30/86 JUNE 6/30/86 6/30/86 
 GENERAL FUND
66-116 Incidental $ 3,747,377 $ 77,483,880 $ 9,691,458 $ 87,175,338 $ 3,602,117 $ 80,538,024 $ 6,637,314
66-126 Teachers 6,459,512 91,193,696 3,592,051 94,785,747 6,012,610 93,903,092 882,655
66-136 Building 1,436 88,521 334,654 423,175 1,462 141,423 281,752
66-156 Free Textbook -0- 2,972,989 88,083 3,061,072 34,355 3,061,072 -0-
66-246 Adult Education 7,282 1,479,018 1,016,781 2,495,799 181,806 2,466,428 29,371
66-286 HB 474 Reimbursements 200,000 2,352,644 137,528 2,490,172 222,980 2,445,806 44,366
64-346 Metro Deseg. Stlment Plan 83/84 -0- -0- 27,874 27,874 -0- 27,874 -0-
65-346 Metro Deseg. Stlment Plan 84/85 -0- 1,063,850 6,389,329 7,453,179 1,554 7,438,252 14,927
66-346 Metro Deseg. Stlment Plan 85/86 3,838,691 24,350,073 365,735 24,715,808 1,828,992 20,944,307 3,771,501
64-536 Metro Deseg. Stlment Plan 83/84 -0- 196,956 (191,975) 4,981 -0- 4,981 -0-
65-536 Metro Deseg. Stlment Plan 84/85 -0- 167,182 1,238,588 1,405,770 69 1,405,482 288
66-556 Metro Deseg. Stlment Plan 85/86 1,310,101 10,005,349 45,842 10,051,191 894,469 9,268,632 782,559
64-556 Voc. Educ. Deseg. Stlment Plan 83/84 -0- -0- 1,851 1,851 -0- 1,851 -0-
65-556 Voc. Educ. Deseg. Stlment Plan 84/85 579 13,056 211,691 224,747 -0- 102,700 122,047
66-556 Voc. Educ. Deseg. Stlment Plan 85/86 262,896 807,794 -0- 807,794 62,532 600,344 207,450
63-576 IntraCity Deseg. Plan 82/83 -0- -0- 42,655 42,655 -0- 42,655 -0-
64-576 IntraCity Deseg. Plan 83/84 -0- 405 769 1,174 -0- 1,174 -0-
65-576 IntraCity Deseg. Plan 84/85 -0- 208,726 3,012,170 3,220,896 40 3,055,362 165,534
66-576 IntraCity Deseg. Plan 85/86 2,498,797 16,197,961 3,671,187 19,869,148 1,201,438 17,408,775 2,460,373
 ___________ _____________ ____________ ____________ ___________ ____________ ____________
 TOTALS $18,326,671 $ 228,582,100 $ 29,676,271 $258,258,371 $14,044,424 $242,858,234 $ 15,400,137
66-616 SCHOOL BOND DEBT REVENUE FUND -0- -0- 25,000 25,000 -0- 25,000 -0-
66-166 ESCROW FUND 1,870,260 22,610,258 2,562,258 25,172,516 2,207,865 22,354,230 2,818,286
66-516 SCHOOL LUNCHROOM FUND 1,179,074 13,074,266 2,097,362 15,171,628 1,047,879 12,238,156 2,933,472
 FOUNDATION, CONTRS. & INC. 100,096 1,516,805 3,171,331 4,688,136 287,850 4,146,316 541,820
 FEDERAL PROGRAMS 1,483,211 17,350,121 539,994 17,890,115 2,032,115 18,140,204 (250,089)
 ___________ _____________ ____________ ____________ ___________ ____________ ____________
 GRAND TOTAL $22,959,312 $ 283,133,550 $ 38,072,216 $321,205,766 $19,620,133 $299,762,140 $ 21,443,626
 =========== ============= ============ ============ =========== ============ ============

*772
 ATTACHMENT 7
 Table XII
 Local Tax Rates, by Fund, 1985-86
 Fund 
 Debt
 Incidental Teachers Service Building Total
 Affton $0.85 $1.38 $0.46 $0.10 $2.79
 Bayless 0.65 1.08 0.00 0.00 1.73
 Brentwood 0.76 1.41 0.06 0.15 2.38
 Clayton 0.89 1.17 0.04 0.30 2.40
 Ferguson-Florissant 1.28 1.71 0.64 0.13 3.76
 Hancock Place 0.80 0.79 0.41 0.03 2.03
 Hazelwood 1.00 1.53 0.50 0.08 3.11
 Jennings 1.39 1.86 0.41 0.00 3.66
 Kirkwood 0.85 1.51 0.00 0.23 2.59
 Ladue 0.63 1.25 0.43 0.04 1.96
 Lindbergh 0.46 1.44 0.12 0.12 2.14
 Maplewood 0.88 1.38 0.42 0.00 2.68
 Mehlville 0.62 1.34 0.67 0.14 2.77
 Normandy 0.64 1.76 0.39 0.07 2.86
 Parkway 0.99 1.80 0.24 0.39 3.42
 Pattonville 0.70 1.40 0.25 0.13 2.48
 Ritenour 1.13 1.16 0.07 0.00 2.36
 Riverview 0.85 1.51 0.54 0.00 2.90
 Rockwood 1.06 1.43 0.75 0.09 3.33
 University City 1.06 1.67 0.00 0.29 3.02
 Valley Park 1.41 1.31 0.00 0.00 2.72
 Webster Groves 0.77 1.78 0.34 0.25 3.14
 Wellston 2.68 0.20 1.25 0.00 4.13
 _____ _____ _____ _____ _____
 $0.97 $1.39 $0.34 $0.10 $2.80
 Special 0.19 0.15 0.00 0.00 0.34
 _____ _____ _____ _____ _____
 County Average $1.16 $1.54 $0.34 $0.10 $3.14
 St. Louis $2.15 $1.01 $0.00 $0.00 $3.16
 Table XIII
 Current Revenues, Per Pupil, 1985-86
 Total
 Local Tax Current
 Eligible Revenue Revenue
 District Pupils per EP per EP
 Affton 1,981 $2,504 $ 4,297
 Bayless 1,284 968 2,786
 Brentwood 781 2,966 5,220
 Clayton 1,640 4,664 7,084
 Ferguson-Florissant 10,672 1,968 4,773
 Hancock Place 1,486 713 2,527
 Hazelwood 15,513 1,593 3,107
 Jennings 2,298 1,367 2,765
 Kirkwood 4,288 2,238 3,711
 Ladue 2,968 3,278 4,988
 Lindbergh 4,764 1,911 3,762
 Maplewood 1,364 1,920 3,271
 Mehlville 9,133 1,516 2,851
 Normandy 6,187 797 2,871
 Parkway 20,447 2,329 3,671
 Pattonville 6,147 2,044 3,812
 Ritenour 6,440 1,013 3,169

*773
 Total
 Local Tax Current
 Eligible Revenue Revenue
 District Pupils per EP per EP
 Riverview Gardens 4,370 $1,186 $ 2,970
 Rockwood 10,771 1,753 3,036
 University City 4,763 1,384 3,509
 Valley Park 676 1,646 4,090
 Webster Groves 3,530 2,118 3,581
 Wellston 1,025 650 2,955
 Special District 4,815 5,618 12,536
 _______ ______ _______
 County 127,343 $1,960 $ 3,880
 St. Louis 49,151 $1,243 $ 4,589
 Table XIV
 Desegregation Receipts Converted to Local Property Tax Rate, 1985-86
 Desegregation One-Cent Yield Equivalent
 District Receipts on Tax Rate Tax Rate
 Affton $ 899,535 $ 17,781 $0.5059
 Bayless 286,347 7,182 0.3987
 Brentwood 619,431 9,731 0.6366
 Clayton 1,164,327 31,871 0.3653
 Ferguson-Florissant 0 55,864 0.0000
 Hancock Place 269,029 4,512 0.5963
 Hazelwood 426,191 79,464 0.0536
 Jennings 0 8,585 0.0000
 Kirkwood 1,013,156 37,053 0.2734
 Ladue 820,638 49,642 0.1653
 Lindbergh 1,350,394 42,533 0.3175
 Maplewood 0 9,737 0.0000
 Mehlville 1,174,664 49,978 0.2350
 Normandy 0 17,246 0.0000
 Parkway 5,379,744 139,223 0.3864
 Pattonville 2,027,317 50,664 0.4001
 Ritenour 1,188,281 27,637 0.4300
 Riverview Gardens 0 17,874 0.0000
 Rockwood 1,851,342 56,707 0.3265
 University City 0 21,827 0.0000
 Valley Park 478,164 4,091 1.1688
 Webster Groves 653,031 23,811 0.2743
 Wellston 0 1,614 0.0000
 ___________ ________ _______
 $19,601,591 $ 33,240 $0.2800
 Special District 176,362 795,656 0.0020
 ___________ ________ _______
 County $19,777,953 $828,896 $0.2820
 St. Louis $32,841,492 $193,391 $1.7000
 Table XV
 Current Expenditures per Pupil, 1985-86
 Current
 Eligible Current Expenditures
 District Pupils Expenditures per EP
 Affton 1,981 $ 7,985,292 $ 4,031
 Bayless 1,284 3,807,977 2,966
 Brentwood 781 4,079,471 5,223
 Clayton 1,640 11,484,264 7,002
 Ferguson-Florissant 10,672 39,832,426 3,732
 Hancock Place 1,486 3,700,404 2,490

*774
 Current
 Eligible Current Expenditures
 District Pupils Expenditures per EP
 Hazelwood 15,513 $ 49,569,276 $ 3,195
 Jennings 2,298 5,611,377 2,442
 Kirkwood 4,288 15,910,715 3,710
 Ladue 2,968 15,277,887 5,148
 Lindbergh 4,764 16,863,801 3,540
 Maplewood 1,364 5,590,715 4,099
 Mehlville 9,133 27,230,058 2,981
 Normandy 6,187 17,880,291 2,890
 Parkway 20,447 71,041,004 3,474
 Pattonville 6,147 24,542,353 3,992
 Ritenour 6,440 21,512,504 3,340
 Riverview Gardens 4,370 12,496,506 2,860
 Rockwood 10,771 30,900,812 2,869
 University City 4,763 17,124,085 3,595
 Valley Park 676 2,771,009 4,099
 Webster Groves 3,530 13,300,413 3,768
 Wellston 1,025 3,601,893 3,514
 Special District 4,815 55,711,761 11,571
 _______ ____________ _______
 County 127,343 $477,826,294 $ 3,752
 St. Louis 49,151 $210,737,649 $ 4,288
 Table XVI
 Current Expenditures, Instruction
 Support Services, 1985-86
 Instruction Support Services
 District Amount Per EP Amount Per EP
 Affton $ 4,906,525 $2,477 $ 3,078,767 $1,554
 Bayless 2,515,619 1,959 1,292,358 1,007
 Brentwood 2,520,497 3,227 1,558,974 1,996
 Clayton 6,324,273 3,856 5,159,991 3,146
 Ferguson-Florissant 25,802,440 2,418 14,029,986 1,314
 Hancock Place 2,602,421 1,751 1,097,983 739
 Hazelwood 30,280,676 1,952 19,288,600 1,243
 Jennings 3,398,090 1,479 2,213,287 963
 Kirkwood 9,597,209 2,238 6,313,506 1,472
 Ladue 8,903,426 3,000 6,374,461 2,148
 Lindbergh 10,841,672 2,276 6,022,129 1,264
 Maplewood 3,397,135 2,491 2,193,580 1,608
 Mehlville 17,024,955 1,864 10,205,103 1,117
 Normandy 11,692,024 1,890 6,188,267 1,000
 Parkway 44,207,392 2,162 26,833,612 1,312
 Pattonville 14,497,369 2,358 10,044,984 1,634
 Ritenour 13,349,490 2,072 8,163,014 1,268
 Riverview Gardens 8,035,823 1,839 4,460,683 1,021
 Rockwood 19,512,496 1,812 11,388,316 1,057
 University City 10,774,466 2,262 6,349,619 1,333
 Valley Park 1,670,622 2,471 1,100,387 1,628
 Webster Groves 8,410,745 2,383 4,889,668 1,385
 Wellston 2,068,916 2,018 1,532,977 1,496
 Special District 35,240,049 7,319 20,471,712 4,252
 ____________ ______ ____________ ______
 County $297,574,330 $2,337 $180,251,964 $1,415
 St. Louis $120,691,190 $2,456 $ 90,046,459 $1,832

*775
 Table XVII
 Dollar Value of Difference between County and City
 Current Support Service Expenditures, 1985-86
 County St. Louis Dollar Value of
 Support Service Category Expenditure/EP Expenditure/EP Difference per EP
Attendance $ 11 $ 30 $ 933,869
Guidance 109 109 0
Health, Psychology, Speech
 and Audio 56 78 1,081,322
Improvement of Instruction 63 93 1,474,530
Media Services (Library) 69 108 1,916,889
Board of Education Expense 21 35 688,114
Executive Administration 91 111 983,020
Building Level Administration 248 304 2,752,456
Operation of Plant 528 613 4,177,835
Pupil Transportation 134 203 3,391,419
Food Service (4) (24) (983,020)
Business/Central Service 89 172 4,079,533
 ______ ______ ___________
Totals $1,415 $1,832 $20,495,967
 Table XVIII
 Current County Cost per Pupil Applied to City Board EP
 Current
 District Cost/EP[*] St. Louis EP Cost Difference
St. Louis $4,288 $49,151 $210,737,649 $ 0
Clayton 7,439 49,151 365,634,287 (154,905,638)
Brentwood 5,660 49,151 278,194,660 (67,457,029)
Ladue 5,585 49,151 274,508,327 (63,770,678)
Maplewood 4,536 49,151 222,948,927 (12,211,278)
Valley Park 4,536 49,151 222,948,927 (12,211,278)
Affton 4,468 49,151 219,606,660 (8,869,011)
Pattonville 4,429 49,151 217,689,770 (6,952,121)
Webster Groves 4,205 49,151 206,679,950 4,057,699
Ferguson-Florissant 4,169 49,151 204,910,510 5,827,139
Kirkwood 4,147 49,151 203,829,190 6,908,459
University City 4,032 49,151 198,176,830 12,560,819
Lindbergh 3,977 49,151 195,473,520 15,264,129
Wellston 3,951 49,151 194,195,600 16,542,049
Parkway 3,911 49,151 192,229,560 18,508,089
Ritenour 3,767 49,151 185,151,810 25,585,839
Hazelwood 3,632 49,151 178,516,430 32,221,219
Mehlville 3,418 49,151 167,998,110 42,739,539
Bayless 3,403 49,151 167,260,850 43,476,799
Normandy 3,327 49,151 163,525,370 47,212,279
Rockwood 3,306 49,151 162,493,200 48,244,409
Riverview Gardens 3,297 49,151 162,050,840 48,686,809
Hancock Place 2,927 49,151 143,864,970 66,872,679
Jennings 2,879 49,151 141,505,720 69,231,929

 Table XIX
 Debt Service Expenditures, 1985-86
 Debt Service
 District Expenditures Amount per EP
Affton $ 432,314 $218
Bayless 0 0
Brentwood 166,465 213
Clayton 344,065 210
Ferguson-Florissant 3,223,840 302
Hancock Place 125,726 85

*776
 Debt Service
 District Expenditures Amount per EP
Hazelwood $ 3,687,437 $238
Jennings 333,795 145
Kirkwood 0 0
Ladue 535,574 180
Lindbergh 505,845 106
Maplewood 249,894 183
Mehlville 2,727,084 299
Normandy 709,558 115
Parkway 4,062,732 199
Pattonville 1,620,432 264
Ritenour 348,221 54
Riverview Gardens 857,156 196
Rockwood 4,241,349 394
University City 0 0
Valley Park 49,245 73
Webster Groves 1,009,761 286
Wellston 263,577 257
Special District 0 0
 ___________ ____
County $25,494,070 $200
St. Louis $ 331,076 $ 7
 Table XX  Gross Expenditures, 1985-86
 Four Largest
 County Districts St. Louis
 Dollar Value of
 Classification Amount Per EP Amount Per EP Difference/EP
 Instructional Services
 Special Education $ 15,071,983 $ 263 $ 16,943,236 $ 345 $ 4,030,382
 Vocational Instruction 4,542,079 79 8,596,289 175 4,718,496
 Student Activities 3,990,642 69 2,332,678 47 (1,081,322)
 Culturally Different 927,176 16 8,999,768 183 8,208,217
 Elementary, Middle and High
 School Instruction 117,080,617 2,040 87,272,014 1,776 (12,975,864)
 Payments to Other Districts 370,823 6 536,359 11 245,755
 ____________ ______ ____________ _______ ____________
 Subtotal Instruction $141,983,320 2,473 $124,680,344 $ 2,537 $ 3,145,664
 ____________ ______ ____________ _______ ____________
 Support Services
 Attendance $ 832,001 $ 14 $ 1,466,534 $ 30 $ 786,416
 Guidance 6,026,537 105 5,500,904 112 344,057
 Health, Psychology, Speech/Audio 3,006,708 52 3,886,392 79 1,327,077
 Improvement of Instruction 3,291,870 57 4,597,579 94 1,818,587
 Media Services (Library) 4,107,765 72 5,604,445 114 2,064,342
 Board of Education 869,934 15 1,739,042 35 983,020
 Executive Administration 4,360,756 76 5,490,624 112 1,769,436
 Building Level Administration 14,565,379 254 15,016,089 305 2,506,701
 Operation of Plant 31,178,933 543 31,071,270 632 4,374,439
 Pupil Transportation 8,644,000 151 10,024,440 204 2,605,003
 Food Services 7,379,169 129 12,368,544 252 6,045,573
 Business/Central Services 6,966,662 121 8,890,379 181 2,949,060
 ____________ ______ ____________ _______ ___________
 Subtotal Support $ 91,229,714 $1,589 $105,656,242 $ 2,150 $27,573,711
 ____________ ______ ____________ _______ ___________
 Facility Acquisition and Construction $ 6,302,545 $ 110 $ 0 $ 0 $ (5,406,610)
 Debt Service
 Principal 9,140,000 159 0 0 (7,815,009)
 Interest 6,801,150 118 331,076 7 (5,455,761)
 Adult Basic Education 332,366 6 597,033 12 294,906
 Adult Continuing Education 1,312,753 23 3,762,924 76 2,605,003
 Community Services 490,084 9 3,482,730 71 3,047,362
 ____________ ______ ____________ _______ ____________
 Subtotal $ 24,378,898 $ 425 $ 8,173,763 $ 166 $(12,730,109)
 ____________ ______ ____________ _______ ____________
 Grand Total Expenditures $257,591,932 $4,487 $238,510,349 $ 4,853 $ 17,989,266

NOTES
[*] "It was the best of times, it was the worst of times, it was the age of wisdom, it was the age of foolishness, it was the epoch of belief, it was the epoch of incredulity. It was the season of Light, it was the season of Darkness. It was the spring of hope, it was the winter of despair. We had everything before us, we had nothing before us. We were all going direct to Heaven, we were all going direct the other wayin short, the period was so far like the present period that some of its noisiest authorities insisted on its being received, for good or for evil in the superlative degree of comparison only." A Tale of Two Cities, Page 1, Charles Dickens.
[1] "Thirty-four of the non-integrated black schools and 21 of the integrated schools are over 50 years old. Nearly one-fourth of the building area in the city schools is over 75 years old. Nearly one-half of the building area in the city schools is over 65 years old. More than two-thirds of the building area in the city schools is over 50 years old."
[2] "In the last 24 years, St. Louis voters have defeated 13 proposed bond issues. The only bond issue to pass during this period was in 1962 and approval came only after resubmission to the voters. Significantly, both of the last two bond issues were approved by a simply majority; the constitutional requirement of two-thirds voter approval, however, blocked passage of these issues."
[3] Judge Meredith handled the case from its inception until 1980 when the case was assigned to Judge Hungate who handled it until January 31, 1985.
[4] The most recent Liddell decision by the Eighth Circuit (filed July 7, 1987 and hereinafter referred to as Liddell XII, 823 F.2d 1252) directs the City Board to "carefully consider closing the smaller, poorly maintained and poorly located nonintegrated elementary and middle schools and consolidating the students in either new or existing buildings that are well located and designed specifically to meet a pupil/teacher ratio of twenty to one, the goal being to achieve significant operating savings while providing the students with suitable facilities."
[5] All of Dr. Brown and Dr. Moody's statistical data related to the cohort survival method is contained in Attachment 1: Tables I-VII.
[6] Dr. Brown's calculations include an estimate of approximately 18,000 city students enrolled in non-integrated schools and approximately 12,000 magnet students. The recent Liddell XII decision speaks of 15,000 non-integrated students and 14,000 magnet students. A shift of 2,000 students minimizes the conflict between Dr. Brown's figures and Liddell XII. The Court believes that the remaining 1,000 students in non-integrated schools will in all probability be a lesser number. Despite the apparent discrepancy, the Court has determined that the effect of Liddell XII on Dr. Brown's enrollment projection is minimal and that the number of needed facilities remains constant.
[7] Although most school of emphasis programs already implemented do not utilize a separate classroom, and its concept does not really require the allocation of separate facilities, the Court has decided to allocate such space to encourage the implementation of this 12(c) program. In the event a particular school of emphasis program does not require a separate classroom, the classroom is available for other use.
[8] Details of Dr. Brown's capacity analysis are contained in Attachment 2.
[9] The Court will allow planning based upon pupil/teacher ratios in the integrated elementary, middle and all high schools, even though such pupil/teacher ratios are below AAA standards as required in Liddell VII and IX. Liddell XII, while acknowledging that these pupil/teacher ratios are lower-court mandated, does not require any action to change them; however, it directs that these pupil/teacher ratios shall no longer be reduced (at least not until a pupil/teacher ratio of 20/1 is met in the nonintegrated elementary and middle schools). This Court concurs and advises parties that facilities planning will not account for pupil/teacher ratios lower than 26/1 in the integrated elementary and middle schools and 28/1 in the regular high schools.
[10] Details are provided in Attachment 3.
[11] The details of this cost analysis are provided in Attachment 4. Attachment 5 provides the details of the cost for additional classrooms and gymnasiums.
[12] A capital improvements program for the 12(c) magnets will be developed separately pursuant to Liddell VIII.
[13] 1985-86 City Board fiscal data and expenditure patterns of the City Board and the county school districts are outlined in Attachments 6 and 7.
[14] The basis for this ruling shall be discussed later in this opinion.
[*] Estimated
[*] Estimated
[*] Estimated
[*] Estimated
[*] Includes 10 Home Economics and 10 Industrial Arts rooms
[**] Includes 14 Home Economics and 14 Industrial Arts rooms
[*] Rooms contributing to building capacity
[**] Divided to provide 40 small classrooms
[*] Rooms contributing to building capacity
[**] Divided to provide 34 small classrooms
[*] Divided to provide 104 small classrooms
[*] Reported as two buildings in L(852)86, pages 61-62
[**] Divided to provide 112 small classrooms
[*] Includes M & M Receipts and Surcharge Tax Receipts
[**] State Assessed
[*] $437 added to each county district as prorata share of Special District costs.